# EXHIBIT 2

CARLSMITH BALL LLP

JOHN P. MANAUT 3989
STEVEN M. EGESDAL 4451
KAI WANG 7319
1001 Bishop Street, Suite 2100
Honolulu, Hawaii 96813
Telephone No. (808) 523-2573
JPM@carlsmith.com
segesdal@carlsmith.com
kwang@carlsmith.com

Attorneys for Defendant/Counterclaimant
DAN DAN ZHANG AKA DANDAN ZHANG

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
30-AUG-2024
04:24 PM
Dkt. 507 MSJ

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff/Counterclaim Defendant<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants/Counterclaimant | CIVIL NO. 1CCV-22-0000964 (DEO)<br><br>DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG'S **MOTION FOR SUMMARY JUDGMENT**; MEMORANDUM IN SUPPORT; DECLARATION OF DAN DAN ZHANG; DECLARATION OF COUNSEL; EXHIBITS 1-13; NOTICE OF HEARING MOTION; CERTIFICATE OF SERVICE<br><br>**In Person Hearing**<br>Date: September 23, 2024<br>Time: 8:30 a.m.<br><br>Trial Date: **October 21, 2024**<br>Trial Judge: Honorable Dean E. Ochiai |

## DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG'S MOTION FOR SUMMARY JUDGMENT

Defendant DAN DAN ZHANG AKA DANDAN ZHANG ("**Defendant**") respectfully moves this Court for summary judgment on all claims asserted in Plaintiff Di Wu's

(““**Plaintiff**”“) Second Amended Complaint filed July 21, 2023 [Dkt. 236] (“SAC”) and Defendant’s First Amended Counterclaim filed April 12, 2024 [Dkt. 394] (“FAC”).

There are no credible or genuinely disputed issues of fact to support the 14 Counts in Plaintiff’s SAC based on: 1) the indisputable evidence that the Lease and Joint Investment Agreement (“JIA”) attached to the SAC are forgeries; 2) the unrebutted affirmative expert reports that conclusively demonstrate the Lease and JIA are forgeries; 3) Plaintiff’s Haw. R. Civ. P. 36 deemed admissions against interest, including that the Lease and JIA are forgeries; 4) Plaintiff’s intentional spoliation of evidence of electronic messaging information that provides for a judicial inference that the Lease and JIA are forgeries; and 5) Plaintiff’s inability to prove certain claims as a matter of law.

Conversely, these same indisputable facts both corroborate and support the 4 Counts asserted by Defendant Zhang in her affirmative FAC claims. Therefore, summary judgment should be granted dismissing Plaintiff’s SAC with prejudice and affirming Defendant’s entitlement to a judgment for liability and damages under the FAC.

This Motion is made pursuant to Rules 7, 12 and 56 of the Hawai‘i Rules of Civil Procedure and Rules 7 and 8 of the Rules of the Circuit Courts of the State of the Hawai‘i, and is supported by the attached Memorandum, Declarations, Exhibits, and the records and files.

DATED: Honolulu, Hawai‘i, August 30, 2024.

*/s/ John P. Manaut*
JOHN P. MANAUT
STEVEN M. EGESDAL
KAI WANG

Attorneys for Defendant/Counterclaimant
DAN DAN ZHANG AKA DANDAN ZHANG

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff/Counterclaim Defendant<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants/Counterclaimant | CIVIL NO. 1CCV-22-0000964 (DEO)<br><br>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

*(Remainder of This Page Intentionally Left Blank)*

# TABLE OF CONTENTS

**Page(s)**


I. SUMMARY OF LEGAL POSITION ........ 1

II. BACKGROUND ........ 1

III. STANDARD ON SUMMARY JUDGMENT ........ 6

IV. ARGUMENT ........ 7

- A. Defendant's Admissions Are Deemed True Because Plaintiff Failed to Serve Timely Responses or Sign Them ........ 7
- B. Plaintiff's Claims Fail as a Matter of Law as a Result of His Deemed Admissions ........ 11
- C. Spoliation of Evidence Requires Inferences That the Lease and JIA Are Forgeries ........ 12
- D. Plaintiff's Claims Rely on Facts Deemed Admitted or Destroyed So They Cannot be Pursued as a Matter of Law ........ 15
- E. Zhang's Affirmative Claims for Relief in the First Amended Counterclaim Should be Awarded on Summary Judgment ........ 19

V. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adewumi v. Amelia Grove/Ashland Park Homeowners Association, Inc.*,
337 Ga. App. 275, 787 S.E.2d 761 (2016).....9

*Alexander v. Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982).....14

*American Tech. Corp. v. Mah*,
174 F.R.D. 687 (D. Nev. 1997).....9

*Anheuser–Busch, Inc. v. Natural Beverage Distribs.*,
69 F.3d 337 (9th Cir. 1995).....14

*Asea, Inc. v. Southern Pac. Transp. Co.*,
669 F.2d 1242, 33 Fed. R. Serv. 2d 73 (9th Cir. 1981).....7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....6

*Cieri v. Leticia Query Realty, Inc.*,
580 Hawai'i 54, 905 P.2d 29 (1995).....18, 20

*Dae Kon Kwon v. Costco Wholesale Corp.*,
Civ. No. 08-00360, 2010 WL 571941 (D. Haw. Feb. 17, 2010).....13

*Durham v. County. of Maui*,
Civ. No. 08-00342, 2010 WL 520699 (D. Haw. Feb. 10, 2010).....13

*In re Estate of Leichman*,
2016-Ohio-4592, 66 N.E.3d 1162 (Ohio Ct. App. 12th Dist. Warren County 2016).....9

*Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*,
116 Hawai'i 277, 172 P.3d 1021 (2007).....6

*Fed. Trade Comm'n v. Medicor LLC*,
217 F. Supp. 2d 1048 (C.D. Cal. 2002).....9

*Flint v. MacKenzie*,
53 Haw. 672, 501 P.2d 357 (1972).....6

*Haw. Cmty. Fed. Credit Union v. Keka*,
94 Hawai'i 213, 11 P.3d 1 (2000).....20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Hawai'i Prince Hotel Waikiki Corp. v. City & Cnty. of Honolulu*,
89 Hawai'i 381, 974 P.2d 21 (1999)....6

*Heath v. Color Imprints USA, Inc.*,
329 Ga. App. 605, 765 S.E.2d 751 (2014)....9

*Hoodho v. Holder*,
558 F.3d 184 (2d Cir. 2009)....7

*Kirksey v. America's Servicing Co.*,
2013 WL 3992179 (S.D. Tex. 2013)....7

*Land Ocean Logistics, Inc. v Aqua Gulf Corp*,
181 F.R.D. 229 (W.D.N.Y. 1998)....10

*Marchand v. Mercy Medical Center*,
22 F.3d 933, 28 Fed. R. Serv. 3d 771 (9th Cir. 1994)....8

*Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*,
306 F.3d 806 (9th Cir. 2002)....13

*Metropolitan Life Ins. Co. v. Carr*,
169 F. Supp. 377, 1 Fed. R. Serv. 2d 597 (D. Md. 1959)....7

*Moosman v. Joseph P. Blitz, Inc.*,
358 F.2d 686, 10 Fed. R. Serv. 2d 1017 (2d Cir. 1966)....7

*Nagele v Electronic Data Systems Corp.*,
193 F.R.D. 94 (W.D.N.Y. 2000)....10

*In re Napster, Inc. Copyright Litig.*,
462 F. Supp. 2d 1060 (N.D. Cal. 2006)....13

*O'Bryant v. Allstate Ins. Co.*,
107 F.R.D. 45 (D. Conn. 1985)....7, 12

*Ocwen Fed. Bank FSB v. Russell*,
99 Hawai'i 173, 53 P. 3d 312 (2002) and Haw. R. Civ....6

*Pancakes of Hawai'i, Inc. v. Pomare Properties Corp.*,
85 Hawai'i 286, 944 P.2d 83 (App. 1997)....6

*Precision Gear Co. v. Northshore Machine, Inc.*,
1987 WL 10052 (Ohio Ct. App. April 23, 1987)....8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Ralston v. Yim*,
129 Hawai‘i 46, 292 P.3d 1276 (2013)....6

*Richardson v. Sport Shinko (Waikiki Corp.)*,
76 Hawai’i 494, 880 P.2d 169 (1994)....13

*Ross v. Wallack*,
188 So. 3d 597 (Miss. Ct. App. 2015)....9

*Silvestri v. Gen. Motors Corp.*,
271 F.3d 583 (4th Cir. 2001)....13

*Stanford Carr Dev. Corp. v. Unity House, Inc.*,
111 Hawai’i 286, 141 P.3d 459 (2006)....6

*State v. Midkiff*,
49 Haw. 456, 421 P.2d 550 (1966)....6

*Stender v. Vincent*,
92 Haw. 355, 992 P.2d 50 (2000)....13, 14

*Sung v. Hamilton*,
710 F. Supp. 2d 1036 (D. Haw. 2010)....18

*Trabon Engineering Corp. v Eaton Mfg. Co.*,
37 F.R.D. 51 (N.D.Ohio, 1964)....10

*Turner & Associates P.L.L.C. v. Estate of Watkins by and Through Watkins*,
357 So. 3d 1087 (Miss. Ct. App. 2022), *cert. denied*, 357 So. 3d 641 (Miss. 2023)....9

*U.S. v New Orleans Chapter, Associated General Contractors of America, Inc.*,
41 F.R.D. 33 (E.D. La. 1966)....10

*U.S. v. Sonebare*,
504 F. Supp. 2d 566 (D. Minn. 2007)....11

*United States v. Kitsap Physicians Serv.*,
314 F.3d 995 (9th Cir. 2002)....13, 14

*W.H. Shipman v. Hawaiian Holiday Macadamia Nut Co.*,
8 Haw. App. 354 (ICA 1990)....9

**Statutes**

HRS Chapter 480....18, 19, 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

HRS § 480-1 ....................20

HRS § 480-13 (2005) ....................20

HRS § 603-21.9(6) ....................13

**Other Authorities**

Fed. R. Civ. P. 56 ....................7

HRE Rule 704 ....................5

HRE Rule 803(a)(1) ....................4

HRE Rule 804(b)(3) ....................4

HRE Rule 804(b)(8) ....................4

HRE Rule 901 ....................4

HRE Rule 1005 ....................4

HRCP Rule 6 ....................3

HRCP Rule 6(e) ....................7

HRCP Rule 26(b)(1) ....................11

HRCP Rule 29 ....................9

HRCP Rule 36 ....................3, 4, 7, 8, 9, 10, 11, 12

HRCP Rule 36(a) ....................7, 8, 9, 10, 11

HRCP Rule 36(b) ....................11

HRCP Rule 56 ....................1, 6, 11

HRCP Rule 56(c) ....................6, 7

HRCP Rule 56(e) ....................6

Miss. R. Civ. P. 36 ....................9

## MEMORANDUM IN SUPPORT OF MOTION

## I. SUMMARY OF LEGAL POSITION

Defendant Dandan Zhang ("Zhang" or "Defendant") seeks summary judgment on all claims by and against Plaintiff Di Wu ("Di Wu" or "Plaintiff'), pursuant to Haw. R. Civ. P. 56. Di Wu's Second Amended Complaint, filed July 21, 2023 [Dkt. 236] ("SAC"), is based on two forged signature documents that are attached to his SAC as Exhibits A and B. A copy of the SAC is attached hereto as **Exhibit 1**. The SAC Exhibit A is a rough and inaccurate cover page translation into English of the second page Chinese language document titled as "property investment agreement 05.28.2019" and also referred to as a Joint Investment Agreement (referred to herein as "JIA"). Exhibit B to the SAC is entitled "Residential Lease Agreement (referred to herein as "Lease"). Both the JIA and Lease are unenforceable as they contain forged signatures of Zhang, presumably placed there by Di Wu. *See* attached Declaration of Dandan Zhang ("Zhang Decl."), ¶ 6 and 7. The purported Lease is attached hereto as **Exhibit 2**. The JIA is attached hereto as **Exhibit 3**. *See* Declaration of Counsel ("Counsel Decl."), ¶¶ 3-4.

All of Plaintiff's 14 counts in his SAC depend on the truthfulness and validity of the purported Lease and JIA, except for Count XI alleging theft or conversion by Zhang for removing Di Wu's personal belongings from Zhang's property to a public storage area; however, all of those items that belong to Di Wu were returned as Zhang testifies and as admitted by Di Wu. *See* Zhang Decl. ¶ 10. In sum, Plaintiff's primary claims fail as a matter of indisputable fact, and otherwise as a matter of law, because the Lease and JIA are indisputable forgeries.

Defendant is also entitled to a ruling on liability and damages on all her claims, set forth in her First Amended Counterclaim, filed April 12, 2024 [Dkt. 394] ("FAC").

## II. BACKGROUND

Dandan Zhang submitted a Purchase Contract dated April 30, 2019, as the sole Buyer, to purchase a residence at 1039 Koohoo Place, Kailua, Hawaiʻi (the "Property"), which was accepted by the previous owner on May 1, 2019. Zhang Decl. ¶¶ 3, 5. Title to the Property was conveyed to Dandan Zhang, as the sole owner, pursuant to a Warranty Deed, dated May 22, 2019 (the "Deed"), which was filed in the Office of Assistant Registrar of Land Court of the State of Hawaiʻi ("Land Court") on July 3, 2019, and evidenced by the issuance of Transfer Certificate of

Title ("TCT") No. 1,178,606. The Warranty Deed, dated May 22, 2019, is attached as Exhibit C to Di Wu's First Amended Complaint filed August 16, 2022 [Dkt.14]. Zhang Decl. ¶ 4.

Zhang was the sole buyer of the Property from the previous owner as memorialized in the Deed. Zhang Decl. ¶ 5. After purchase, Zhang was a consumer of services that Di Wu had offered as property manager and for renovation work at the Property. Di Wu acted as Zhang's agent and fiduciary to handle all responsibilities at the Property since Zhang resided in China and Di Wu was located in Honolulu. He represented that he had the experience and ability to properly handle all rentals and work to renovate her Property. Zhang learned later that Di Wu violated her trust, failed to book rentals, and took monies that were to go to her in an 80% share for all rentals. Di Wu failed to advise Zhang of his actions as property manager, including huge renovation costs that he said he incurred, but without Zhang's authority. Zhang Decl. ¶ 5.

Zhang never agreed that Di Wu could live on her Property and never saw nor signed the Lease document attached as Exhibit B to the SAC (**Exhibit 2)** which did not appear until Di Wu's quiet title claim in this action had been dismissed. The Lease is a <u>forgery</u>. Zhang Decl. ¶ 6.

In addition, Zhang did not sign either the English or Chinese version of the purported JIA attached as Exhibit A to the SAC. **Exhibit 3**. Zhang's signature was <u>forged</u> on that document and the signature line image was attached without her knowledge or approval. Zhang Decl. ¶ 7.

Zhang did have an oral agreement with Di Wu for him to manage her Property for third party short term vacation renters. The oral agreement included a budget of $185,000.00, i.e., 10% of the original purchase price, for repair and renovation of the Property so it could be rented. Di Wu was required to provide Zhang with periodic reports, copies of invoices, and proof of payments of the expenses incurred. However, as property manager, Di Wu did not provide Zhang with periodic reports, invoices, or proof of payments so there was never any agreement much less proof that he spent the outrageous sum of over $1.5 million dollars for Property renovation purposes. Zhang Decl. ¶ 8.

Di Wu was not authorized to reside at Zhang's Property and he falsely claimed to have such a right only after Zhang learned he was living at her Property with his family and not renting it out as he had agreed, so his services were terminated on July 29, 2022. Zhang Decl. ¶ 9. When Zhang learned someone had left belongings in the Property after Di Wu was terminated as property manager, those items were removed to a secure storage unit because no one else was authorized to be on the Property. The items were turned over to Di Wu who claimed to own the

items as he had been residing at the Property unbeknownst to Zhang. Zhang did not keep and instead returned all alleged personal belongings to Di Wu. Zhang Decl. ¶ 10.

As part of the effort to have Di Wu admit his lies and forgeries asserted in his SAC, written requests for admissions were sent to him on July 15, 2024. **Exhibit 4** is a true and correct copy of a Certificate of Service filed in this action on July 15, 2024 [Dkt. 497] that contains Defendant Dan Dan Zhang aka Dandan Zhang's First Request for Admissions to Plaintiff Di Wu ("Admissions"), which was attached to the Certificate as Exhibit 1 (referred to as the "Admissions"). Counsel Decl. ¶ 5.

Service of the Admissions pursuant to Haw. R. Civ. P. 36 was made on Di Wu by filing them in JEFS on **July 15, 2024;** therefore the deadline to answer or object was **August 14, 2024**. Service was also effected by sending the Admissions on July 15, 2024 to Plaintiff Di Wu both by email and by U.S. Mail, as stated in the Certificate [Dkt. 497]. Counsel Decl. ¶¶6-7. The 30 day deadline after that service to respond was August 14, 2024. Delivery was also confirmed to Di Wu's mailing address on July 18, 2024, by postal service receipt. *Id.*

No answers or objections to the Admissions was received from Di Wu by the deadline of August 14, 2024. Counsel Decl. ¶ 8. Haw. R. Civ. P. 6 provides that if no responses are received within 30 days of the service, then the matters separately stated in each of the Admissions requests is deemed admitted as a matter of law under the rule.

Seven days after the expiration of the 30 day period to respond to the Admissions, and without leave of court for an extension of time to respond or request to withdraw the admissions, on August 21, 2024 at 6:53 p.m., Di Wu submitted to JEFS a letter style document entitled Objection to Request for Admissions" [Dkt. 505] ("Objection"). A true and correct copy of the Objection is attached hereto as **Exhibit 5**. Counsel Decl. ¶ 9. The Objection was not signed by Di Wu or any counsel, as required. It contained only Di Wu's typewritten name. *Id.* The majority of the objections contained improper claims that evidence will be uncovered or else required future information to respond, which is not a permissible response under Haw. R. Civ. P. 36. *See* **Exhibit 5**.

The Objection was not timely submitted before the expiration of the 30-day period under Haw. R. Civ. P 36, and no leave of court to allow any late filing was sought by Plaintiff. Further, the discovery cutoff was on August 22, 2024 [Dkt. 335]. As a result, by operation of law and the plain meaning of language in Haw. R. Civ. P. 36, the matters contained in the Admissions are

deemed admitted and are evidence directly admissible in evidence as admissions against interest. Haw. R. Evid. 803(a)(1); 804(b)(3) and (8); 901; and 1005. Counsel Decl. ¶ 10.

The Lease document sought to be admitted through the Admissions is at the heart of Plaintiff Di Wu's claims, as it was attached as Exhibit B to Di Wu's SAC [Dkt. 236]. The Lease document (**Exhibit 2**) was previously admitted by Di Wu to be the basis for his SAC claims and was specifically referenced in the Admissions definitions for him to answer (**Exhibit 4**, at Admissions page 3). Similarly, the JIA (**Exhibit 3**) was asserted in Plaintiff Di Wu's SAC and was attached and verified by Di Wu as Exhibit A to the SAC. The JIA document was previously admitted by Di Wu to be the basis for certain designated Counts and was specifically referenced in the Admissions definitions (**Exhibit 4**, at Admissions page 3). Counsel Decl. ¶¶ 11-12.

Both the Lease and the JIA are deemed to be forgeries based on the failure of Di Wu to timely respond to the Admissions within 30 days under Haw. R. Civ. P. 36. Counsel Decl. ¶ 13. In addition to the Admissions, the affirmative claims disclosures required by the 2nd Scheduling Order - Non-Jury Trial, filed February 14, 2024 [Dkt. 335] ("Sched. Order") set deadlines for expert reports and opinions. Defendant's disclosed expert witnesses demonstrate the Lease and the JIA are both forged documents. Defendant Zhang's experts were timely disclosed on June 24, 2024, as set forth in Defendant Dan Dan Zhang aka Dandan Zhang's Affirmative Claim Disclosure filed June 24, 2024 [Dkt. 453] ("Disclosure"). Counsel Decl. ¶ 14.

Two experts in forensic imaging and handwriting, Michael McMurdo and Reed Hayes, both submitted separate unrebutted reports concluding that the Lease and JIA attached to Di Wu's SAC were forged documents. McMurdo's report was submitted as Exhibit I to the Disclosures and filed in JEFS on June 24, 2024, as Docket number 462. True and correct copies of excerpted pages 1-16 of Docket 462 are attached hereto as **Exhibit 6**. A true and correct copy of excerpted pages 1-9 from Reed Hayes' expert report filed as Exhibit K to the Disclosures filed June 24, 2024 [Dkt. 464], is attached hereto as **Exhibit 7**. A true and correct copy of Reed Hayes's Exhibit L Disclosures for the Lease forgery expert report filed in JEFS as Docket 465 is attached hereto as **Exhibit 8**. A true and correct copy of Reed Hayes's Exhibit M Disclosures for the JIA forgery expert report filed in JEFS as Docket 466 is attached hereto as **Exhibit 9**. These unrebutted expert reports establish conclusively that the Lease and JIA were forged documents. Counsel Decl. ¶¶ 15-17.

Each of those expert reports was timely filed by the June 24, 2024 deadline set forth in the Sched. Order [Dkt. 335]. Plaintiff Di Wu did not respond or file and disclose any affirmative claim response or rebuttal expert report by the deadlines of June 24, 2024, July 23, 2024, or August 22, 2024, as set forth in the Sched. Order. Counsel Decl. ¶¶ 18-19.

In addition to the forged Lease and JIA documents, deposition testimony under oath from Di Wu's business associates for his dealings confirm that Di Wu destroyed electronic information and an email account despite the obligation to retain all such information, and as Zhang's property manager fiduciary. The testimony of Jason Tootell demonstrated that Di Wu knowingly deleted electronic information directly as a result of Zhang's efforts to regain possession of her Property from Di Wu through a separate State District Court eviction action. This led Di Wu, according to Zhang, to fake the Lease and JIA documents to improperly manufacture a basis to stay in possession of her Property. Zhang Decl. ¶ 9. True and correct copies of excerpts of testimony from the deposition of Jason Tootell from his deposition taken on November 30, 2022 is attached hereto as **Exhibit 10**. Counsel Decl. ¶ 21. True and correct copies of excerpts of testimony from the deposition of Lonnie Adams are attached as **Exhibit 11**. Counsel Decl. ¶ 22. In addition, a Declaration of Lonnie Adams, further corroborates Di Wu's destruction of email evidence, and is attached hereto as **Exhibit 12**. Counsel Decl. ¶ 23. Admissions 35 and 36 also admit that Di Wu deleted Gmail and Telegram account information. **Exhibit 4.**

The above information establishes that relevant information and an email account with evidence relevant to the dispute was deleted so the evidence of Di Wu's spoliation of evidence should be dispositive as a discovery sanction in order to deem facts admitted against Di Wu and also supports dismissal of the SAC based on the legal precedent below. Counsel Decl. ¶ 24.

The expert report from property valuation and lost rentals damages expert Wendell Brooks was attached to Zhang's Disclosures, filed on June 24, 2024, as Exhibit A [Dkt. 454]. The Brooks report shows damages for lost rentals and costs to remediate improper building code and permit violation work done by Di Wu, as well as substantial lost revenues, and supports the $1.5 million plus in damages claimed by Defendant Zhang in the FAC. The Brooks report has been unrebutted and no expert report exists to dispute those damages sought by Zhang based on Plaintiff's liability under the FAC [Dkt 394]. As a result, Defendant's unrebutted expert report should be admitted directly as uncontradicted admissible evidence to support summary judgment for liability and damages on the FAC under Haw. R. Evid. 704. Counsel Decl. ¶ 25.

## III. <u>STANDARD ON SUMMARY JUDGMENT</u>

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawai'i 286, 295, 141 P.3d 459, 468 (2006); *In re Hawai'i Prince Hotel Waikiki Corp. v. City & Cnty. of Honolulu*, 89 Hawai'i 381, 393, 974 P.2d 21, 34 (1999); *Pancakes of Hawai'i, Inc. v. Pomare Properties Corp.*, 85 Hawai'i 286, 291, 944 P.2d 83, 88 (App. 1997); *see also Ocwen Fed. Bank FSB v. Russell*, 99 Hawai'i 173, 182-83, 53 P. 3d 312, 321-22 (2002) and Haw. R. Civ. P. 56(c); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (moving party "entitled to a judgment as a matter of law" because nonmoving party failed to make sufficient showing on essential element of its case where it had burden of proof). The purpose of summary judgment is to expedite matters, to avoid the additional time, cost, and delay of trial where, as here, the material facts lead to only one reasonable conclusion. *See* Haw. R. Civ. P. Rule 56(c); *see also Flint v. MacKenzie*, 53 Haw. 672, 672, 501 P.2d 357, 357 (1972).

Zhang has the initial burden to identify the portions of the record that demonstrate an absence of any genuine issue of material fact. *See Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co*., 116 Hawai'i 277, 301, 172 P.3d 1021, 1045 (2007). Zhang may satisfy her initial burden by (1) presenting evidence negating an element of Plaintiff's claim, or (2) pointing to materials on file showing that Plaintiff will be unable to carry his burden of proof at trial. *Ralston v. Yim*, 129 Hawai'i 46, 57, 292 P.3d 1276, 1287 (2013). A motion need not be supported by affidavits or similar materials that negate Plaintiff's claims, but need only point out that there is an absence of evidence to support those claims. *Id.* at 57-58, 292 P.3d at 1287-88 (discussing, with approval, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "For if no evidence could be mustered to sustain [Plaintiffs'] position, then a trial would be useless." *Id.* at 60, 292 P.3d at 1290 (quoting *Exotics Hawaii-Kona*, 116 Hawai'i at 301, 172 P.3d at 1045).

Plaintiff "may not rest upon the mere allegations or denials of [their] pleading," and must respond by setting forth specific, admissible, and material facts showing there is a genuine issue for trial. Haw. R. Civ. P. 56(e). If Plaintiffs do not so respond with credible admissible evidence, summary judgment is appropriate and necessary. *See* Haw. R. Civ. P. Rule 56. Where a Plaintiff "cannot show that countervailing evidence will be available at the trial," he is not entitled to denial of this motion "on the basis of a hope that such evidence will develop at the trial." *State v. Midkiff*, 49 Haw. 456, 459, 421 P.2d 550, 554 (1966) (citation omitted).

Deemed admissions or a failure to timely respond to admissions under Rule 36 is an appropriate basis for summary judgment under Rule 56(c). Admissions under Rule 36 are intended to promote judicial economy and avoid unnecessary issues at trial. *Hoodho v. Holder*, 558 F.3d 184, 190–92 (2d Cir. 2009) (rule that judicial admissions are binding promotes judicial economy); *Moosman v. Joseph P. Blitz, Inc.*, 358 F.2d 686, 688, 10 Fed. R. Serv. 2d 1017 (2d Cir. 1966) (purpose of Rule 36 is to expedite trial by removing uncontested issues); *Metropolitan Life Ins. Co. v. Carr*, 169 F. Supp. 377, 378, 1 Fed. R. Serv. 2d 597 (D. Md. 1959) ("The purpose of Rule 36 … is to require admission of matters which ought to be admitted, or which will not be disputed at the trial, so that the time, trouble and expense required to prove them may be avoided."); *Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1245, 33 Fed. R. Serv. 2d 73 (9th Cir. 1981) (purpose of allowing requests for admissions under Rule 36 is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial).

Similarly, Fed. R. Civ. P. 56 provides that admissions on file can be an appropriate basis for summary judgment. *See, e.g. Kirksey v. America's Servicing Co.*, 2013 WL 3992179 (S.D. Tex. 2013) (summary judgment granted after plaintiff failed to respond to the defendant's request for admissions; the requests were deemed admitted and unquestionably demonstrated the absence of any genuine dispute of any material fact); *see also O'Bryant v. Allstate Ins. Co.*, 107 F.R.D. 45, 48 (D. Conn. 1985) (""Admissions may demonstrate the want of a genuine issue of material fact on which a summary judgment may be premised.").

## IV. ARGUMENT

### A. DEFENDANT'S ADMISSIONS ARE DEEMED TRUE BECAUSE PLAINTIFF FAILED TO SERVE TIMELY RESPONSES OR SIGN THEM

Every matter contained in a Haw. R. Civ. P. 36 request for admissions is admitted unless the receiving party serves a written answer or objection within 30 days after service of the request to admit. Haw. R. Civ. P. 36(a) & 6(e) (adding 2 days to the prescribed period when a paper is served by mail). Here, Defendant indisputably served her Request for Admissions to Plaintiff by way of the JEFS Certificate filing on July 15, 2024 [Dkt. 497], so the deadline for Plaintiff to respond was August 14, 2024. *See* **Exhibit 4**. Counsel Decl. ¶ 6. After the deadline and the Admissions were automatically deemed admitted on August 14, 2024, Di Wu submitted a letter to JEFS that contained the Objections, but the letter contained no admission and no denial, only objections to responding to each of the requests. Counsel Decl. ¶ 9, **Exhibit 5**.

Plaintiff's late and inadequate responses to the Admissions indisputably failed to meet the 30-day deadline of Haw. R. Civ. P. 36(a). Counsel Decl. ¶ 10.

Under Haw. R. Civ. P. 36(a), Plaintiff as a responding party had four options concerning Defendant's Request for Admissions: (1) admit; (2) deny; (3) admit in part, and deny in part; or (4) explain why he was unable to answer. While it was possible to object to all or part of a request as well, courts do not like parties who play "word games" to avoid responding. Haw. R. Civ. P. 36 is phrased to discourage objections, and place quite a burden on an objecting party. Plaintiff here engaged in a giant "word game," objecting to all 42 Admissions, and not admitting or denying any request, in whole or part. **Exhibit 5**.

In addition, Plaintiff's response is of no legal effect: neither the response letter nor its 42 objections are "signed either by the party of the party's attorney," as expressly required by Haw. R. Civ. P. 36(a). Another state court, concerning an analogous Rule 36(a), instructs:

> When appellant finally did serve answers to the request for admissions, they were not signed by appellant or his attorney. The rule provides that the matters are admitted unless the answers are signed, making it clear that admissions function very much as pleadings do. The trial court did not err in holding that the matters contained in the request for admissions were conclusively established by appellant's (1) failure to answer the request for admissions within the time prescribed, and (2) failure to sign the answers when they finally were provided.

*Precision Gear Co. v. Northshore Machine, Inc.*, 1987 WL 10052 at *1 (Ohio Ct. App. April 23, 1987) (emphasis added) (interpreting analogous Rule 36(a) language). The Ninth Circuit shares wisdom on how seriously a party should consider a request for admissions:

> Parties may not view requests for admission as a mere procedural exercise requiring minimally acceptable conduct. They should focus on the goal of the Rules, full and efficient discovery, not evasion and word play.... And to aid the quest for relevant information parties should not seek to evade disclosure by quibbling and objection. They should admit to the fullest extent possible, and explain in detail why other portions of a request may not be admitted.

*Marchand v. Mercy Medical Center*, 22 F.3d 933, 936-37, 28 Fed. R. Serv. 3d 771 (9th Cir. 1994) (affirming award of sanctions based on misleading responses to requests for admissions and criticizing the defendant for "relying on unfounded objections to the wording, instead of admitting the uncontestable question).

Because Plaintiff failed to answer Defendants' Admissions within 30 days, the matters contained therein are automatically deemed admitted. *See* Haw. R. Civ. P. 36(a). HRCP Rule 36

dictates that requests for admissions are automatically admitted, unless the receiving party serves a timely response that complies with the rules:

> The matter [of which an admission is requested] is deemed admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney....

Haw. R. Civ. P. 36(a). "Rule 36(a) imposes a sanction of automatic admission from a failure to respond within the time provided for in the rule." *W.H. Shipman v. Hawaiian Holiday Macadamia Nut Co.*, 8 Haw. App. 354, 365 (ICA 1990). The rule is self-executing, so a motion to affirm the admissions is not necessary. *American Tech. Corp. v. Mah*, 174 F.R.D. 687, 690 (D. Nev. 1997); *Fed. Trade Comm'n v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("No motion to establish admissions is needed because [] Rule [] 36(a) is self-executing.").

Plaintiff never requested an extension of the 30-day deadline, and none was granted by this Court before the discovery cutoff. Therefore, the statements in the Admissions should be deemed admitted, and may be relied upon by Defendant and this Court for purposes of a summary judgment motion. This is the general rule in a majority of jurisdictions that have a similar Rule 36. *See, generally, Adewumi v. Amelia Grove/Ashland Park Homeowners Association, Inc.*, 337 Ga. App. 275, 787 S.E.2d 761 (2016) (property owner's failure to respond within 30-day time frame to requests for admission amounted to admission of requests as matter of law);. *Turner & Associates P.L.L.C. v. Estate of Watkins by and Through Watkins*, 357 So. 3d 1087 (Miss. Ct. App. 2022), *cert. denied*, 357 So. 3d 641 (Miss. 2023) (Under Miss. R. Civ. P. 36, law firm's failure to respond to requests for admissions conclusively established the law firm's misrepresentation, expiration of statute of limitations, and negligence); *Ross v. Wallack*, 188 So. 3d 597 (Miss. Ct. App. 2015) (summary judgment granted where admissions not timely received and attempt to answer after the motion a summary judgment was filed was improper procedurally under Rule 36); *In re Estate of Leichman*, 2016-Ohio-4592, 66 N.E.3d 1162 (Ohio Ct. App. 12th Dist. Warren County 2016) ("When a party fails to timely respond to a request for admissions, the admissions become facts of record, which the court must recognize" under Rule 36*);* *Heath v. Color Imprints USA, Inc.*, 329 Ga. App. 605, 765 S.E.2d 751 (2014) ("Failure by accountant's corporate client and client's officers to file responses to accountant's requests for

admissions within 30 days resulted in requests being deemed admitted by operation of law, in accountant's suit on account" under Rule 36).

Plaintiff's purported late response objection does not constitute a "written answer or objection" for HRCP Rule 36. First, as stated above, the entire response, including the nonresponsive objections, determinatively, was not timely served. Second, Plaintiff's objections do not meet the requirements for a Haw. R. Civ. P. 36 objection, which must be based on specific reasons that the responding party *cannot* admit or deny despite *reasonable* attempts to do so. Haw. R. Civ. P. 36 provides in relevant part:

> If objection is made, the reasons therefor shall be stated. The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.... An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.

Haw. R. Civ P. 36(a) (emphasis added). "The only permissible responses to requests are an admission, a denial or a statement that the contention cannot honestly be either admitted or denied." *U.S. v New Orleans Chapter, Associated General Contractors of America, Inc.*, 41 F.R.D. 33, 34 (E.D. La. 1966). None of those exist in the Objections submitted by Plaintiff, particularly with respect to the alleged document forgeries and claims he asserted in his SAC.

Plaintiff may not seek relief from the admissions that he made, due to his failure timely to respond (or sign). Plaintiff cannot rely on objections he made to the admissions: untimely responses to discovery requests waive objections. *See, e.g. Trabon Engineering Corp. v Eaton Mfg. Co.*, 37 F.R.D. 51, 53 (N.D.Ohio, 1964); *Nagele v Electronic Data Systems Corp.*, 193 F.R.D. 94 (W.D.N.Y. 2000) (failure to object to interrogatories results in waiver); *Land Ocean Logistics, Inc. v Aqua Gulf Corp*, 181 F.R.D. 229, 236-37 (W.D.N.Y. 1998) (failure to timely object to production requests waives objection). All of Plaintiff's objections to the Request for Admissions were waived due to Plaintiff's failure to timely respond. The only permitted responses to the Admissions were admissions, denials, or statements of inability to admit or deny for lack of information. Plaintiff failed to do so timely. *Pro se* or not, Plaintiff may not disregard his discovery obligations simply because he objects to the substance of the Request for

Admission.[1] Defendant may serve requests that "seek the truth of any matters within the scope of Rule 26(b)(1) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of documents described in the request." Haw. R. Civ. P. 36(a). All of Defendant's Admissions fall within the scope of HRCP Rule 36(a).

B. PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW AS A RESULT OF HIS DEEMED ADMISSIONS.

Plaintiff's admissions bind him for purposes of Defendants' Rule 56 summary judgment motion. Under Rule 36, "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Haw. R. Civ. P. 36(b) (emphasis added). Plaintiff has not made any motion to withdraw the admissions and, at any rate, it would be prejudicial to Defendants to allow him to do so after the close of discovery and filing of the instant motion, and less than two months before trial. *See* Haw. R. Civ P. 36(b) (court may not permit withdrawal of admissions if it would prejudice the party who obtained the admissions in maintaining its defense); *U.S. v. Sonebare*, 504 F. Supp. 2d 566, 572 (D. Minn. 2007) (holding that permitting untimely answers to unanswered requests for admissions after the close of discovery would prejudice the requesting party and delay the trial). Therefore, Plaintiff's admissions conclusively establish the truth of the matters contained therein.

Instead of fairly participating with the procedural tool known as a Request for Admissions, under Haw. R. Civ. P. 36, Plaintiff made his response to Defendant's Request completely useless. Plaintiff's responses are a cocktail of non-responsive, evasive, and meritless objections, without a single admission or denial out of 42 Admissions. Plaintiff's responses are blanket, boilerplate, cut/paste objections. Plaintiff's objections do not fairly meet the substance of the Admissions. Plaintiff fails properly and specifically to answer the Admissions and Plaintiff cannot now rely on those nonresponsive answers to satisfy his good faith obligation

---

[1] The pleading form Objection submitted by Plaintiff may have been drafted in part by outside counsel despite not making an appearance. Possibly this was through the assistance of withdrawn counsel who has a material interest in the outcome of this litigation by asserting an attorney's charging lien [Dkt. 445]. Presumably, Plaintiff owes withdrawn counsel substantial unpaid fees, which begs the question about who is the real party in interest here for purposes of any damages recovery and whether this lien claim prevents Plaintiff from effectively negotiating, resolving, or settling this case since any recovery he might receive will apparently go first to his withdrawn counsel. Plaintiff is not entitled to receive *any* monetary recovery in this case or may no longer have an actual stake in its outcome so the ethics of that dilemma should be investigated.

under Haw. R. Civ. P. 36. Plaintiff's objections, served late and providing nothing of substance, are not appropriate to be reviewed for validity, but in any event should be disregarded or stricken, and all 42 of the Admissions confirmed as admitted under Rule 36.

"Admissions may demonstrate the want of a genuine issue of material fact on which a summary judgment may be premised." *O'Bryant v. Allstate Ins. Co.*, 107 F.R.D. 45, 48 (D. Conn. 1985). Here, Plaintiff has several deemed admissions that are fatal to his claims against Defendant. Based on Plaintiff's failure to respond to Defendant's Admissions, Plaintiff has essentially admitted that Zhang's defenses are legitimate and his claims are baseless as they are premised on the two forged documents that cannot support his SAC Counts as a matter of law.

### C. SPOLIATION OF EVIDENCE REQUIRES INFERENCES THAT THE LEASE AND JIA ARE FORGERIES

In furtherance of the scheme to falsely manufacture and gaslight or con not only the Defendant but this Court, Di Wu has tried to foist the fake Lease and JIA as legitimate documents and not as documents that he himself created and forged. They are not binding agreements but fake shams used to bolster baseless claims made in the SAC. Not only are the Lease and JIA deemed forgeries based on his deemed admissions, but Di Wu destroyed any evidence that supports his claim that they were or were not legitimate. He has provided no evidence in discovery or otherwise that the Lease was ever sent to him by Zhang in any email or electronic transmittal. No such proof of transmittal exists for the Lease. Zhang Decl. ¶¶ 6. The same exists for lack of proof that Zhang signed the JIA. Zhang Decl. ¶ 7. Instead, Di Wu not only failed to produce any proof of those documents being signed and transmitted from or to Zhang in his discovery production of materials, but no such evidence was ever produced in discovery - and none exists. *Id.*; Counsel Decl at ¶ 13,17. Di Wu also destroyed electronic message evidence, email and text information. This is not only shown by the Admissions 35 and 36 that are deemed admitted by operation of law (**Exhibit 4**), but more directly, this evidence is also shown and unrebutted by the testimony of his business associates, Jason Tootell and Lonnie Adams, both of whom testified that Di Wu destroyed electronic information in text, email or chat materials, despite Di Wu's fiduciary duty to preserve any such evidence as a fiduciary for his principal Zhang. *See* Zhang Decl. ¶ 5; **Exhibits 10-12**. Di Wu should be held liable for his failure to produce corroborating proof and for his destruction of potential exculpatory evidence. He cannot prove the Lease was ever sent to him by Zhang and he cannot prove the JIA was

signed by Zhang and sent to him as an approved signed document from her. Zhang Decl. ¶¶ 6-7. That evidence simply does not exist or is presumed not to exist by Di Wu's destruction of evidence. So Di Wu cannot prove his case. Summary judgment is appropriate as there is no credible evidence to support Di Wu's claims that the Lease and JIA are not forged documents. They indisputably are forgeries. Zhang Decl. ¶ 6-7; **Exhibits 6-9**.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Spoliation sanctions are appropriate to remedy the purposeful destruction of evidence. A party has a duty to preserve evidence, when it knows or reasonably should know the evidence is potentially relevant to litigation, and when the destruction of that evidence prejudices the opposing party. *Durham v. County. of Maui*, Civ. No. 08-00342, 2010 WL 520699, at *7 (D. Haw. Feb. 10, 2010) (citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)). "If a party breaches its duty to preserve evidence, the opposing party may move the court to sanction the party destroying evidence." *Id.* (citing *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006).

The circuit court has wide-ranging authority to impose sanctions for the spoliation of evidence. *Stender v. Vincent,* 92 Haw. 355, 362, 992 P.2d 50, 57 (2000). The court "has the ***inherent power*** . . . to fashion a remedy to cure prejudice suffered by one party as a result of another party's loss or destruction of evidence." *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507-08, 880 P.2d 169, 182-83 (1994) (emphasis added); *see also* Haw. Rev. Stat. § 603-21.9(6) (providing circuit courts with the power to take steps "necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them. An ***adverse inference instruction*** consistently has been held as an appropriate sanction for spoliation of evidence. *See, e.g., Stender,* 92 Haw. at 363, 992 P.2d at 58; *Dae Kon Kwon v. Costco Wholesale Corp.,* Civ. No. 08-00360, 2010 WL 571941, at *2 (D. Haw. Feb. 17, 2010); *Durham,* 2010 WL 520699, at *7; *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 824 (9th Cir. 2002).

Under Hawai'i law, the party seeking sanctions need not prove that the destruction of evidence was intentional, willful, or undertaken in bad faith. Instead, even negligent destruction of evidence is sufficient to trigger the imposition of sanctions if it appears that the responsible

party would enjoy "an unfair advantage with respect to the lost evidence." *Stender,* 92 Hawai'i at 364-65, 992 P.2d at 59-60 ("This court has never regarded bad faith or intentionality as a talisman in the imposition of discovery sanctions; we refuse to do so now.").

Di Wu knew (or should have known) that any evidence relating to his communications that do not include transmittals of the signed documents would be relevant to the dispute Zhang had with Di Wu. At that time, a duty arose to preserve that evidence. *Stender*, 92 Hawai'i at 361-65, 992 P.2d at 56-60 (holding that preservation duties exist even before a complaint is filed). Di Wu never produced any evidence to show receipt of the signed Lease and JIA. Any purported exculpatory evidence that confirms they were never sent was destroyed and not produced and cannot be introduced in this action now. Based on this legal precedent, Zhang is entitled to the benefit of an adverse inference that the Lease and JIA are forgeries.

Di Wu certainly knew that the destroyed evidence or email account, that prove the Lease and JIA were never sent to him as signed or approved documents, was entirely relevant to this potential litigation. Knowing that this evidence is relevant to this litigation, Di Wu had a duty under Hawai'i law to take affirmative steps toward preservation of the evidence. *Stender,* 92 Hawai'i at 361-65, 992 P.2d at 56-60. Instead, Di Wu willfully destroyed the evidence. Spoliation sanctions are appropriate to remedy such purposeful destruction of evidence. *Id.*

A party's destruction of evidence qualifies as willful spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv*., 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotation marks and citation omitted). Because "the relevance of ... [destroyed] documents cannot be clearly ascertained because the documents no longer exist," a party "can hardly assert any presumption of irrelevance as to the destroyed documents." *Alexander v. Nat'l Farmers Org*., 687 F.2d 1173, 1205 (8th Cir. 1982). Dismissal is an available sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser–Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995).

Based on the above, Zhang is entitled to an inference from the facts stated in the Admissions, and also that any exculpatory evidence should be deemed additional factual support for Zhang's evidence under her FAC. As a result, the facts of forgery are established not only

by affirming the admissions against interest, but also the destruction of evidence and failure to produce exculpatory proof that warrants the factual inferences as a sanction on all claims.

D. PLAINTIFF'S CLAIMS RELY ON FACTS DEEMED ADMITTED OR DESTROYED SO THEY CANNOT BE PURSUED AS A MATTER OF LAW

The SAC is primarily premised on the two forged documents (the Lease and JIA) as established by the credible testimony of Zhang and the failure of Di Wu to provide credible and genuinely disputed facts based on his Admissions, the testimony of spoliation, and Di Wu's failure to produce any evidence to support those forged documents were ever sent by Zhang in email or otherwise. No such evidence exists. Zhang Decl. ¶¶ 6-7. Each of the SAC Counts based on that evidence cannot be used to support the SAC as a matter of law, as set forth below:

**Count I for Breach of Contract (Lease**) is baseless because it depends on a viable Lease document. **Exhibit 1**, pages 7-9, ¶¶ 48-69. The only credible admissible evidence is that the Lease is a forgery. **Exhibit 4** Admissions 1-4; **Exhibits 6-9;** Zhang Decl. ¶¶ 6-7. Count I also includes alleged facts about occupancy and alleged lost belongings that were also rejected by the deemed Admissions and inferences from Di Wu's spoliation of evidence. *See* **Exhibit 4** Admissions No. 10-14, 19. As a matter of law, there can be no breach of any obligation of good faith and fair dealing by Zhang in defending against a false and forged Lease document as alleged in Count I. Therefore, summary judgment on Count I is appropriate and no damages can be recovered based on the lack of liability and proof of any damages.

**Count II Alternative Breach of Implied Contract** (**Exhibit 1** pages 9-10, ¶¶ 70-77) is another way to argue the same claim under Count I, but also argues for an interest in Zhang's Land Court property that was already decided and ruled upon against Di Wu in this Court's Findings of Fact, Conclusions of Law and Order, entered on November 3, 2022 [Dkt. 43]. Plaintiff has no right to own, use, possess or occupy the Property. *Id.* This was also confirmed in the Findings of Fact, Conclusions of Law and Order entered May 20, 2024 [Dkt. 435]. (collectively the "**FOFCOL**"). The Property's Land Court TCT contains no registered right of Di Wu to any interest in the Property, so Count 2 should be dismissed as a matter of law because it seeks to establish a right to the Property on the basis of an unrecorded contract, or otherwise is premised on the forged Lease or JIA documents. Di Wu's deemed Admissions 10, 12, 13, 18, and 21, and his spoliation of evidence inferences, deny him the right to recover as a matter of law. There can also be no viable claim for breach of a good faith obligation without a legitimate

contract being properly alleged under Count II so summary judgment is appropriate.

**Count III for Specific Performance of Lease** is based on the false and invalid forged Lease. **Exhibit 1**, pages 10-11, ¶¶ 78-88. The Lease is a forgery established by credible testimony from Zhang, admissions against Di Wu's interest, and inferences from spoliation of evidence. Zhang Decl. ¶¶ 6-7; **Exhibits 4, 6-12**. Further, the Court has already ruled in the **FOFCOL** that Wu has no right to occupy the premises for 10 years as the documents are not registered in Land Court. Admissions 10, 12, 13, 18 and 21 demonstrate Di Wu has no rights under the Lease, or any right to occupy Zhang's property, so Count 3 should be dismissed.

**Count IV for Injunctive Relief** is also premised on the false and forged Lease that cannot support the legal basis for injunctive relief. **Exhibit 1**, pages 11-12, ¶¶ 89-93. The JIA is similarly a forged document and cannot support an injunction preventing Zhang's rights to use and enjoy her Property. Admissions 14, and 1-4, 10, 12, 13, 19 and 21. Legally, neither the Lease nor the JIA are registered against the TCT in Land Court so there is no right to encumber or enjoin Zhang's use of her Property. Count IX should be dismissed based on no viable claim.

**Count V for Declaratory Relief** also depends on the validity of the forged Lease and JIA. **Exhibit 1**, pages 12-13, ¶¶ 94-98. There is no viable basis to award any Declaratory Relief based on the forgeries as requested by Plaintiff so this Count should be dismissed.

**Count VI for Breach of the JIA** (**Exhibit 1**, pages 13-14,¶¶ 99-107) is baseless because the JIA is a forgery. There is no credible evidence to support Zhang's formal signature and approval of the JIA. Admissions 4. Di Wu was Zhang's fiduciary as her property manager. Zhang Decl. ¶ 5; Admissions No. 30. The JIA is not an enforceable agreement and Di Wu continues to con the Court by promoting it as valid when it is not. Any renovation budget was indisputably limited to $185,000. **Exhibit 4**, Admissions 5, 17; Zhang Decl. ¶ 8. Di Wu received monies from renters or from his own family's occupancy so he is not able to recover based on his admission against interest and spoliation inferences. **Exhibit 4** Admissions 8, 13, 16, 18 and 30.

**Count VII for Implied Contract** cannot be maintained on the basis of the forged Lease and JIA documents, as cited in **Exhibit 1**, pages 14-15, ¶¶ 108-114. No credible evidence exists of a meeting of the minds to enter into those agreements and Di Wu's admissions against interest establish there are no such viable agreements as they were forged. **Exhibit 4**, Admissions 1-4. In addition, Di Wu's destruction of evidence and efforts to steal Zhang's Land Court Property, in violation of his fiduciary duties as her property manager and agent, are despicable and warrant

no relief and his unclean hands provide for no equitable relief. Zhang Decl. ¶¶ 5, 8.

**Count VIII for Specific Performance** of the JIA is baseless as set forth in the SAC at **Exhibit 1**, pages 15-16, ¶¶ 115-126. The claim is based on an invalid forged signature document and Di Wu destroyed any email to conclusively demonstrate he never received a signed version from Zhang. Di Wu has no legally recognized property interest in this Land Court Property TCT, and as confirmed by this Court in the **FOFCOL** [Dkts. 43 and 435]. Di Wu never performed any approved obligations under the JIA. **Exhibit 4**, Admissions 4, 18, 21 and 30; Zhang Decl. ¶ 7. Summary judgment is therefore appropriate to dismiss Count VIII.

**Count IX for Quantum Meruit or Unjust Enrichment** of the SAC at **Exhibit 1**, pages 16-17, ¶¶ 127-136, is not credible or viable as it unsupportable based on the deemed Admissions **Exhibit 4** at 5, 6, 7, 17, 32, 33, 40. Di Wu is not entitled to judicial equity with unclean hands and insidious efforts to breach his fiduciary duties and steal Zhang's property. The renovation budget was set at $185,000 as Di Wu confirms by his deemed Admissions and also cannot be denied based on his destruction and spoliation of email evidence, so the inferences are against his allegations and in support of Zhang's. Zhang Decl. ¶ 8. Any alleged damages are fully offset by Zhang's losses as set forth in the unrebutted expert report of Wendell Brooks (**Exhibit 13**).

**Count X for Promissory Estoppel** is not a viable separate claim or independent cause of action from the prior implied contract Count VII, as set forth in the SAC at Exhibit 1, pages 18-19, ¶¶ 137-147. It fails to state a separate viable claim upon which relief can be granted. Di Wu has no facts to establish any rights to the Property, as set forth in the **FOFCOL**, and no evidence exists to contradict his deemed admissions, or that is not already inferred against him due to his spoliation of evidence as well as his forgeries of the Lease and JIA. **Exhibit 4**.

**Count XI for Theft or Conversion** is another baseless claim with no credible evidentiary support. SAC **Exhibit 1**, pages 19-21, ¶¶ 148-168. Di Wu violated his property manager agency and fiduciary duties by inhabiting Zhang's Property without her knowledge and consent. Zhang Decl. ¶¶ 5-9. When belongings were located at the Property it was not initially known that Di Wu was living there or had left materials there, but those materials were removed by the new manager and representatives and placed in a secure storage area. All of those materials were returned to Di Wu and nothing remained withheld. Zhang Decl. ¶ 10. This is also another admitted fact in the Admissions. **Exhibit 4**, Admissions 10, 11, 12, 13, 14, 21, and 30. Di Wu has no basis to claim any damages for materials removed and all belongings were

returned to him. Zhang Decl. ¶ 10. Di Wu's deemed Admissions also demonstrate he recovered everything. Since Plaintiff recovered all belongings, there is no basis to allege his Count XI claim; it should be dismissed for failing to present credible admissible evidence in support.

**Count XII for Violation of Chapter 480** is not viable as Zhang is a *consumer*, and there is no allegation that Zhang is a business, as intended by the statute. **Exhibit 1**, pages 21-24, ¶¶ 169-176. **Exhibit 4,** Admissions 20 (admitting no basis to assert a Chapter 480 claim). This claim has no viable legal basis for relief as Di Wu is not a *consumer* concerning Zhang's purchase of residential property, because his alleged investment was for business purposes. *Cieri v. Leticia Query Realty, Inc.*, 580 Hawai'i 54, 905 P.2d 29 (1995); *see Sung v. Hamilton*, 710 F. Supp. 2d 1036, 1051-53 (D. Haw. 2010) (plaintiff was not consumer under UDAP in claims involving his purchase of property for bottling business, as his "investment was for business purposes"). This claim cannot be maintained as a matter of law and should be dismissed.

**Count XIII for Wrongful Eviction** (Exhibit 1, pages 24-25, ¶¶ 177-187) is a claim that was already ruled upon and against Di Wu in the District Court that confirmed Zhang's entitlement to possession and denying Di Wu's right to possession. This was confirmed in the District Court order entered in *Dan Dan Zhang v. Di Wu*, District Court of the First Circuit, Koolaupoko Division, State of Hawai'i, Civil No. 1DRC-22-0005097 [Minutes, Dkt. 479 and Dkt. 490], which this Court has previously taken Judicial notice of in **FOFCOL** [Dkt. 435]. This is also confirmed by this Court's **FOFCOL** that Di Wu has no right to ownership, possession or use of the premises, so Count XIII should be dismissed on summary judgment. *Id.* Di Wu has no evidence in email or otherwise where he can show he had permission to reside at the Property, and he destroyed evidence demonstrating that he has no such right and no such approval was ever communicated to him by Zhang. Zhang Decl.¶ 9. Di Wu admitted he had no right or claim to reside on the Property. **Exhibit 4** Admissions 10, 12, 13, 14, 18, 21 and 30. This Court also lacks jurisdiction to rule on any alleged wrongful eviction claim since this issue has already been ruled upon and subject to District Court jurisdiction. That District Court action is currently on appeal in *Zhang v. Wu*, CAAP-23-0000380, which is currently pending before the ICA.

**Count XIV for Equitable Lien** is another false and dishonest effort to encumber and adversely interfere with Zhang's rights to her quiet enjoyment and use of her Property. **Exhibit 1**, page 25, ¶¶ 188-191. Admissions 21. There is no legal basis for an equitable lien based on the District Court ruling and this Court's **FOFCOL** [Dkts. 43 and 435], as well as nothing

recorded on the TCT. *Id.* To the extent this claim seeks a form of prejudgment attachment, it is premature and the only available remedy, if granted, is not as a separate equitable lien but a Final Judgment. To the extent the equitable lien is based on the forged Lease and JIA, there is no legal basis to grant such equitable relief and otherwise Di Wu's unclean hands afford him no right to recover in equity. Therefore, this claim should be dismissed as a matter of law.

In sum, all of Plaintiff's affirmative claim Counts in the SAC should be dismissed as a matter of law and on the basis that there is no credible evidence to support the claims for relief; therefore, summary judgment should be granted in favor of Zhang.

E. ZHANG'S AFFIRMATIVE CLAIMS FOR RELIEF IN THE FIRST AMENDED COUNTERCLAIM SHOULD BE AWARDED ON SUMMARY JUDGMENT

Zhang's First Amended Counterclaim, filed on April 12, 2024 [Dkt. 394] contains 4 counts for affirmative relief. Based on Di Wu's deemed Admissions and spoliation of evidence inferences, the credible admissible evidence shows that Zhang's claims are incontrovertible and should be granted in her favor on summary judgment, as set forth below.

**Count I for Breach of Oral Agreement** is based on Di Wu's confirmed promise to provide property management and renovation services which he breached by failing to collect and pay over to Zhang those rental proceeds and profits. Instead, Di Wu hid the fact that he moved himself and his family on to Zhang's Property and he failed to rent the Property to vacation renters and renovate the Property as agreed. Zhang Decl. ¶¶ 5, 6, 8 and 9. This is also confirmed in Admissions 1-8, 9-13, 17-18 and 30. **Exhibit 4**. Therefore, Di Wu has breached his oral property manager agreement and failed to pay 80% of the anticipated rental proceeds. The lost rental value was calculated by rental valuation expert Wendell Brooks at **Exhibit 13**. In addition, Di Wu's multiple breaches of contract entitle Zhang to damages of $1.5 million, as set forth in Brook's expert report, including $1 million for code and permit problems to be remediated, as well as $500,000 in lost rental value. Brooks Report **Exhibit 13**, pages 26-27.

**Count II for Accounting** is necessary, but may be moot now due to Di Wu's deemed admissions and testimony that he destroyed evidence. **Exhibit 4**, Admissions 17, 35 and 36; **Exhibits 10-12**. Since Di Wu's records cannot be discovered Zhang is entitled to an inference that the damages she seeks are appropriate due to Plaintiff's spoliation of evidence and violation of fiduciary duties. Zhang is entitled to an inference and ruling in favor of an accounting.

**Count III for Violation of Chapter 480** is appropriate against Di Wu as he held himself

out and represented to Zhang and other investors in Hawai'i that he: (i) possessed the necessary skills, qualifications, experience and manpower to first source and procure real properties and, then post-acquisition, to design, construct, re-construct or renovate the properties so acquired and to manage and maintain them for rental income; and (ii) was engaged in the trade of selling all such services for compensation as a property manager, contractor, realtor, designer and fiduciary. Zhang relied upon those false representations of Di Wu's commercial positions. **Exhibit 4** Admissions 26-30; Zhang Decl. ¶ 5. Di Wu violated his business obligation to refrain from unfair and deceptive practices. His actions are the epitome of the need for HRS Chapter 480 protections. In contrast to Di Wu's baseless claim, Zhang is a *consumer* because Zhang committed money in a personal investment for residential property. *Cieri v. Leticia Query Realty, Inc.*, 580 Hawai'i 54, 67, 905 P.2d 29, 42 (1995) (residential purchaser is a consumer under HRS Section 480-1); *see Haw. Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 227, 11 P.3d 1, 15 (2000). As set forth above, the facts clearly demonstrate unfair and deceptive acts and warrant at least the statutory minimum of $1,000 in damages and otherwise a maximum of the amounts stated in the Brooks' expert report as trebled under Haw. Rev. Stat. §480-13 (2005).

**Count IV for Breach of Fiduciary Duty** is also clearly established by the Admissions, spoliation of evidence, and the credible testimony and facts presented by Zhang. **Exhibit 4** Admissions 1-4, 6, 7, 9, 11-19, 21, 25-33 and 40. Di Wu's destruction of evidence, breaches of duty in squatting on Zhang's property, trying to steal it by forging a Lease and JIA, and multiple abusive practices are clear violations of fiduciary and agency duties warranting damages as set forth in Brooks' expert report (**Exhibit 13**) and warrant granting summary judgment.

## V. CONCLUSION

For these reasons, Defendant respectfully requests that the Court grant summary judgment in her favor on all counts and claims or for such alternative relief as is appropriate.

DATED: Honolulu, Hawai'i, August 30, 2024.

*/s/ John P. Manaut*
JOHN P. MANAUT
STEVEN M. EGESDAL
KAI WANG
Attorneys for Defendant/Counterclaimant
DAN DAN ZHANG AKA DANDAN ZHANG

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff/Counterclaim Defendant<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants/Counterclaimant | CIVIL NO. 1CCV-22-0000964 (DEO)<br><br>DECLARATION OF DAN DAN ZHANG AKA DANDAN ZHANG |

**DECLARATION OF DAN DAN ZHANG AKA DANDAN ZHANG**

I, Dan Dan Zhang, declare:

1. I am the named Defendant in this action. I make this Declaration on my personal knowledge and information and I am competent to testify to these matters. I am a resident of the People's Republic of China and the sole owner of the real property that is the subject matter of this litigation located at 1039 Koohoo Place, Kailua, Hawaii, and as more particularly described in the First Amended Counterclaim, filed April 12, 2024 [Dkt 394] (the "Property").

2. I have a limited ability to read and speak in English, as my native language is Mandarin Chinese. To the extent that I am unable to understand matters relating to this case because it goes beyond my ability to communicate in English, I have retained the services of a translator to provide translation services. My counsel, Kai Wang, who speaks Mandarin Chinese, has also translated the materials as stated herein for purposes of this motion.

3. I was the sole Buyer of the Property as evidenced by the Purchase Contract dated April 30, 2019 submitted to Dieter K. Stadelmann, as the Seller, by Shih-Jen L. Martin (R), the real estate broker who worked with Di Wu for the acquisition of multiple Hawaii properties for a group of PRC investors, including myself, and accepted by Seller on May 1, 2019 (the "Purchase Contract").

4. I acquired title to the Property pursuant to a Warranty Deed, dated May 22, 2019 (the "Deed"), which was filed in the Office of Assistant Registrar of Land Court of the State of Hawaii ("Land Court") on July 3, 2019, and evidenced by the issuance of Transfer Certificate of Title ("TCT") No. 1,178,606. A true and correct copy of the Warranty Deed, dated May 22, 2019, is attached as Exhibit C to Di Wu's First Amended Complaint filed August 16, 2022 [Dkt.14].

5. I was the sole buyer of the Property from the previous owner as memorialized in both the Purchase Contract and the Deed. After purchase, I was a consumer of services that Di Wu had offered as property manager and for renovation work at the Property so it could be rented to third party vacation renters. Di Wu also acted as my property manager agent and fiduciary tasked with handling all responsibilities at the Property since I resided in China. Di Wu was located in Honolulu and represented to me that he had the experience and ability to properly handle all short term vacation rentals as well as required work to renovate my Property so it could be rented. I learned later that Di Wu violated my trust, failed to pay me for rentals and took monies that were to go to me in an 80% payment for all rentals. Di Wu failed to advise me of his actions, including the renovation costs that he says he incurred for the Property but without my authority. As a result, his services were terminated by letter from my attorney on July 29, 2022.

6. At no time did I ever agree that Di Wu could live on my Property, and I never saw nor signed the Lease document attached as Exhibit B to the Second Amended Complaint filed July 21, 2023 [Dkt. 236] ("SAC") (the "Lease"). Di Wu has produced no evidence that I ever saw or signed the Lease document before he was terminated. It is a forgery.

7. I did not sign both the English version of the document entitled "property investment agreement 05.28.2019" or the second page Chinese version of the document entitled "共同出资协议书05.28.20," and also referred to as a Joint Investment Agreement or JIA, which was attached as Exhibit A to the SAC ("JIA"). While, before the closing of the acquisition, there was some discussion early on with Di Wu about possibly entering into such an arrangement, such proposed arrangement was not finalized before the closing. I never agreed or approved that arrangement and never signed the document that is attached as Exhibit A to the SAC. It is a forgery. My signature was forged on that document and the signature line image was attached without my knowledge or approval. I did not consent to nor agree to the JIA.

8. Plaintiff Di Wu and I had an oral agreement that he would manage my Property. The oral agreement included a budget of $185,000.00 for repair and renovation of the property. Di Wu was required to provide me with periodic reports, copies of invoices, and proof of payments of the expenses incurred. He has never provided me with periodic reports, invoices or proof of payments and therefore as my property manager there was never any authority or agreement, much less proof, that he spent over $1.5 million dollars for renovation costs.

9. Di Wu was not authorized to reside at my Property and he falsely claimed to have such a right only after I learned he was living in my Property with his family and not renting it out to vacation renters as he agreed. The Lease did not surface until after Di Wu's quiet title claim in this action had been dismissed.

10. When I learned someone had left belongings in the Property the items were removed to a secure storage unit. Di Wu claimed those items were his and all of those items (except for files concerning the properties owned by the group of PRC property investors, including the Property) were later returned to Di Wu. The items were removed because I was informed by Di Wu that, at that time, the Property as vacant, Di Wu's services as property manager were terminated and he was never authorized to reside on my Property. Di Wu's items removed from the Property were returned to him.

I declare under penalty of law that the foregoing is true and correct.

DATED: Honolulu, Hawai'i, August 30, 2024.

/s/
DAN DAN ZHANG

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff/Counterclaim Defendant<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants/Counterclaimant | CIVIL NO. 1CCV-22-0000964 (DEO)<br><br>DECLARATION OF COUNSEL: EXHIBITS 1-13 |

**DECLARATION OF COUNSEL**

I, JOHN P. MANAUT, declare:

1. I am counsel for Defendant Dan Dan Zhang aka Dandan Zhang ("Defendant Zhang") in the above-captioned matter. I am familiar with the documents and events described below and I make this declaration upon personal knowledge. I am competent to testify to the matters stated in this Declaration.

2. Attached as **Exhibit 1** is a true and correct copy of Plaintiff Di Wu's Second Amended Complaint, filed July 21, 2023 [Dkt. 236] ("SAC").

3. Attached as **Exhibit 2** is a true and correct copy of the purported Residential Lease Agreement that was attached to Plaintiff's SAC as Exhibit B.

4. Attached as **Exhibit 3** is a true and correct copy of the purported Joint Investment Agreement document with the heading of "property investment agreement 05.28.2019" on the

first page English version that was attached and verified by Di Wu as Exhibit A to the SAC ("JIA").

5. Attached hereto as **Exhibit 4** is a true and correct copy of a Certificate of Service filed in this action on July 15, 2024 [Dkt. 497] ("Certificate") that contains Defendant Dan Dan Zhang aka Dandan Zhang's First Request for Admissions to Plaintiff Di Wu ("Admissions"), which was attached thereto as Exhibit 1.

6. Service of the Admissions pursuant to Haw. R. Civ. P. 36 was made on Di Wu by filing in JEFS on July 15, 2024 [Dkt. 497]; therefore the deadline to answer or object was August 14, 2024.

7. Service was also effected by sending the Admissions on July 15, 2024 to Plaintiff Di Wu both by email and by U.S. Mail as stated in the Certificate [Dkt. 497]. The 30 day deadline after that service to respond was August 14, 2024. Delivery was also confirmed to Di Wu's mailing address on July 18, 2024 by postal service return receipt.

8. No answers or objections to the Admissions were received from Di Wu by the deadline of August 14, 2024. Haw. R. Civ. P. 36 provides that if no responses are received within 30 days of the service, then the matters separately stated in each of the Admissions requests is deemed admitted as a matter of law under the rule.

9. Seven days after the expiration of the 30 day period to respond to the Admissions, and without leave of court for an extension of time to respond or request to withdraw the admissions, on August 21, 2024 at 6:53 p.m., Di Wu submitted to JEFS a letter style document entitled Objection to Request for Admissions" [Dkt. 505] ("Objection"). A true and correct copy of the Objection is attached hereto as **Exhibit 5**. The Objection was not signed by Di Wu or any counsel, as required. It contained only Di Wu's type written name. The majority of the

objections contained improper claims that evidence will be uncovered or required future information to respond, which is not a permissible response under Haw. R. Civ. P. 36.

10. The Objection was not timely submitted before the expiration of the 30 day period under Haw. R. Civ. P 36 and no leave of court to allow any late filing or withdrawal was sought by Plaintiff. As a result, by operation of law and the plain meaning of language in Haw. R. Civ. P. 36, the matters contained in the Admissions are deemed admitted and are evidence as admissions against interest.

11. The Lease document sought to be admitted in the Admissions is at the heart of Plaintiff Di Wu's claims and was attached as Exhibit B to Di Wu's SAC. The Lease document attached to Di Wu's SAC was previously admitted by Di Wu to be the basis for his claims and was specifically referenced in the Admissions definitions for him to answer (**Exhibit 4**, at Admissions page 3).

12. The JIA was attached and verified by Di Wu as Exhibit A to the SAC. The JIA document was previously admitted by Di Wu to be the basis for certain designated Counts and was specifically referenced in the Admissions definitions (Exhibit 4, at Admissions page 3).

13. Both the Lease and the JIA are deemed to be forgeries based on the failure of Di Wu to timely respond to the Admissions within 30 days under Haw. R. Civ. P. 36.

14. In addition to the Admissions, the affirmative claims disclosures from Defendant's expert witnesses contain expert reports that demonstrate the Lease and the JIA are both forged documents. Defendant Zhang's experts were timely disclosed on June 24, 2024, as set forth in Defendant Dan Dan Zhang aka Dandan Zhang's Affirmative Claim Disclosure filed June 24, 2024 [Dkt. 453] ("Disclosure").

15. Two experts in forensic imaging and handwriting, Michael McMurdo and Reed Hayes, both submitted separate unrebutted reports concluding that the Lease and JIA attached to Di Wu's SAC were forged documents. McMurdo's report was submitted as Exhibit I to the Disclosures and filed in JEFS on June 24, 2024, as Docket number 462. True and correct copies of excerpted pages 1-16 of Docket 462 are attached hereto as **Exhibit 6**.

16. True and correct copies of excerpted pages 1-9 from Reed Hayes' expert report filed as Exhibit K to the Disclosures filed June 24, 2024, is attached hereto as **Exhibit 7**. A true and correct copy of Reed Hayes's Exhibit L Disclosures for the Lease forgery expert report filed in JEFS as Docket 465 is attached hereto as **Exhibit 8**. A true and correct copy of Reed Hayes's Exhibit M Disclosures for the JIA forgery expert report filed in JEFS as Docket 466 is attached hereto as **Exhibit 9**.

17. The unrebutted handwriting and image analysis expert reports in **Exhibits 6-9** establish that the Lease and JIA were forged documents.

18. Those expert reports were timely filed by the June 24, 2024 deadline set forth in the 2nd Scheduling Order - Non-Jury Trial, filed February 14, 2024 [Dkt. 335] ("Sched. Order").

19. Plaintiff Di Wu did not file or disclose any affirmative claim, responsive or rebuttal expert report by the Sched. Order deadlines of June 24, 2024, July 23, 2024, or August 22, 2024.

20. In addition to the forged documents, testimony under oath from Di Wu's partners for his business dealings confirm that Di Wu destroyed email and an email account despite the obligation to retain all such information and as Zhang's property manager fiduciary. The testimony of Jason Tootell demonstrated that Di Wu knowingly deleted electronic information and an account directly as a result of Zhang's efforts to regain possession of her Property from

Di Wu through a separate State District Court eviction action. This led Di Wu, according to Zhang, to fake the Lease and JIA documents to improperly manufacture a basis to stay in possession of Zhang's Property.

21. True and correct copies of excerpts of testimony from the deposition of Jason Tootell, from his deposition taken on November 30, 2022, is attached hereto as **Exhibit 10**.

22. True and correct copies of excerpts of testimony from the deposition of Lonnie Adams taken in the case of *Lonnie Adams v. 210S LLC*, et al, Circuit Court of the First Circuit, State of Hawaii, 1CCV-22-0001122, is attached hereto as **Exhibit 11**.

23. In addition, a Declaration of Lonnie Adams, dated January 10, 2024, further corroborating Di Wu's destruction of evidence at paragraph 11, is attached hereto as **Exhibit 12**. Relevant provisions from Adams' Declaration at Paragraph 11 state:

> After the dispute was made known to me, I learned that Di Wu had deleted and destroyed accounts, transaction history and records related to actual and proposed rentals with the online short-term rental platforms and third parties. At least one gmail account and other electronically stored data and information, such as chat records, images and video recordings on messaging apps such as Telegram, were willfully deleted by Di Wu despite the fact that members of the group and Di Wu were in disputes over payments and the information in those accounts could provide important evidence.

24. The above information establishes that email material to the dispute was deleted so the evidence of Di Wu's spoliation of evidence should be dispositive as a discovery sanction in order to deem facts admitted against Di Wu and also as support for dismissal of his SAC. **Exhibits 10 and 11** were also previously submitted to this Court as Exhibit 5 and 6, respectively, in support of Defendant Dan Dan Zhang aka Dandan Zhang's Motion for Appointment of Discovery Master and for Order on the Scheduling and Number of Depositions, filed April 3, 2024 [Dkt. 374].

25. The expert report of property valuation and lost rentals expert Wendell Brooks was attached to the Disclosures filed on June 24, 2024 as Exhibit A [Dkt. 454]. A true and correct copy of that report is attached at **Exhibit 13**. The Brooks report shows damages for lost rentals and costs to remediate improper building code and permit violation work done by Di Wu as well as substantial lost revenues which establishes the $1.5 million calculation of damages claimed by Defendant Zhang. *Id.* pages 26-27. The Brooks report has been unrebutted and no expert exists to dispute those damages calculations sought by Zhang based on Plaintiff's liability on the First Amended Counterclaim, filed April 12, 2024 [Dkt 394].

I declare under penalty of law that the foregoing is true and correct. This declaration is made in accordance with Rule 7(g) of the Rules of the Circuit Courts of the State of Hawai'i.

DATED: Honolulu, Hawai'i, August 30, 2024.

*/s/ John P. Manaut*
JOHN P. MANAUT

STARN O'TOOLE MARCUS & FISHER
A Law Corporation

STEPHANIE E. W. THOMPSON 8399-0
ROBERT J. BROWN 10174-0
Pacific Guardian Center Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 537-6100

Counsel for Plaintiff DI WU

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
21-JUL-2023
02:09 PM
Dkt. 236 CAMD

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff,<br><br>vs.<br><br>DANDAN ZHANG AKA DAN DAN ZHANG, JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, OR ENTITIES 1-20,<br><br>Defendants. | CIVIL NO.: 1CCV-22-0000964<br><br>SECOND AMENDED VERIFIED COMPLAINT; EXHIBITS "A" – "B"; SUMMONS<br><br>Judge: Honorable Dean E. Ochiai<br>Trial Date: May 20, 2024 |

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiff DI WU ("***Mr. Wu*** " or "***Plaintiff***"), by and through his attorneys, hereby asserts the following Second Amended Complaint against DAN DAN ZHANG, a.k.a. DANDAN ZHANG ("***Defendant***" or " ***Ms. Zhang***") and additional counterclaim defendants (defined below), and avers and alleges as follows:

## PARTIES

1. DI WU is now, and at all times relevant to the claims asserted herein, a resident of the City and County of Honolulu, in the State of Hawaii.

2. Upon information and belief, Ms. Zhang is a resident of the People's Republic of China.

3. Additional Defendants INDIVIDUAL DOE DEFENDANTS 1-10; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; DOE GOVERNMENTAL UNITS 1-10, AND DOE TRUSTS 1-10, (collectively "***Doe Defendants***") are persons, partnerships, corporations, trusts, agencies, governmental or other entities sued under fictitious names because their true names and identities are presently unknown to Counterclaimant except, that they are or may be connected to the events that are the subject of this lawsuit or acting in concert with one or more of the other Defendants herein, are or may be liable to Counterclaimant for the relief demanded herein. Counsel for Counterclaimant has made a good faith and diligent search to ascertain the names and identities of such defendants, but has been unable to obtain additional identities, and therefore requests the Court to allow leave to certify their true names, identities, activities, and responsibilities if the same are subsequently ascertained.

4. All Defendants, including but not limited to the Ms. Zhang and Doe Defendants (defined above, and collectively referred to herein as "***Defendants***"), acted as agents, servants, employees, employers, representatives, co-conspirators, associates, or independent contractors of each other. The term "***Parties***" shall refer to Defendant and Mr. Wu, collectively.

**JURISDICTION**

1. This Court has This Court has jurisdiction and venue over the Parties named herein under Hawai'i Revised Statutes ("***HRS***") § 634-35, as the real property, transactions, and tortious conduct alleged herein arise within this state. Defendants are subject to the jurisdiction of the Court because he/they reside and/or conduct business in this Circuit and the tortious conduct alleged herein occurred within this Circuit.

2. This Court has subject matter jurisdiction over this matter pursuant to HRS § 603-21.5(a)(3).

3. Venue is proper in the Circuit Court of the First Circuit, State of Hawaii pursuant to HRS § 603-36(5).

## FACTS COMMON TO ALL CLAIMS

4. In or around April 2018, the Parties began online discussion through WeChat.

5. The Parties began discussing a plan to purchase and develop real property on Oahu.

6. In or around May 2019, the Parties decided to jointly purchase real property located at 1039 Koohoo Place, Kailua, Hawaii 96734 (the "***Property***").

7. In furtherance of their decision to purchase and develop the Property for a profit, the Parties negotiated and agreed to a joint venture property investment agreement (the "***JV Agreement***").

8. The Parties agreed to put Ms. Zhang on title for the Property, but split the interest to the Property: 75% to Ms. Zhang, and 25% to Mr. Wu, with profits and losses to be shared similarly.

9. The Parties further agreed that in the event one Party intended to transfer his/her rights to a third party, the other Party would have the right of first refusal.

10. The Parties recognized and acknowledged that the Property at the time of purchase needed extensive and immediate repairs in order for it to be habitable.

11. Based on the Parties' agreements and promise made under the JV Agreement, Mr. Wu transferred and committed funds for the purchase of the Property, thereby enabling the Parties to successfully purchase the Property.

12. Mr. Wu paid to Ms. Zhang approximately $220,000, as contribution to the funds necessary to purchase the Property.

13. The Parties' JV Agreement was reduced to a writing, a true and correct copy of which is attached hereto as Exhibit A.

14. The purchase of the Property closed, and the deed was recorded on July 3, 2019.

15. After the closing on the Property, and based on the Parties' agreements under the JV Agreement, Mr. Wu took possession of the Property and began extensive repairs and renovations at the Property.

16. By agreement and consent of the Parties, Mr. Wu paid approximately $1.6 million, for the repairs, remodeling and renovations, including the related legal costs, undertaken at the Property.

17. Additionally, during the course of the Parties' joint venture relationship, Mr. Wu transferred money to Ms. Zhang (or to her husband on her behalf) so that the property taxes for the Property could be paid.

18. Mr. Wu also transferred additional funds to Ms. Zhang and/or her husband for, among other things, the payment of the property taxes and miscellaneous materials.

19. The effects of the global pandemic and changes in Hawaii law forced the parties to alter their original plans for the Property. The global pandemic adversely impacted the parties' ability to quickly repair or renovate the luxury Property and find appropriate renters for the Property.

20. In June 2021, in light of the Parties' JV Agreement and their mutual interest in the Property, and given the negative effects of the global pandemic on the Parties' plans for the

Property, the Parties agreed that Mr. Wu would rent the Property under a ten year long term lease (the "***Lease***").

21. Under the terms of the Parties' Lease, the Parties' agreed, among other things, to the following:

a. Mr. Wu and his family would reside at the Property;

b. Mr. Wu would pay to Ms. Zhang $20,000 a year as rent;

c. Rent would be due at the end of each calendar year.

22. The Parties' Lease was reduced to a writing, a true and correct copy of which is attached hereto as Exhibit B.

23. The Lease also provides to Mr. Wu the right to sublease the Property.

24. Mr. Wu paid rent to Ms. Zhang as agreed to by the parties under the terms of the Lease.

25. Mr. Wu has fully performed under the terms of the Lease.

26. On July 29, 2022, without notice, communication, or cause, Ms. Zhang, (with the assistance of others, and while Mr. Wu was vacationing on the mainland with his family), broke into the Property, changed the locks, and installed "new" renters at the Property.

27. These individuals, at the direction of Ms. Zhang, removed Mr. Wu's and his family's significant personal and business property and belonging from the Property.

28. On July 29, 2022, while on the mainland, Mr. Wu received notification from his security cameras he installed at the Property that two men were attempting to gain access to the Property. Fearful that someone had broken into the home, Mr. Wu immediately returned to Oahu and contacted the police.

29. Police reports obtained by Mr. Wu confirm that Ms. Zhang initiated a scheme to break into the Property, without Mr. Wu's knowledge or consent, change the locks, remove Mr. Wu's and his family's belongings and install new renters at the Property in his stead.

30. Statements taken by the police from independent, credible witnesses confirm Ms. Zhang's scheme to wrongfully remove Mr. Wu from the Property, without his knowledge or consent.

31. The new "renters" purportedly installed at the Property by agents or representatives of Ms. Zhang were informed she//he/they could stay at the Property temporarily. On information and belief, no rental agreement was executed between Ms. Zhang (or her representatives) and the new renters.

32. Also on information and belief, Ms. Zhang did not charge any rent to the new renters.

33. When the police appeared at the Property, on or about August 1, 2022, and were presented with the facts relating to Mr. Wu's and his family's possession of the Property, the police put Mr. Wu in possession of the Property and the "renters" voluntarily left the Property.

34. Ms. Zhang never informed Mr. Wu of her intent to travel to Oahu in late July 2022, prior to the break in at the Property on July 29, 2022.

35. Prior to July 29, 2022, Ms. Zhang never informed Mr. Wu of her intent to engage Mr. Thompson Pham, to break into the Property, change the locks, and remove personal property from the Property.

36. When questioned by the police on or about August 1, 2022, Ms. Zhang denied even knowing Mr. Wu.

37. Subsequent to the removal of the personal and business property belonging to Mr. Wu and his family from the Property, demand was made to Ms. Zhang, by and through her attorneys, that the property and belongings be returned to Mr. Wu.

38. Ms. Zhang refused to immediately return the personal property and belongings Mr. Wu, contending that Mr. Wu must first pay for all the costs of transport and storage for the personal property.

39. On or about September 14, 2022, Mr. Wu filed a statement with the Honolulu Police Department, in which he detailed the personal property and documents taken from the Property on or about July 29, 2022 through August 1, 2022.

40. At that time, Mr. Wu estimated the value of the personal property wrongfully taken from the Property to be in excess of $500,000.

41. On August 12, 2022, Mr. Wu commenced this civil proceeding against Ms. Zhang in the Circuit Court of the First Circuit, State of Hawaii.

42. On August 15, 2022, Ms. Zhang filed her complaint for ejectment against Mr. Wu in the District Court of the First Circuit, State of Hawaii

43. On or about January 28, 2023, Mr. Wu was finally provided access to the storage units into which his and family's belongings, documents and other personal items had been purportedly stored after Ms. Zhang's removal of the same from the Property during the weekend of May 29, 2022.

44. On or about January 30, 2023, Ms. Zhang and her attorneys' announced that they would be keeping approximately seven (7) boxes of original documents and items and not returning these items to Mr. Wu. Ms. Zhang and her attorneys' stated that these documents and items were the property of Ms. Zhang, or several of her attorneys' "other" clients—to which they

had a right to access and ownership. Upon information and belief, Ms. Zhang is not a party to her attorneys' "other" cases involving different clients.

45. Ms. Zhang and her attorneys' have wrongfully withheld and converted Mr. Wu's and his family's personal and business information and items for their own use.

46. To date, Mr. Wu has still not received many of the items listed in his original statement to the police.

47. Mr. Wu has not received the originals of confidential personal and business information.

**COUNT I**

Breach of Contract (Lease)

48. Plaintiff realleges the allegations contained in paragraphs 1-47 as if fully set forth herein.

49. The Lease existing between the Parties constituted a valid contract that imposed duties and conditions on the Parties.

50. The Lease provided that Mr. Wu would have the right to possess the Property for ten (10) years, and that Mr. Wu could use portions of the Property for "other rentals or sublease purpose [sic]."

51. The Lease further provided that Mr. Wu would pay rent of $20,000 each year to Ms. Zhang.

52. Rent would be due at the end of each of the calendar year.

53. Mr. Wu agreed to pay, and Ms. Zhang agreed to accept rent in the form of bitcoin and cash.

54. In 2021, Mr. Wu paid to Ms. Zhang rent in the form of bitcoin, valued in excess of approximately $50,000 at the time.

55. Ms. Zhang and her husband willingly accepted this bitcoin payment as rent.

56. Mr. Wu has also paid to Ms. Zhang's attorneys' an additional $20,000 in January 2023, as rent, as a show of good faith during the pendency of the litigation in the district court case.

57. Based on the payments of bitcoin and cash (some of which is still being held by Ms. Zhang's attorneys), Mr. Wu has paid rent through 2024.

58. Mr. Wu's contributions to Ms. Zhang for the purchase price of the Property, the extensive costs of the remodel, the money paid to Ms. Zhang and her husband for the payment of the property taxes, as well as the payment of rent through 2024, constitute good and valuable consideration of the parties' Lease.

59. Mr. Wu has fully performed under the terms of the parties' Lease.

60. In late July 2022, Ms. Zhang wrongfully attempted to remove Mr. Wu from the Property in violation of the Lease terms.

61. Ms. Zhang failed to provide the proper notice to Mr. Wu regarding her intent to access the Property.

62. Ms. Zhang failed to provide proper notice to Mr. Wu regarding her intent to remove Mr. Zhang from the Property.

63. Ms. Zhang has breached the terms of Parties' Lease by, among other things, engaging agents to break into the Property, change the locks, install new "renters" at the Property, and remove valuable personal and business property belonging to Mr. Wu and his family.

64. Ms. Zhang has also breached the terms of the Parties' Lease by wrongfully retaining Mr. Wu's and his family's personal and business property and documents without consent or permission.

65. Ms. Zhang has further breached the terms of the Parties' Lease by disclaiming the existence of the Lease and initiating ejectment proceedings.

66. Ms. Zhang has breached the terms of the Lease by attempting to cancel the Lease.

67. Ms. Zhang has also breached the covenant of good faith and fair dealing inherent in every contract by, among other things, the actions described herein, but also by wrongfully seeking to remove Mr. Wu from the Property.

68. Ms. Zhang has breached the covenant of good faith and fair dealing by failing to perform her duties under the Lease in commercially reasonable and responsible manner.

69. As a direct and proximate result of Ms. Zhang's actions or omissions, Mr. Wu has suffered damages in amounts to be proven at trial.

**COUNT II**

Breach of Implied Contract (In the Alternative)

70. Plaintiff realleges the allegations contained in paragraphs 1 – 68 as if fully set forth herein.

71. In the alternative to claims asserted in Count I, the Parties demonstrated a mutual intention to enter into a lease agreement on the terms described herein, thereby creating an implied contract between them.

72. This implied contract obligated the Parties thereto to perform in accordance with the terms of their mutual promises and agreements.

73. Mr. Wu fully performed his duties and obligations under the terms of the implied contract, to include the payment of rent to Ms. Zhang.

74. Mr. Wu's performance takes the parties' agreement out of the Statute of Frauds.

75. Ms. Zhang breached the implied contract by, among other things:

a. Disclaiming and/or denying the existence of the parties' implied contract;

b. Attempting to remove Mr. Wu and his family from the Property, without proper notice or cause;

c. Removing Mr. Wu's and his family's the personal property and valuables from the Property, without proper notice or consent.

d. Wrongfully retaining Mr. Wu's and his family's personal and business property and documents without consent or permission.

76. Ms. Zhang also breached her obligation of good faith and fair dealing implied in every contract (express and implied) in the manner detailed herein.

77. As a direct and proximate result of Ms. Zhang's actions and/or omissions, Mr. Wu has suffered damages in amounts to be proven at trial.

**COUNT III**

Specific Performance (Lease)

78. Plaintiff realleges the allegations contained in paragraphs 1-77 as if fully set forth herein.

79. The Lease between the Parties constitutes a valid and enforceable contract between them.

80. The Lease provides that Mr. Wu is entitled to occupy and use the Property for a specific term of ten years.

81. As detailed herein, Mr. Wu has fully performed under the terms of the Lease, and has duly tendered performance of his duties under the Lease.

82. Mr. Wu has provided good and valuable consideration for the rights and obligations described in the Lease.

83. Ms. Zhang's attempts to remove Mr. Wu from the Property constitutes a material breach of the Lease terms.

84. Mr. Wu is entitled to use and occupy the Premises in accordance with the terms of the Lease, so long as he abides by its terms.

85. Mr. Wu stands ready, willing and able to fully perform under the terms of the parties' Lease.

86. Because Mr. Wu's rights to use and occupy the Property, for a specific term and specific rent constitute unique interests in the Property, Mr. Wu lacks an adequate remedy at law and is entitled to invoke the equitable jurisdiction of this Court for specific performance.

87. Consequently, Mr. Wu is entitled to the quiet use and enjoyment of the Property and order from this Court enforcing his rights under the contract to do so.

88. As a direct and proximate result of Defendant's breaches of the Lease, described herein, Mr. Wu is entitled to specific performance of the contract, together with recovery of Plaintiff's costs associated with Defendant's breaches thereof, including but not limited to his attorneys' fees and costs in connection with this action.

**COUNT IV**
Injunctive Relief

89. Plaintiff realleges the allegations contained in paragraphs 1-88 as if fully set forth herein.

90. Pursuant to the terms of the Lease, and Ms. Zhang's duties of good faith to Mr. Wu, inherent in every contract, Ms. Zhang is not permitted to cancel or forfeit Plaintiff's rights to use and occupy the Property as set forth in the Lease.

91. Moreover, Ms. Zhang is not permitted to cancel or forfeit Mr. Wu's rights of first refusal contained in the JV Agreement, so long as Mr. Wu abides by and properly exercises those rights and obligations under the terms of the JV Agreement.

92. Because Mr. Wu's rights to use and occupy the Property and his right to exercise his first right of refusal (when and if the circumstances arise) constitute unique interests in the Property, Mr. Wu lacks an adequate remedy at law and is entitled to invoke the equitable jurisdiction of this Court for injunctive relief.

93. Mr. Wu is entitled to an order enjoining Ms. Zhang from removing him or Mr. Wu's family or their property and belongings from the Property, or from cancelling Mr. Wu's rights of first refusal.

## COUNT V

Declaratory Relief

94. Plaintiff realleges the allegations contained in paragraphs 1-93 as if fully set forth herein.

95. An actual controversy exists between Plaintiff and Defendant in that Plaintiff has a legal relation, status, right or privileges in which he has concrete interests under the terms of the Lease and the JV Agreement.

96. Defendant challenges and/or denies Plaintiff's asserted relation, status, right or privileges arising from or existing under the Parties' Lease and JV Agreement.

97. A declaratory judgment will serve to terminate the uncertainty or any controversy giving rise to these proceedings.

98. Plaintiff is entitled to a judgment, pursuant to Section 632-1 of the Hawaii Revised Statutes, declaring that:

a. The Lease is a valid, enforceable contract between the Parties for the Property, thereby establishing a landlord/tenant relationship between the Parties.

b. The Parties are obligated under the clear terms of the Lease to perform in accordance therewith.

c. The JV Agreement is a valid and enforceable contract between the parties thereby establishing a joint venture relationship between the Parties.

d. The Parties are obligated under the clear terms of the JV Agreement to perform in accordance therewith.

**COUNT VI**
Breach of Contract (JV Agreement)

99. Plaintiff realleges the allegations contained in paragraphs 1-98 as if fully set forth herein.

100. In 2019, Mr. Wu entered into partnership or joint venture partnership with the Ms. Zhang in accordance with Hawaii Revised Statutes § 425-109, as described above.

101. The JV Agreement was valid and enforceable, and imposed on Ms. Zhang a duty to abide by its terms, including but not limited to Mr. Wu's right of first refusal, and the Parties' agreements for the sharing of the costs of the repairs to the Property, as well as any profits.

102. Mr. Wu's contributions to Ms. Zhang for the purchase price of the Property, the extensive costs of the remodel which he supervised and paid, his contribution of funds for the payment of the property taxes, among other contributions, constitute good and valuable consideration of the parties' JV Agreement.

103. Mr. Wu fully performed his duties and obligations under the JV Agreement, by among other things, committing money to the purchase of the Property, funding and supervising the repairs and renovations at the Property, and contributing funds to Ms. .Zhang for the payment of the property taxes at the Property.

104. Ms. Zhang breached the JV Agreement, by, among other things

a. failing to honor and acknowledge the Parties' JV Agreement;

b. failing to provide Mr. Wu with a first right of refusal;

c. failing to properly compensate Mr. Wu for his capital contributions.

105. There is implied in every contract a duty of good faith and fair dealing.

106. Ms. Zhang breached her duty of good faith and fair dealing in the performance of her duties under the joint venture agreement by, among other things, failing to pay Mr. Wu what he is owed for his contributions to the Property, and seeking to disclaim the existence of the joint venture partnership and Mr. Wu's right of first refusal.

107. As a direct and proximate result of Ms. Zhang's actions or omissions, Mr. Wu has suffered damages in amounts to be proven at trial, including but not limited to his share of the joint venture profits.

## COUNT VII

Breach of Implied Contract (in the Alternative, for the JV Agreement)

108. Plaintiff realleges the allegations contained in paragraphs 1 - 105 as if fully set forth herein.

109. In the alternative, to Count VI t Mr. Wu and Ms. Zhang demonstrated a mutual intention to enter into a joint venture or partnership agreement, thereby creating an implied contract between them.

110. This implied contract obligated the parties thereto to perform in accordance with the terms of the joint venture agreement.

111. Mr. Wu fully performed his duties and obligations with respect to the investment of funds for the purchase, repairs, and property taxes, and otherwise, under the implied contract.

112. Ms. Zhang breached the implied contract by, among other things:

a. failing to honor and acknowledge the Parties' JV Agreement;

b. failing to provide Mr. Wu with a first right of refusal; and

c. failing to properly compensate Mr. Wu for his capital contributions.

113. Ms. Zhang also breached her obligation of good faith and fair dealing implied in every contract (express and implied) in the performance of her duties under the implied contract as detailed herein.

114. As a direct and proximate result of Ms. Zhang's actions or omissions, Mr. Wu has suffered damages in amounts to be proven at trial, including but not limited to their share of the joint venture profits.

## COUNT VIII

Specific Performance (JV Agreement)

115. Plaintiff realleges the allegations contained in paragraphs 1 - 114 as if fully set forth herein.

116. The JV Agreement between the Parties constitutes a valid and enforceable contract between them.

117. The JV Agreement provides, among other things, that Mr. Wu is entitled to profits from the JV Agreement split 75/25%: 75% to Ms. Zhang, and 25% to Mr. Wu.

118. Additionally, the JV Agreement provides that in the event that Ms. Zhang decides to transfer her interest in the Property to a third party, the other party (Mr. Wu) would have the right of first refusal.

119. As detailed herein, Mr. Wu has fully performed under the terms of the JV Agreement, and has duly tendered performance of his duties under the JV Agreement.

120. Mr. Wu has provided good and valuable consideration for the rights and obligations described in the JV Agreement.

121. Ms. Zhang's attempts to disclaim the validity of the Parties' JV Agreement and cancel Mr. Wu's rights of first refusal and of his profits under the terms of the JV Agreement constitute material breaches of the JV Agreement's terms.

122. Mr. Wu is entitled to the rights, obligations and benefits afforded him under the parties' JV Agreement, which includes a right of first refusal.

123. Mr. Wu stands ready, willing and able to fully perform under the terms of the Parties' JV Agreement.

124. Because Mr. Wu's rights of first refusal and right to the profits arising from the Property constitute unique interests in the Property, Mr. Wu lacks an adequate remedy at law and is entitled to invoke the equitable jurisdiction of this Court for specific performance.

125. Consequently, Mr. Wu is entitled to his right of first refusal as stated under the terms of the JV Agreement, and order from this Court enforcing his rights under the JV Agreement.

126. As a direct and proximate result of Defendant's breaches of the JV Agreement (described herein), Mr. Wu is entitled to specific performance of the Parties' contract (the JV Agreement), together with recovery of Plaintiff's costs associated with Defendant's breaches thereof, including but not limited to his attorneys' fees and costs in connection with this action.

**COUNT IX**

Quantum Meruit/Unjust Enrichment

127. Plaintiff realleges the allegations contained in paragraphs 1 - 126 as if fully set forth herein.

128. Mr. Wu fully performed his duties and obligations under the Lease, as described herein.

129. Mr. Wu fully performed his duties and obligations under the JV Agreement, as described herein.

130. Ms. Zhang has been unjustly enriched by, among other things, Mr. Wu's payment of a portion of the purchase priced needed to secure ownership of the Property, the payment and performance of the renovation and repairs to the Property (approximating $1.6m), the payment of

rent to Ms. Zhang, and the contribution of funds for the payment of the property taxes for the Property.

131. These investments of money and services were provided with the expectation that the successful sale of the Property would benefit Mr. Wu in that he would realize a profit and be reimbursed for his efforts and the investments of time and money spent in the performance of his duties under the Lease and the JV Agreement.

132. Ms. Zhang failed to fully perform the duties and obligations pertaining to her under the Parties' Lease and JV Agreement, as described herein.

133. Ms. Zhang has unjustly benefitted from the efforts and investments of time and money by Mr. Wu, by, among other things, significantly improving the quality of the Property through the planning, execution and payment of important repairs and upgrades to the Property, the payment of rent, and the contribution of funds for the payment of property taxes for the Property.

134. It would be unjust for Ms. Zhang to retain the benefit of the investment of money, compensation and efforts of Mr. Wu as described above without providing Mr. Wu with a mutual benefit.

135. As a direct and proximate result of Ms. Zhang's actions or omissions, Mr. Wu has suffered injury in an amount to be proven at trial.

136. Under the equitable principles of *quantum meruit*, Mr. Wu is entitled to payment in the amount by which Ms. Zhang has been unjustly enriched in her retention of the benefits of the Mr. Wu's efforts, services and investments of time and money.

/ / /

/ / /

**COUNT X**

Promissory Estoppel

137. Plaintiff realleges the allegations contained in paragraphs 1 – 136 as if fully set forth herein.

138. Pursuant to the parties joint venture partnership, Ms. Zhang promised Mr. Wu that she would compensate him for his efforts, investments of time and money to purchase, maintain, repair and renovate the Property.

139. Ms. Zhang also promised to Mr. Wu that he would have a first right of refusal for the Property should she decide to transfer or sell her interest in the Property.

140. Ms. Zhang also promised Mr. Wu that so long as he timely paid rent of $20,000 at the end of each year, he could reside at the Property, for at least ten (10) years.

141. In reasonable reliance on Ms. Zhang's promises, Mr. Wu provided Ms. Zhang investments of time and money to purchase, maintain, repair and renovate the Property.

142. Additionally, in reasonable reliance on Ms. Zhang's promises, Mr. Wu provided Ms. Zhang rent in the form of cash and/or bitcoin, as requested.

143. Mr. Wu also provided substantial contributions of both time, money and his services to Ms. Zhang in reasonable reliance of Ms. Zhang's promises, as detailed herein.

144. Instead of proceeding with her promises under the Parties' joint venture partnership, Ms. Zhang has disclaimed any existence of any such joint venture, and has refused to provide Mr. Wu just, fair compensation for his performance and reliance based Ms. Zhang's promises.

145. By her actions and/or omissions described herein, Ms. Zhang failed to fulfill her promises regarding payments of compensation and/or profits to Mr. Wu investments and compensation provided by Mr. Wu.

146. Ms. Zhang has also failed to fulfill her promises regarding Mr. Wu's right to the quiet use and enjoyment of the Property under the terms of the Lease.

147. As a direct and proximate result of Ms. Zhang's promises, Mr. Wu invested substantial efforts, time and money into the Parties' joint venture to his detriment, in an amount to be shown at trial.

**COUNT XI**
Theft/Conversion

148. Plaintiff realleges the allegations contained in paragraphs 1 - 147 as if fully set forth herein.

149. On or about July 29, 2022, Ms. Zhang conspired with others, to break into the Property, change the locks, install new renters at the Property and then remove all of Mr. Wu's and his family's belongings and possessions from the Property

150. Ms. Zhang knew that the belongings she directed to be removed from the Property on or about July 29 or July 30, 2022, did not belong to her.

151. Ms. Zhang in concert with others purposefully failed to timely and properly alert Mr. Wu or his family regarding their plans to break into the Property and remove all of Mr. Wu's and his family's possessions and belongings.

152. Inasmuch as Ms. Zhang knew that Mr. Wu and his family resided at the Property, and knew that he would be away from the Property the weekend of July 29, 2022, she knew that Property contained personal and business property belonging to Mr. Wu and his family.

153. Mr. Wu never consented or gave permission to Ms. Zhang, or anyone purporting to act on her behalf, to access the Property on July 29, 2022,

154. Mr. Wu never consented or gave permission to Ms. Zhang, or anyone purporting to act on her behalf, to change the locks at the Property.

155. Mr. Wu never consented or gave permission to Ms. Zhang, or anyone purporting to act on her behalf, to remove his and or his family's personal and business possessions from the Property.

156. Mr. Wu never consented or gave permission to Ms. Zhang, or anyone purporting to act on her behalf, to dispose of or store his or his family's personal and business possessions from the Property, once they were removed.

157. Since the date of the removal of Mr. Wu's and his family's personal and business property and valuables from the Property, until January 2023, Mr. Wu has wrongfully been denied access to the personal property and valuables. To this day, many of the personal and business property and valuables belonging to Mr. Wu and his family, some of which are irreplaceable, have yet to be returned to Mr. Wu.

158. Mr. Wu has demanded a written inventory of his and family's personal property valuables from the Property by Ms. Zhang, or those purporting to act on her behalf.

159. Ms. Zhang and her agents have refused to provide any written inventory of the personal property and valuables to Mr. Wu.

160. Ms. Zhang and her attorneys have admitted to retaining documents and things that Ms. Zhang's attorneys claim belong to Ms. Zhang's attorneys' other clients—clients not a party to this lawsuit.

161. Despite repeated demand, neither Ms. Zhang nor her attorneys have returned all of the personal and business property taken from the Property during the weekend of May 29, 2022 through August 1, 2022.

162. Upon information and belief, during the removal and/or transport of Mr. Wu's and his family's personal property and valuables from Property, certain amounts of cash, electronic devices, important documents and other valuables were taken, and never put in storage.

163. Ms. Zhang, in concert with others who have yet to be identified, conspired to wrongfully remove Mr. Wu's and his family's personal property from the Property and keep it for his/her/their own.

164. Ms. Zhang, as well as those purporting to act on her behalf, are liable for common law theft and/or conversion of Mr. Wu's and his family's personal and business property and valuables.

165. Mr. Wu estimates that the value of the personal and business property and valuables wrongfully removed from Property exceeds $200,000.

166. Upon information and belief, the personal and business documents wrongfully retained by Ms. Zhang and her attorneys for "others" have been "used" by Ms. Zhang's attorneys to undermine Mr. Wu's business interests and instigate or further the interests of their own clients-clients not a party to this lawsuit.

167. Ms. Zhang and her co-conspirators are liable for the loss of Mr. Wu's and his family's personal and business property and valuables in amounts to be proven at trial.

168. The conduct set forth above was undertaken intentionally, willfully or in reckless disregard for the interests and civil rights and protections of Mr. Wu and warrants the imposition of punitive damages against Ms. Zhang and her co-conspirators.

## COUNT XII

Unfair and Deceptive Trade Practices/ Violation of HRS § 480-2

169. Plaintiff realleges the allegations contained in paragraphs 1 - 168 as if fully set forth herein.

170. Mr. Wu's contribution of funds towards the purchase of the Property (as detailed herein) constitute a personal investment.

171. As detailed herein, Mr. Wu sought to protect his personal investments for the Property, by among other things, committing money for the extensive repairs and renovations to the Property, by making payments to Ms. Zhang for the property taxes for the Property, and by agreeing to offset unforeseen costs and plans for the Property by entering into the Lease and paying Ms. Zhang rent.

172. Mr. Wu paid additional consideration in the form of rent in order to protect his interests in the Property.

173. Mr. Wu has standing as a consumer under Hawai`i Revised Statutes ("***HRS***") § 480-2 to bring a claim against Ms. Zhang for unfair and deceptive trade practices.

174. Ms. Zhang engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, including but not limited to:

1. Falsely representing that she and Mr. Wu are not joint venture partners with respect to the Property;
2. Misleading Mr. Wu and wrongfully acting to remove Mr. Wu from Property by making false representations, including but not limited to, among other things, that:
    i. Mr. Wu is only a property manager pursuant to an "oral" agreement;
    ii. Mr. Wu never resided at the Property;
    iii. Mr. Wu has no legal rights or interests in the Property;
    iv. Ms. Zhang did not know who Mr. Wu was;

v. The Property at the time of the break-in, in or around July 29 2022, was not being occupied by anyone;

vi. The personal property and valuables existing at the Proper at the time of the break-in belonged to Ms. Zhang; and

vii. The personal and business documents, papers and information retained wrongfully by Ms. Zhang and her attorneys belong to other "clients" of Ms. Zhang's attorneys.

3. Wrongfully conspiring, without any notice, consent or cause, to remove Mr. Wu from the Property;

4. Wrongfully conspiring, without proper consent, to remove and keep important confidential information, documents and devices for the benefit of Ms. Zhang and her attorneys;

5. Falsely representing that Mr. Wu never paid rent to Ms. Zhang, or others purporting to act on her behalf;

6. Falsely characterizing Mr Wu's contributions to Ms. Zhang as a "loan"; and

7. Giving assurances to Mr. Wu that she would honor the terms of their joint venture agreement and Lease.

175. Ms. Zhang's misconduct, and the misconduct of her representatives acting on her behalf, have directly caused injury and damage to Mr. Wu's personal investments, his contributions to the joint-venture partnership, his interests in the Property, his personal and business property and belongings.

176. Mr. Wu has suffered, and continues to suffer injury as a result of Ms. Zhang's wrongful actions and he is entitled to an award of treble damages as a result of the harm sustained, in addition to an award of attorneys' fees and costs pursuant to HRS § 480-13.

**COUNT XIII**

Violation of HRS § 521-53/Wrongful Eviction

177. Plaintiff realleges the allegations contained in paragraphs 1 - 176 as if fully set forth herein.

178. A valid Lease exists between the parties obligating Ms. Zhang to comply with the provisions of Hawai`i's landlord/tenant code, codified as HRS § 521, *et. seq.*

179. As detailed herein, Mr. Wu has fully performed pursuant to the term of the Parties' Lease.

180. Pursuant to HRS § 521-53(b), a landlord must provide tenant a two days' notice of his/her intent to access the subject property.

181. As described herein, Ms. Zhang failed to provide Mr. Wu any notice of her intent to access the Property, before she—or those agents acting on her behalf or at her direction—wrongfully entered the property on or about July 29, 2022.

182. Ms. Zhang's wrongful actions were not done for any emergent purpose.

183. Ms. Zhang's wrongful entry and access to the Property on or about July 29, 2022 were done intentionally and willfully with the express intent to remove Mr. Wu and his family from the Property in violation of the Parties' Lease agreement.

184. Ms. Zhang, as well as those acting on her behalf, violated HRS § 521-53(b). They conspired together to wrongfully evict Mr. Wu, and (as described herein) specifically undertook steps to do so.

185. Their actions constitute a wrongful eviction.

186. Mr. Wu has suffered and continues to suffer damages as a result of their actions, in amounts to be proven at trial.

187. The conduct set forth above was undertaken intentionally, willfully or in reckless disregard for the interests of Mr. Wu and others and warrants the imposition of punitive damages against Ms. Zhang and her co-conspirators.

**COUNT XIV**
Equitable Lien

188. Plaintiff realleges the allegations contained in paragraphs 1 - 187 as if fully set forth herein.

189. While title to the property is in the name of Defendant, pursuant to the JV Agreement, Plaintiff has a twenty-five percent (25%) share of the Property.

190. As described herein, Plaintiff has advanced and invested additional funds for the upkeep and maintenance of the Property.

191. Plaintiff has an equitable lien against the Property based upon the JV Agreement and Plaintiff's contribution of funds and services advanced and invested in the Property, the exact amount of which shall be proved in trial.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Wu prays for judgment in his favor against Ms. Zhang, and any co-conspirators, as follows: (which relief may be granted cumulatively or alternatively):

A. General damages in amounts to be proven at trial;

B. Special and punitive damages, if applicable, and in amounts to be proven at trial;

C. Treble damages, and award of attorneys' fees and costs, pursuant to HRS § 480-13;

D. An accounting as members of the joint venture;

E. Pre- and post-judgment interest at the maximum allowable rate;

F. Specific performance;

G. An award of Plaintiff's attorneys' fees and costs of suit; and

H. A declaratory judgment determining that the JV Agreement is valid, binding and enforceable against Defendant;

I. An injunction enjoining Defendant from cancelling or otherwise interfering with Plaintiff's right of quiet use and enjoyment of the Property under the terms of the Lease

J. An injunction enjoining Defendant from cancelling or otherwise interfering with Plaintiff's rights of first refusal under the Lease and JV Agreement;

K. The imposition of an equitable lien; and

L. Such other relief as this Court deems just and proper.

Date: Honolulu, Hawaii, July 21, 2023

/s/ *Stephanie E.W. Thompson*
STEPHANIE E.W. THOMPSON
ROBERT J. BROWN

Attorneys for Plaintiff DI WU

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff,<br><br>vs.<br><br>DANDAN ZHANG AKA DAN DAN ZHANG, JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, OR ENTITIES 1-20,<br><br>Defendants. | CIVIL NO.: 1CCV-22-0000964<br><br>VERIFICATION |

**VERIFICATION**

STATE OF ______________________ )
) SS:
COUNTY OF ____________________ )

DI WU, Plaintiff in the above-entitled action, being duly sworn, deposes and says:

That he has read the foregoing Second Amended Verified Complaint, and the attached exhibits (A and B), knows the contents thereof, and that the same is true to the best of his knowledge and belief.

[signature]
DI WU

Subscribed and sworn to before me
this 17th day of July, 2023.

[signature]
Notary Public, State of CA

Print Name Hanif Mohammad
My commission expires: 05/22/2026

HANIF MOHAMMAD
Notary Public - California
Los Angeles County
Commission # 2401963
My Comm. Expires May 22, 2026

2830385

# EXHIBIT A

Property investment agreement 05.28.2019
Party A: Dan-dan Zhang. ID Number: G40409420
Party B: Di Wu. ID Number:G51525965

After friendly consultation with each other, Part A and B have reached the following agreement on the joint purchase property in
1039 Koohoo Pl, Kailua 96734, Hawaii:

1. The total purchase price of the property is US dollars1,850,000. Party A provides 75% of the total fund. Party B provides 25% of the total fund.

2. Since the property is in tear down condition, needs to be renovated to become inhabitable. the renovation cost will forecast would be above 185,000 US dollars or market value, Party A contributes 75%, Party B contributes 25%

3. Party A will make all best she can in the real estate escrow procedures, and Party A will be the title holder on the property deed, which is convenient for the property tax exemption. Party A enjoys 75% of the above-mentioned jointly purchased property rights, and Party B enjoys 25%.

4. After the renovation of the property, 20% of the rental income will use for property maintenance, cleaning and other costs of the property, Net rental income after deducting basic expenses such as property management fees, property taxes, utilities, etc., is distributed according to the proportion of capital contribution, party A gets 75%, and Party B gets 25%. Before January 31 of each year, Party B will brief Party A and transfers the rental income belonging to Party A to the designated account

5. After renovations both parties agree to put the property into a joint families trust. If the property needs to be sold in the future or left in the form of a trust to the heirs of both parties, the two parties may reach a consensus through friendly consultation.

6. Neither party may transfer the common property, provide mortgage security for itself or to a third party, or contribute in any kind without the consent of both parties.

7. If one party transfers its share of the property to the third party, the other party has the right of first refusal under the same conditions.

8. Because the market appreciation part of the property belongs to both parties, the rights and interests are distributed in proportion to the capital contribution of both parties.

9. In the event of loss or expropriation of real estate caused by force majoure or government policies, the risk shall be borne jointly by both parties, and the compensation shall be distributed by both parties in proportion to the capital contribution.

10. Neither party shall affect the ownership or use of the joint property due to the debts of the individual, otherwise, the other party shall be compensated for the losses incurred.

11. Both parties shall jointly hold the shares in the real estate, and all business activities and creditor's rights, debts, disputes, etc. arising therefrom shall be jointly borne by both parties in accordance with the proportion of capital contribution.

12. The parties A and B sign this agreement for the purpose of win-win cooperation, and if any dispute arises, it shall be resolved by the two parties through friendly consultation.

13. This Agreement shall be made in duplicate, one for each Party, and shall enter into force upon signature by the Parties.

Party A. [signature] Party B. [signature]

EXHIBIT A

# 共同出资协议书05.28.20.

甲方：Dandan Zhang　　证件号：G40409420
乙方：Di Wu　　证件号：G51525965

甲乙双方经友好协商，就共同出资购买位于夏威夷1039 Koohoo Pl, Kailua 96734一处房产，达成以下协议：

1. 该房产购入总价壹佰捌拾伍万美金（USD1,850,000），按照合同约定在交割日closing day之前甲方出资购房总价的75%，壹佰叁拾捌万柒仟伍佰美金(USD1,387,500)，乙方出资购房总价的25%，肆拾陆万贰仟伍佰美金（USD462,500）。
2. 由于该房产需要重新修整之后才能入住，整修费用以185,000美金计，甲方出资75%，乙方出资25%，工程时间控制在两个月之内完成。
3. 甲方配合办理房产过户交易手续，房屋产权证上甲方为持有人，方便后续申请唯一房屋物业税减半优惠。甲方享有上述共同所购物业产权的75%，乙方享有25%。
4. 该房产整修之后用于出租，租金收入部分20%支付给物业管理公司，由指定的物业管理公司对该房产进行运营维修清洁等管理，此事项由甲方授权乙方代为负责。扣除物业管理费、物业税、水电费等基本开销之后的租金净收入，按照出资比例进行分配，甲方获取75%，乙方获取25%。每年1月31日前乙方向甲方公开账目，并将属于甲方的租金收益转入甲方指定账户。
5. 该房产今后如需出售或者以信托形式留给甲乙双方继承人，双方可经友好协商达成共识。
6. 未经双方协商同意，任何一方不得将共有房产进行转让、为自己或第三人提供抵押担保及作为实物出资等。
7. 如一方对外转让房产份额，另一方在同等条件下有优先购买权。
8. 因该房产的市场增值部分，属于双方共同享有，权益按双方出资比例进行分配。
9. 因不可抗力或政府政策等原因，导致的房产损失、被征收等情形出现，风险由双方共同承担，所得补偿由双方按出资比例分配。
10. 任何一方不得因个人的债务导致共有房产的所有权、使用权收到影响，否则，应赔偿另一方所产生的损失。
11. 甲乙双方共同持有该房产股份，一切经营行为及产生的债权、债务、纠纷等由甲乙双方按照出资比例共同承担。
12. 甲乙双方本着合作共赢的目的签订此协议，如产生任何争议，应由双方经友好协商解决。
13. 本协议一式两份，双方各执一份，自双方签字之后生效。

甲方签字：[signature]　乙方签字：[signature]

# EXHIBIT B

## RESIDENTIAL LEASE AGREEMENT

THIS NOTICE OF RESIDENTIAL LEASE AGREEMENT ("Agreement") dated *Jun 30th 2021* is made and entered into, by and between Di Wu, Married ("Tenant") and Dandan Zhang ("Landlord"), Married. Di Wu is the co-owner of the property.

### I. RECITALS

1. Landlord is the fee owner of the certain real property being, lying and situated at 1039 Koohoo pl, Kailua, HI 96734 and further identified by Tax Map Key No. (1) 4-3-006-160-0000 ("Premises");
2. Landlord desires to lease the Premises to Tenant pursuant to the terms and conditions contained herein; and
3. Tenant desires to lease the Premises from Landlord pursuant to the terms and conditions contained herein;

### II. TERMS AND CONDITIONS

1. Lease Term: Landlord leases to Tenant and Tenant leases from Landlord, the Premises together with any and all appurtenances thereto, for a term of 10 years from Jul 1st, 2021 through Jul 1, 2031 ("Term") This Lease shall automatically convert to a month to month tenancy unless cancelled in writing by either party no less than 60 days from the desired termination date. The Term may be extended by written agreement of both the Tenant and the Landlord and all other terms and conditions shall continue to apply unless agreed to otherwise
2. Rent: The total yearly rent for the Term agreed to above is TWENTY THOUSAND DOLLARS ($20,000.00) ("Rent") per year payable on the last day of the year.
3. Payment Address: All payments shall be made to the Landlord and sent to the following address:

   Both parties agree

4. Security Deposit: Landlord and Tenant agree that a security deposit is not required.
5. Use of Premises: The Premises shall be used and occupied by Tenant and Tenant's family, and other rentals or sublease purpose.



EXHIBIT B

6. Utilities: Tenant shall be responsible for arranging for and paying for all utility services required on the Premises.
7. Governing Law: This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Hawaii and City and County of Honolulu.
8. Severability: If any provision of this Agreement is, for any reason and to any extent, determined to be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected.
9. Binding Effect: The covenants, obligations, provisions, and conditions in this Agreement shall be binding on the heirs, legal representatives, agents, and assigns of Tenant and Landlord.
10. Notice: Any written notice required or permitted under this Agreement or under governing law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested. Landlord or Tenant may change the place notice is to be given under this paragraph by written notice to the other party sent United States certified mail, return receipt requests to the last valid address under this paragraph.
11. Execution in Counterparts and Copies: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The parties are entitled to rely upon a copy or facsimile signature of the other parties to this Agreement transmitted via electronic mail or telecopier.

Landlord: Tenant:

| STATE OF HAWAIʻI<br>CIRCUIT COURT OF THE FIRST CIRCUIT | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER<br>1CCV-22-000964 |
|---|---|---|

| PLAINTIFF VS. | DEFENDANT(S) |
|---|---|
| DI WU | DANDAN ZHANG AKA DAN DAN ZHANG, JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, OR ENTITIES 1-20, |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

STEPHANIE E. W. THOMPSON 8399-0
ROBERT J. BROWN 10174-0
Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 537-6100

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

STEPHANIE E. W. THOMPSON, ESQ. and ROBERT J. BROWN, ESQ.

______________________________________________________________________,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us

**Effective Date of 28-Oct-2019**
**Signed by: /s/ Patsy Nakamoto**
**Clerk, 1st Circuit, State of Hawaiʻi**

In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff,<br><br>vs.<br><br>DANDAN ZHANG AKA DAN DAN ZHANG, JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, OR ENTITIES 1-20,<br><br>Defendants. | CIVIL NO.: 1CCV-22-0000964<br><br>CERTIFICATE OF SERVICE |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated below, a copy of the foregoing document was duly served as indicated upon the following parties at their last known address:

| **PARTY** | **EMAIL VIA JEFS** | **HAND DELIVERY** | **U.S. MAIL** |
|---|---|---|---|
| YURIKO J. SUGIMURA, ESQ.<br>MATTHEW MURAKAMI, ESQ.<br>700 Bishop Street, Suite 2100<br>Honolulu, Hawaii, 96813<br>Attorney for Defendant<br><br>DAN DAN ZHANG<br>AKA DANDAN ZHANG | **X** | | |

Date: Honolulu, Hawaii, July 21, 2023.

/s/ *Stephanie E.W. Thompson*
STEPHANIE E.W. THOMPSON
ROBERT J. BROWN

RESIDENTIAL LEASE AGREEMENT

THIS NOTICE OF RESIDENTIAL LEASE AGREEMENT ("Agreement") dated *Jun 30th 2021* is made and entered into, by and between Di Wu, Married ("Tenant") and Danden Zhang ("Landlord"), Married. Di Wu is the co-owner of the property.

I. RECITALS

1. Landlord is the fee owner of the certain real property being, lying and situated at 1039 Koohoo pl, Kailua, HI 96734 and further identified by Tax Map Key No. (1) 4-3-006-160-0000 ("Premises");
2. Landlord desires to lease the Premises to Tenant pursuant to the terms and conditions contained herein; and
3. Tenant desires to lease the Premises from Landlord pursuant to the terms and conditions contained herein;

II. TERMS AND CONDITIONS

1. Lease Term: Landlord leases to Tenant and Tenant leases from Landlord, the Premises together with any and all appurtenances thereto, for a term of 10 years from Jul 1st, 2021 through Jul 1, 2031 ("Term") This Lease shall automatically convert to a month to month tenancy unless cancelled in writing by either party no less than 60 days from the desired termination date. The Term may be extended by written agreement of both the Tenant and the Landlord and all other terms and conditions shall continue to apply unless agreed to otherwise
2. Rent: The total yearly rent for the Term agreed to above is TWENTY THOUSAND DOLLARS ($20,000.00) ("Rent") per year payable on the last day of the year.
3. Payment Address: All payments shall be made to the Landlord and sent to the following address:

Both parties agree

4. Security Deposit: Landlord and Tenant agree that a security deposit is not required.
5. Use of Premises: The Premises shall be used and occupied by Tenant and Tenant's family, and other rentals or sublease purpose.



EXHIBIT 2

6. Utilities: Tenant shall be responsible for arranging for and paying for all utility services required on the Premises.
7. Governing Law: This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Hawaii and City and County of Honolulu.
8. Severability: If any provision of this Agreement is, for any reason and to any extent, determined to be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected.
9. Binding Effect: The covenants, obligations, provisions, and conditions in this Agreement shall be binding on the heirs, legal representatives, agents, and assigns of Tenant and Landlord.
10. Notice: Any written notice required or permitted under this Agreement or under governing law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested. Landlord or Tenant may change the place notice is to be given under this paragraph by written notice to the other party sent United States certified mail, return receipt requests to the last valid address under this paragraph.
11. Execution in Counterparts and Copies: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The parties are entitled to rely upon a copy or facsimile signature of the other parties to this Agreement transmitted via electronic mail or telecopier.

Landlord: [signature] Tenant: [signature]

Property investment agreement 05.28.2019
Party A: Dan-dan Zhang. ID Number: G40409420
Party B: Di Wu. ID Number:G51525965

After friendly consultation with each other, Part A and B have reached the following agreement on the joint purchase property in
1039 Koohoo Pl, Kailua 96734, Hawaii:

1. The total purchase price of the property is US dollars1,850,000. Party A provides 75% of the total fund. Party B provides 25% of the total fund.

2. Since the property is in tear down condition, needs to be renovated to become inhabitable. the renovation cost will forecast would be above 185,000 US dollars or market value, Party A contributes 75%, Party B contributes 25%

3. Party A will make all best she can in the real estate escrow procedures, and Party A will be the title holder on the property deed, which is convenient for the property tax exemption. Party A enjoys 75% of the above-mentioned jointly purchased property rights, and Party B enjoys 25%.

4. After the renovation of the property, 20% of the rental income will use for property maintenance, cleaning and other costs of the property, Net rental income after deducting basic expenses such as property management fees, property taxes, utilities, etc., is distributed according to the proportion of capital contribution, party A gets 75%, and Party B gets 25%. Before January 31 of each year, Party B will brief Party A and transfers the rental income belonging to Party A to the designated account

5. After renovations both parties agree to put the property into a joint families trust. If the property needs to be sold in the future or left in the form of a trust to the heirs of both parties, the two parties may reach a consensus through friendly consultation.

6. Neither party may transfer the common property, provide mortgage security for itself or to a third party, or contribute in any kind without the consent of both parties.

7. If one party transfers its share of the property to the third party, the other party has the right of first refusal under the same conditions.

8. Because the market appreciation part of the property belongs to both parties, the rights and interests are distributed in proportion to the capital contribution of both parties.

9. In the event of loss or expropriation of real estate caused by force majoure or government policies, the risk shall be borne jointly by both parties, and the compensation shall be distributed by both parties in proportion to the capital contribution.

10. Neither party shall affect the ownership or use of the joint property due to the debts of the individual, otherwise, the other party shall be compensated for the losses incurred.

11. Both parties shall jointly hold the shares in the real estate, and all business activities and creditor's rights, debts, disputes, etc. arising therefrom shall be jointly borne by both parties in accordance with the proportion of capital contribution.

12. The parties A and B sign this agreement for the purpose of win-win cooperation, and if any dispute arises, it shall be resolved by the two parties through friendly consultation.

13. This Agreement shall be made in duplicate, one for each Party, and shall enter into force upon signature by the Parties.

Party A. [signature] Party B. [signature]

EXHIBIT 3

# 共同出资协议书05.28.20.

甲方：Dandan Zhang 证件号：G40409420
乙方：Di Wu 证件号：G51525965

甲乙双方经友好协商，就共同出资购买位于夏威夷1039 Koohoo Pl, Kailua 96734一处房产，达成以下协议：

1. 该房产购入总价壹佰捌拾伍万美金（USD1,850,000），按照合同约定在交割日closing day之前甲方出资购房总价的75%，壹佰叁拾捌万柒仟伍佰美金(USD1,387,500)，乙方出资购房总价的25%，肆拾陆万贰仟伍佰美金(USD462,500)。
2. 由于该房产需要重新修整之后才能入住，整修费用以185,000美金计，甲方出资75%，乙方出资25%，工程时间控制在两个月之内完成。
3. 甲方配合办理房产过户交易手续，房屋产权证上甲方为持有人，方便后续申请唯一房屋物业税减半优惠。甲方享有上述共同所购物业产权的75%，乙方享有25%。
4. 该房产整修之后用于出租，租金收入部分20%支付给物业管理公司，由指定的物业管理公司对该房产进行运营维修清洁等管理，此事项由甲方授权乙方代为负责。扣除物业管理费、物业税、水电费等基本开销之后的租金净收入，按照出资比例进行分配，甲方获取75%，乙方获取25%。每年1月31日前乙方向甲方公开账目，并将属于甲方的租金收益转入甲方指定账户。
5. 该房产今后如需出售或者以信托形式留给甲乙双方继承人，双方可经友好协商达成共识。
6. 未经双方协商同意，任何一方不得将共有房产进行转让、为自己或第三人提供抵押担保及作为实物出资等。
7. 如一方对外转让房产份额，另一方在同等条件下有优先购买权。
8. 因该房产的市场增值部分，属于双方共同享有，权益按双方出资比例进行分配。
9. 因不可抗力或政府政策等原因，导致的房产损失、被征收等情形出现，风险由双方共同承担，所得补偿由双方按出资比例分配。
10. 任何一方不得因个人的债务导致共有房产的所有权、使用权收到影响，否则，应赔偿另一方所产生的损失。
11. 甲乙双方共同持有该房产股份，一切经营行为及产生的债权、债务、纠纷等由甲乙双方按照出资比例共同承担。
12. 甲乙双方本着合作共赢的目的签订此协议，如产生任何争议，应由双方经友好协商解决。
13. 本协议一式两份，双方各执一份，自双方签字之后生效。

甲方签字： [signature] 乙方签字： [signature]

CARLSMITH BALL LLP

JOHN P. MANAUT 3989
KAI WANG 7319
1001 Bishop Street, Suite 2100
Honolulu, Hawai‘i 96813
Telephone No. (808) 523-2573
Email: jpm@carlsmith.com
Email: kwang@carlsmith.com

Attorneys for Defendant
DAN DAN ZHANG AKA DANDAN ZHANG

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
15-JUL-2024
05:26 PM
Dkt. 497 CS

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI‘I

| | |
|---|---|
| DI WU,<br><br>Plaintiff,<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants. | Civil No. 1CCV-22-0000964 (DEO)<br><br>**CERTIFICATE OF SERVICE**<br><br>RE: DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG’S FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF DI WU [ADMISSION REQUESTS ATTACHED COPY HERETO AS EXHIBIT 1] |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated below, an original and a copy of the foregoing DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG’S **FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF DI WU,** (a copy of which is attached hereto as Exhibit 1 so as to confirm Di Wu's access to it and receipt on JEFS) will be duly served on the following parties via JEFS, individual email, and U.S. Mail, as follows:

DI WU
2605 Decatur Blvd. #586
Las Vegas, Nevada 89102 and

DI WU
2943 W. Parkway Blvd., Unit 222
West Valley, Utah 84119

Email Address:
pacifichale@gmail.com and Difinity812@gmail.com

*Pro Se* Plaintiff

DATED: Honolulu, Hawai‘i, July 15, 2024.

*/s/ John P. Manaut*

JOHN P. MANAUT
KAI WANG
Attorneys for Defendant
DAN DAN ZHANG AKA DANDAN ZHANG

CARLSMITH BALL LLP

JOHN P. MANAUT 3989
KAI WANG 7319
1001 Bishop Street, Suite 2100
Honolulu, Hawaiʻi 96813
Telephone No. (808) 523-2573
Email: jpm@carlsmith.com
Email: kwang@carlsmith.com

Attorneys for Defendant
DAN DAN ZHANG AKA DANDAN ZHANG

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| DI WU,<br><br>Plaintiff,<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants. | Civil No. 1CCV-22-0000964 (DEO)<br><br>DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG'S FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF DI WU<br><br>Trial Date: October 21, 2024<br>Trial Judge: Honorable Dean E. Ochiai |

DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG'S
FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF DI WU

TO: DI WU
2605 Decatur Blvd. #586
Las Vegas, Nevada 89102 and

DI WU
2943 W. Parkway Blvd., Unit 222
West Valley, Utah 84119

Email Address:
pacifichale@gmail.com and Difinity812@gmail.com

*Pro Se* Plaintiff



EXHIBIT 1

Defendant DAN DAN ZHANG AKA DANDAN ZHANG ("Dandan Zhang" or "Defendant"), by and through her attorneys, Carlsmith Ball, LLP, under Rules 26 and 36 of the Hawaiʻi Rules of Civil Procedure, requests that Plaintiff DI WU ("Plaintiff") responds to DEFENDANT DAN DAN ZHANG AKA DANDAN ZHANG'S FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF DI WU within thirty (30) days after service.

1. Plaintiff shall specifically admit or deny each Request.

2. If Plaintiff objects to any of the Requests, the reasons for the objection shall be stated. Each answer shall specifically admit or deny the matter or set forth in detail the reasons why Plaintiff cannot truthfully admit or deny the matter.

3. A denial shall fairly meet the substance of the Request, and when good faith requires that Plaintiff qualify an answer or deny only a part of the matter of which an admission is requested, Plaintiff shall specify so much of it as is true and qualify or deny the remainder.

4. Plaintiff may not rely upon a lack of information or knowledge as a reason for a failure to admit or deny a Request unless Plaintiff made a reasonable inquiry and that the information known to or readily obtainable by Plaintiff cannot allow Plaintiff to admit or deny.

5. If Plaintiff fails to admit the truth of any matter proved by Defendant to be true, Defendant may recover all expenses, fees and costs, incurred in proving the truth of that matter.

The following Definitions are to be considered applicable to each Request and are hereby incorporated into each of the Requests to which they pertain:

## DEFINITIONS

The following Definitions are to be considered applicable to each request for admission and are hereby incorporated into each admission to which they pertain:

1. “You” or “Your” or “Plaintiff” as used herein refers to DI WU, and all persons or entities acting or purporting to act on his behalf, including, without limitation, his present and former members, managers, attorney(s), investigator(s), agent(s), accountant(s), and/or advisor(s) and their agents, employees, and consultants.

2. “Defendant” as used herein refers to Defendant/Counterclaimant Dan Dan Zhang aka Dandan Zhang, and all persons or entities acting or purporting to act on her behalf, including, without limitation, her present and former attorney(s), investigator(s), agent(s), accountant(s), and/or advisor(s) and their agents, employees, and consultants.

3. “Subject Lawsuit” or “Litigation” refers to the lawsuit presently before the Court identified as *Di Wu vs. Dan Dan Zhang aka Dandan Zhang, et al.*, Civil No. *1CCV-22-0000964*, Circuit Court of the First Circuit, State of Hawaiʻi.

4. The “Property” refers to the residence at 1039 Koohoo Place, Kailua, Hawaii 96734.

5. The Residential Lease Agreement attached as Exhibit B to the verified Second Amended Complaint is referred to as the “Lease.”

6. The joint investment agreement attached as Exhibit A to the verified Second Amended Complaint is referred to as the “JIA.”

Any term not specifically defined herein shall be construed in accordance with its plain, ordinary, and common meaning within the English language.

DATED: Honolulu, Hawaiʻi, July 15, 2024

*/s/ John P. Manaut*
JOHN P. MANAUT
KAI WANG

Attorneys for Defendant
DAN DAN ZHANG AKA DANDAN ZHANG

# REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSIONS NO. 1:**

Admit that the Lease signature for Defendant is a forgery.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 2:**

Admit that you copied and placed Dandan Zhang's signature from a prior escrow closing document on to the Lease without her knowledge and approval.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 3:**

Admit that the Lease was never approved to be signed by Dandan Zhang.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 4:**

Admit that you placed Dandan Zhang's signature image on to the JIA.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 5:**

Admit that the renovation budget for the Property that was agreed to with Dandan Zhang would be no more than $185,000.

________ Admit _________ Deny

**REQUEST FOR ADMISSIONS NO. 6:**

Admit that the invoice from Home Builders is for a false and inflated amount that was never incurred for repairs and renovations for the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 7:**

Admit that the approximate $1.56 million in remedial work was never performed by Home Builders and they were never paid that full amount by you.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 8:**

Admit that you used funds from other rental properties to advance $172,000 to close the purchase of the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 9:**

Admit that the $36,000 commission credit from the realtor Susan Martin that you claim as part of your advance was not disclosed to Dandan Zhang.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 10:**

Admit that you have no right to ownership, possession, or use of the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 11:**

Admit that you falsified claims for items you claimed were stolen from the Property and submitted receipts to HPD for items that were never taken.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 12:**

Admit that you personally had no agreement to rent the Property from Dandan Zhang.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 13:**

Admit that you moved into the Property without notifying Dandan Zhang ahead of time and without any approval for you to occupy the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 14:**

Admit that you received all items allegedly taken from you at the Property and that you no longer have any valid claim to return any of those items.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 15:**

Admit that Dandan Zhang never agreed to accept bitcoin from you for use of the Property as your own personal rental.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 16:**

Admit that the bitcoin payment was from third party renters of the Property to pay for short term rental use of the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 17:**

Admit that you had an oral agreement with Dandan Zhang to manage, rent and renovate the Property up to a renovation budget of no more than $185,000 in return for your receipt of 20% of the rental proceeds from short term rentals that you promised to arrange.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 18:**

Admit that you had no ownership interest in the Property and any advance that you provided was a loan to be repaid from the proceeds of rentals to third party renters.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 19:**

Admit that the alleged value of all items you claim were taken does not exceed $200,000, as alleged in paragraph 165 of the Second Amended Complaint and those items were all returned to you.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 20:**

Admit that Dandan Zhang's ownership of the Property is not a business and you are not a consumer as alleged in Count XII of the Second Amended Complaint, pursuant to Haw. Rev. Stat. Chapter 480.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 21:**

Admit that you do not have a 25% interest in the Property as alleged in Paragraph 189 of the Second Amended Complaint.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 22:**

Admit that you are a citizen of the People's Republic of China and are in the United States on a Visa basis only.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 23:**

Admit that you are a citizen of the People's Republic of China and are staying in the United States without a proper visa or authorization from the relevant immigration authority.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 24:**

Admit that you never communicated with Dandan Zhang on the messaging app or portal known as Telegram.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 25:**

Admit that you were terminated as Dandan Zhang's property manager and fiduciary on behalf of the Property as of July 29, 2022.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 26:**

Admit that you have never held a real estate license in the State of Hawaii.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 27:**

Admit that you never held a contracting license in the State of Hawaii.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 28:**

Admit that you were never licensed as and never held a property manager license in the State of Hawaii.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 29:**

Admit that you were never licensed as and never held an architect license in the State of Hawaii.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 30:**

Admit that you were Dandan Zhang's agent and fiduciary with respect to handling the Property to rent to third party renters and account for all rentals and payments to her directly.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 31:**

Admit that you never used unionized construction workers for the renovation work done to the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 32:**

Admit that you used left over construction materials from other projects under your care for the renovation work done to the Property.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 33:**

Admit that contractors or subcontractors such as JM Electrical LLC engaged by you to do work for the Property were paid in part by letting them and their families stay without charge in properties you manage for other owners.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 34:**

Admit that you or entities owned by you are evading enforcement of multiple court judgments and administrative fines issued by authorities in China.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 35:**

Admit that you deleted a Gmail account used to manage short term rentals.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 36:**

Admit that you routinely used the self-destruct function of Telegram to delete messages with your associates.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 37:**

Admit that you asked Dandan Zhang to pay your daughters' tuitions to their school in Hawaii because you did not wish to leave any trace by using conventional banking or payment methods.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 38:**

Admit that you asked Dandan Zhang and/or her husband to wire money to accounts owned by your wife in China and China-based vendors for construction materials used in other projects as a way to bypass China's foreign currency exchange regime.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 39:**

Admit that you routinely asked your associates to send funds belonging to owners of properties under your care to your personal bitcoin accounts or wallets.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 40:**

Admit that you and Homage Builders LLC engaged in bartering practice or otherwise paying in cash to avoid taxes.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 41:**

Admit that the injury you allegedly suffered in February 2024 no longer prevents you from flying to the State of Hawaii.

______ Admit ______ Deny

**REQUEST FOR ADMISSIONS NO. 42:**

Admit that you have not reported to the United States Internal Revenue Service all income you have received from all of your activities related to the Property.

______ Admit ______ Deny

Dated: ___________________________, 2024

____________________________
Di Wu

**Plaintiff:**
**DI Wu**
**2943 Parkway Blvd, Unit 222**

**Salt Lake City, UT84119**

**Email: PacificHale@gmail.com.**

**Tel: 202-9988523**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
21-AUG-2024
06:53 PM
Dkt. 505 REPLY

**[Aug 20th, 2024]**

**CARLSMITH BALL LLP**

**JOHN P. MANAUT 3989**

**KAI WANG 7319**

**1001 Bishop Street, Suite 2100 Honolulu, Hawaii 96813**

**Tel. No.: (808) 523-2500 Fax No.: (808) 523-0842 jpm@carlsmith.com kwang@carlsmith.com**

**Attorneys for Defendant**
**DAN DAN ZHANG AKA DANDAN ZHANG**

**Re: Objection to Request for Admissions**

Dear Mr Manaut,

Please find below the specific objections to the Requests for Admissions for Civil No. 1CCV-22-0000964 (DEO)

## PRELIMINARY STATEMENT

1. Discovery has not been completed and will continue as long as permitted by court rules or stipulation of the parties. Plaintiff's investigation in this matter is ongoing, and he specifically reserves his right to rely at any time, including at trial, upon any information or documents hereafter obtained from any source.

2. Plaintiff is responding to the interrogatories propounded as he interprets and understands them. If Plaintiff subsequently asserts an interpretation of any interrogatory that differs from Defendant's understanding, then Plaintiff reserves the right to modify and/or supplement his objections and responses as he deems necessary and appropriate.

3. The following answers are made without waiver, and with express preservation, of Plaintiff's rights to object on any ground at any time to a demand or request for further response (including further responses to these or any other requests) or other discovery proceedings involving or relating to the subject matter of the

interrogatories responded to here.

4. The responses made herein to the interrogatories are being made on information and documents presently available to and located by Plaintiff and/or his attorneys, and upon reasonable and ongoing inquiry and investigation. Plaintiff expressly reserves the right to use or rely at trial upon subsequently discovered information or documents, or information or documents omitted on the basis of the vagueness and ambiguity of the interrogatories, or through good faith oversight, error, or mistake.

**GENERAL OBJECTIONS TO THE INSTRUCTIONS AND DEFINITIONS**

1. Plaintiff objects to the “Definitions and Instructions” section, cumulatively, including all subparagraphs thereof, to the extent they impose burdens greater than the requirements under HRCP and/or Rules of the Circuit Courts, State of Hawaiʻi (***RCC***). Defendant will comply with his obligations under the HRCP and RCC. Accordingly, Plaintiff will amend or supplement his responses and take such other action requested by Defendant if and when it is appropriate to do so.

2. Plaintiff is responding to the interrogatories for and on behalf of Plaintiff, only. And on this basis, Plaintiff object to Defendant’s definitions of the same.

3. Plaintiff objects to the Request to the extent that the Request’s instructions and definitions are confusing, vague and ambiguous and seeks to impose obligations that exceed those imposed by the HRCP or the RCC.

5. All objections made in this response to the to the Definitions and Instructions of the Request have been made by the undersigned.

Date: Honolulu, Hawaii, Aug 10, 2024.

**REQUEST FOR ADMISSIONS NO. 1:**
*Admit that the Lease signature for Defendant is a forgery.*
**Objection:** This request is vague and lacks sufficient foundation. It assumes facts not yet established, and the term "forgery" is not defined. The request is also overly broad and seeks a legal conclusion rather than a fact. Responding to this request would be unduly burdensome without a proper factual basis.

**REQUEST FOR ADMISSIONS NO. 2:**
*Admit that you copied and placed Dandan Zhang's signature from a prior escrow closing document onto the Lease without her knowledge and approval.*
**Objection:** This request is based on a flawed premise and is vague as to what is meant by "copied and placed." The request also presumes facts not in evidence and is therefore not appropriate for admission.

**REQUEST FOR ADMISSIONS NO. 3:**
*Admit that the Lease was never approved to be signed by Dandan Zhang.*
**Objection:** The request is overly broad and lacks sufficient context. It is also based on assumptions not established by evidence. Further, it seeks an admission of a legal conclusion rather than a specific fact.

**REQUEST FOR ADMISSIONS NO. 4:**
*Admit that you placed Dandan Zhang's signature image onto the JIA.*
**Objection:** This request is vague and ambiguous as to what is meant by "placed" and "JIA." The request is also unclear and lacks the necessary factual support to make a meaningful response.

**REQUEST FOR ADMISSIONS NO. 5:**
*Admit that the renovation budget for the Property that was agreed to with Dandan Zhang would be no more than $185,000.*
**Objection:** This request is partially objected to based on the assumption that the renovation budget was agreed upon as stated. The request requires clarification of what constitutes the "agreed" budget and may involve issues of disputed fact. The budget was never agreed upon in any circumstance.

**REQUEST FOR ADMISSIONS NO. 6:**
*Admit that the invoice from Home Builders is for a false and inflated amount that was never incurred for repairs and renovations for the Property.*
**Objection:** This request is objectionable because it requires a legal conclusion and is based on an unproven assertion that the invoice amount is "false and inflated." Further evidence and context are necessary to properly address this request. The invoice had been verified by contractor in deposition loud and clear and also much less than the appraisal Hawaii No1 Top appraiser, J Uno associates for the work had been done in the property, which also represent the majority of the value of the property, the property was purchased in tear down condition.

**REQUEST FOR ADMISSIONS NO. 7:**
*Admit that the approximate $1.56 million in remedial work was never performed by Home Builders and they were never paid that full amount by you.*

**Objection:** This request is overly broad and presumes facts not yet established. The request is also unduly burdensome and requires detailed evidence not yet provided.

**REQUEST FOR ADMISSIONS NO. 8:**
*Admit that you used funds from other rental properties to advance $172,000 to close the purchase of the Property.*
**Objection:** This request is vague and lacks specificity. It assumes facts not in evidence and requires clarification regarding the nature and source of the funds.

**REQUEST FOR ADMISSIONS NO. 9:**
*Admit that the $36,000 commission credit from the realtor Susan Martin that you claim as part of your advance was not disclosed to Dandan Zhang.*
**Objection:** This request is based on an assumption of fact that is not established. The request presumes the non-disclosure of the credit, which may involve disputed facts and legal conclusions.

**REQUEST FOR ADMISSIONS NO. 10:**
*Admit that you have no right to ownership, possession, or use of the Property.*
**Objection:** This request seeks a legal conclusion and is overly broad. It requires a determination of legal rights rather than specific factual admissions. All evidences in discovery actually proved the plaintiff have 25% of the ownership verified by defendants in many occasions clear and loud.

**REQUEST FOR ADMISSIONS NO. 11:**
*Admit that you falsified claims for items you claimed were stolen from the Property and submitted receipts to HPD for items that were never taken.*
**Objection:** This request is objectionable as it presumes wrongdoing and involves disputed facts that are not established. The request is based on allegations that require further evidence and clarification.

**REQUEST FOR ADMISSIONS NO. 12:**
*Admit that you personally had no agreement to rent the Property from Dandan Zhang.*
**Objection:** The request lacks context and specificity. It is also based on an assumption of fact not yet established and may involve contested issues of fact.

**REQUEST FOR ADMISSIONS NO. 13:**
*Admit that you moved into the Property without notifying Dandan Zhang ahead of time and without any approval for you to occupy the Property.*
**Objection:** This request is vague and lacks necessary context. It presumes facts that may be in dispute and requires clarification regarding the notice and approval process.

**REQUEST FOR ADMISSIONS NO. 14:**
*Admit that you received all items allegedly taken from you at the Property and that you no longer have any valid claim to return any of those items.*
**Objection:** This request is objectionable as it assumes facts not in evidence and involves contested issues regarding the return and claim of items.

**REQUEST FOR ADMISSIONS NO. 15:**
*Admit that Dandan Zhang never agreed to accept bitcoin from you for use of the Property as your own personal rental.*
**Objection:** The request is objectionable as it is based on an assumption of fact that is not yet established. The request may involve disputed issues regarding the terms of agreement. Instead in Wechat conversation Dandan Zhang's own words in my occasions was our mutual properties and also eager to accept bitcoin as rent.

**REQUEST FOR ADMISSIONS NO. 16:**
*Admit that the bitcoin payment was from third-party renters of the Property to pay for short-term rental use of the Property.*
**Objection:** This request is vague and ambiguous regarding the nature of the bitcoin payment and its source. It requires further clarification and is based on assumptions not established by evidence. The assumption was nowhere to prove in any circumstances.

**REQUEST FOR ADMISSIONS NO. 17:**
*Admit that you had an oral agreement with Dandan Zhang to manage, rent and renovate the Property up to a renovation budget of no more than $185,000 in return for your receipt of 20% of the rental proceeds from short-term rentals that you promised to arrange.*
**Objection:** This request involves complex terms and conditions of an alleged oral agreement that is disputed in existence. It is also objectionable as it involves legal conclusions and disputed facts. So call oral agreement and management were never discussed in any circumstances, instead the relation always in Dandan Zhang's language was "partner" and "co owner".

**REQUEST FOR ADMISSIONS NO. 18:**
*Admit that you had no ownership interest in the Property and any advance that you provided was a loan to be repaid from the proceeds of rentals to third-party renters.*
**Objection:** The request is based on disputed facts and legal conclusions regarding ownership and the nature of any advances provided. Further context and evidence are necessary to properly address this request. Loan was never mentioned in any circumstances, neither term, period, and interest etc.

**REQUEST FOR ADMISSIONS NO. 19:**
*Admit that the alleged value of all items you claim were taken does not exceed $200,000, as alleged in paragraph 165 of the Second Amended Complaint and those items were all returned to you.*
**Objection:** This request is objectionable as it involves disputed factual issues and requires admission of a specific value that may not be established. The request also assumes the return of items, which may be contested.

**REQUEST FOR ADMISSIONS NO. 20:**
*Admit that Dandan Zhang's ownership of the Property is not a business and you are not a consumer as alleged in Count XII of the Second Amended Complaint, pursuant to Haw. Rev. Stat. Chapter 480.*
**Objection:** This request seeks a legal conclusion and involves interpretation of statutes that are not appropriate for an admission request. It also assumes facts not established by evidence.

**REQUEST FOR ADMISSIONS NO. 21:**
*Admit that you do not have a 25% interest in the Property as alleged in Paragraph 189 of the Second Amended Complaint.*
**Objection:** This request is objectionable as it involves a contested issue of fact regarding ownership interest. Further context and evidence are necessary to respond appropriately. 25% ownership was drafted by Dandan Zhang herself, and repeatedly confirmed by her and her husband in many occasion verified evidence by the court.

**REQUEST FOR ADMISSIONS NO. 22:**
*Admit that you are a citizen of the People's Republic of China and are in the United States on a Visa basis only.*
**Objection:** This request seeks information that is irrelevant to the material issues of the case. Personal citizenship and visa status do not pertain to the substantive issues in dispute.

**REQUEST FOR ADMISSIONS NO. 23:**
*Admit that you are a citizen of the People's Republic of China and are staying in the United States without a proper visa or authorization from the relevant immigration authority.*
**Objection:** This request is irrelevant to the substantive issues of the case and seeks information about immigration status that does not pertain to the central issues in dispute. The assumption is objectionable and no fact basis at all.

**REQUEST FOR ADMISSIONS NO. 24:**
*Admit that you never communicated with Dandan Zhang on the messaging app or portal known as Telegram.*
**Objection:** This request is vague and lacks context. It also may involve issues related to the completeness of communications that are not central to the substantive issues of the case.

**REQUEST FOR ADMISSIONS NO. 25:**
*Admit that you were terminated as Dandan Zhang's property manager and fiduciary on behalf of the Property as of July 29, 2022.*
**Objection:** This request is objectionable because it assumes facts not in evidence and may involve disputed issues of fact. The termination date and the circumstances surrounding it are subject to further examination and are not suitable for a straightforward admission. Dandan Zhang has no right to terminated a co-owner, let alone lying to HPD she didn't even know the plaintiff just to rip off the ownership of the partner.

**REQUEST FOR ADMISSIONS NO. 26:**
*Admit that you have never held a real estate license in the State of Hawaii.*
**Objection:** This request is irrelevant to the substantive issues of this case, as it pertains to licensure status which does not directly impact the core issues in dispute. It also seeks an admission of a fact that is not material to the current litigation.

**REQUEST FOR ADMISSIONS NO. 27:**
*Admit that you never held a contracting license in the State of Hawaii.*
**Objection:** This request is similar to No. 26 and is objectionable on the same grounds. It seeks information that is irrelevant to the central issues of the case and does not pertain to any disputed facts.

**REQUEST FOR ADMISSIONS NO. 28:**
*Admit that you were never licensed as and never held a property manager license in the State of Hawaii.*
**Objection:** This request is objectionable because it is irrelevant to the core issues of the case. The licensure status of the responding party does not directly impact the substantive legal or factual disputes in this matter.

**REQUEST FOR ADMISSIONS NO. 29:**
*Admit that you were never licensed as and never held an architect license in the State of Hawaii.*
**Objection:** This request is similarly objectionable on the grounds of relevance. The request pertains to licensure status that is not material to the key issues in dispute in this case.

**REQUEST FOR ADMISSIONS NO. 30:**
*Admit that you were Dandan Zhang's agent and fiduciary with respect to handling the Property to rent to third-party renters and account for all rentals and payments to her directly.*
**Objection:** This request is objectionable because it seeks a wrong, and conclusory admission regarding the nature of the relationship without accounting for the facts and specific terms of the co-ownership agreement between the parties.

**REQUEST FOR ADMISSIONS NO. 31:**
*Admit that you never used unionized construction workers for the renovation work done to the Property.*
**Objection:** This request is vague and lacks context. It is also based on assumptions that may not be relevant to the central issues in the case. The employment practices regarding construction workers are not directly related to the main factual disputes.

**REQUEST FOR ADMISSIONS NO. 32:**
*Admit that you used leftover construction materials from other projects under your care for the renovation work done to the Property.*
**Objection:** This request is objectionable as it is vague regarding what constitutes "leftover construction materials" and how they relate to the renovation work. It presumes facts that may be disputed and requires clarification.

**REQUEST FOR ADMISSIONS NO. 33:**
*Admit that contractors or subcontractors such as JM Electrical LLC engaged by you to do work for the Property were paid in part by letting them and their families stay without charge in properties you manage for other owners.*
**Objection:** This request involves multiple assumptions and presumes a practice that is not directly related to the core issues of the case. It is also based on information that is not clearly established and may involve disputed facts.

**REQUEST FOR ADMISSIONS NO. 34:**
*Admit that you or entities owned by you are evading enforcement of multiple court judgments and administrative fines issued by authorities in China.*
**Objection:** This request is objectionable because it seeks an admission regarding matters that are not directly relevant to the issues in this litigation and involves allegations that may be outside the scope of the current proceedings. Also ignoring the basic fact China is a corrupted and

dictatorship, human rights violated country whose justice system status not recognized by common value of US and all other western countries.

**REQUEST FOR ADMISSIONS NO. 35:**
*Admit that you deleted a Gmail account used to manage short-term rentals.*
**Objection:** This request is vague and lacks necessary context. It also involves issues of data management that may not be central to the substantive disputes in the case. Further details are required to address this request meaningfully.

**REQUEST FOR ADMISSIONS NO. 36:**
*Admit that you routinely used the self-destruct function of Telegram to delete messages with your associates.*
**Objection:** This request is objectionable because it involves assumptions about messaging practices that may not be relevant to the core issues of the case. The concept of "associates" is questionable, ambiguity, and misleading. The app function does not directly address the substantive legal or factual disputes.

**REQUEST FOR ADMISSIONS NO. 37:**
*Admit that you asked Dandan Zhang to pay your daughters' tuitions to their school in Hawaii because you did not wish to leave any trace by using conventional banking or payment methods.*
**Objection:** This request is objectionable as it involves matters that are not relevant to the substantive issues in the case. It also presumes specific motives and actions that may not be directly related to the core legal disputes.

**REQUEST FOR ADMISSIONS NO. 38:**
*Admit that you asked Dandan Zhang and/or her husband to wire money to accounts owned by your wife in China and China-based vendors for construction materials used in other projects as a way to bypass China's foreign currency exchange regime.*
**Objection:** This request is objectionable because it involves complex matters and legal issues unrelated to the central disputes in this case. It presumes illicit practices without providing clear context or evidence.

**REQUEST FOR ADMISSIONS NO. 39:**
*Admit that you routinely asked your associates to send funds belonging to owners of properties under your care to your personal bitcoin accounts or wallets.*
**Objection:** This request is objectionable due to its broad nature and the presumption of routine practices that may not be relevant to the main issues of the case. It also lacks specificity and context. Also as No38, The concept of "associates" is questionable, ambiguity, and misleading.

**REQUEST FOR ADMISSIONS NO. 40:**
*Admit that you and Homage Builders LLC engaged in bartering practice or otherwise paying in cash to avoid taxes.*
**Objection:** This request seeks an admission of illegal conduct and is based on assumptions that are not directly relevant to the central issues of the case. It also presumes facts that may be contested and requires further evidence.

**REQUEST FOR ADMISSIONS NO. 41:**
*Admit that the injury you allegedly suffered in February 2024 no longer prevents you from flying to the State of Hawaii.*
**Objection:** This request is objectionable as it concerns personal medical conditions and travel capabilities that are related to personal privacy and subject to medical therapies progress.

**REQUEST FOR ADMISSIONS NO. 42:**
*Admit that you have not reported to the United States Internal Revenue Service all income you have received from all of your activities related to the Property.*
**Objection:** This request involves matters of tax reporting that are not directly related to the substantive issues of this case. The request is also based on assumptions about financial conduct that are outside the scope of the core disputes.

Please let me know if you need any further modifications or additional information.

Thank you for your attention to this matter.

Sincerely,

Plaintiff/ DI WU

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI‘I

| | |
|---|---|
| DI WU,<br><br>Plaintiff,<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants. | Civil No. 1CCV-22-0000964 (DEO)<br><br>CERTIFICATE OF SERVICE |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was duly served upon the following parties on the date and in the manner as indicated below:

via JEFS

**CARLSMITH BALL LLP**
**JOHN P. MANAUT 3989 KAI WANG 7319 1001 Bishop Street,**
**Suite 2100 Honolulu, Hawaii 96813**
**Tel. No.: (808) 523-2500 Fax No.: (808) 523-0842**
**jpm@carlsmith.com kwang@carlsmith.com**
**Attorneys for Defendant**
**DAN DAN ZHANG AKA DANDAN ZHANG**

**Aug 20th, 2024**

Di Wu / Plaintiff

CETRA TECHNOLOGY

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
24-JUN-2024
06:09 PM
Dkt. 462 EXH

# Report on Signature Analysis for Carlsmith Ball LLP
June 21, 2024

## Definition of Assignment

Carlsmith Ball LLP, a Limited Liability Partnership (more specifically Kai Wang a partner of Carlsmith Ball) retained Cetra Technology Inc (forensics group) to analyze the signatures present on two different documents (Residential Lease Agreement and the Property Investment Agreement) that the Defendant claims is not authentic. Cetra was asked to determine the authenticity of the signatures as presented on both documents. The documents in question are attached as **Exhibit A** (hereafter referred to as *The Lease*) and **Exhibit B** (hereafter referred to as the Investment Agreement). Both are instrumental in civil case, Di Wu vs. Dan Dan Zhang aka Dandan Zhang (Civil No. 1CCV-22-0000964). The signatures of the documents were allegedly the signatures of Dandan Zhang (Zhang). Additionally, Cetra was asked, should the signatures not be authentic, would it be possible to determine how the signatures were forged or tampered with. Michael McMurdo (*McMurdo*), CEO of Cetra Group and forensic engineer was the principal investigator.

## Preparation

As part of the process, McMurdo requested samples of Ms. Zhang's signature from different documents. Essentially a random sampling of her signatures. Although the signature is written in Chinese (and Mr. McMurdo does not read or speak Chinese), the science of checking the validity of a signature has no dependence whatsoever on the investigator having any kind of command of the language. Knowing the language is simply not relevant to this investigation.

Mr. McMurdo further asked for a copy of any documents Mr. Di Wu may have had access to prior to the date of the suspect documents being signed. More specifically any documents known to have been provided to Mr. Di Wu with Ms. Zhang's signature. Mr. McMurdo was provided DocuSign documents that contained four different signatures collected by the DocuSign, on or about July 2019 (Hawaii Time): **Exhibit C**. These signatures were all available to Di Wu and as such were possible sources for the forgery. All signatures were written by Zhang using her finger on a glass screen. As it turns out only one of the four was used as a source. Screenshots of these documents were sent to Di Wu.



**EXHIBIT 6**

Lastly, McMurdo was provided a graphic comparisons/analysis of four signatures. These graphics were used as a way of mitigating the cost of the investigation. The graphics were used to illustrate the findings.

## Procedure for Analysis

Signature analysis can be performed in a number of different ways. This would be overlay, relative size and spacing and analysis of pen strokes, intersection points and more. In this case, the most obvious and straight forward of methodologies will be the comparison of the suspect signature to the source. It is well documented that no two signatures from the same individual can be identical. Thus, if the source signature and the suspect signature are identical, it can be concluded without a doubt that one signature is a facsimile of another. The final task would be to determine the generational standing. Which signature is a child of the other. This is done by looking at the date of creation of each signature as well as the preservation of resolution: a copy of a copy of a copy often results in an identical image, but sharpness or resolution is lost.

International Journal of Innovative Science, Engineering & Technology, Vol. 8 Issue 4, April 2021.

> *Empirical evidence that two genuine signatures are never identical in practice has been available for more than 120 years, but a scientific explanation for this phenomenon is lacking. The authors present a detailed explanation based on the latest research in biomedical sciences, identifying four reasons: 1) The "strokes" of each signature last 1/10 of a second, while the visual reaction time in humans requires at least 2/10 of a second, so the "strokes" cannot be corrected by visual feedback. 2) Each time a signature is written, different motor units of the corresponding muscles are quasi-randomly activated, resulting in slightly different movements and thus a non-identical signature. 3) In writing a signature, muscles of the forearm and the rest of the upper limb are used, which are less controllable from the motor cortex than the intrinsic muscles of the hand. 4) It is implied by electromyogram studies and kinesiology that a unique sequence of muscle movements is required to produce a specific signature or handwriting, so if a person tries to repeat the same movement, the two actions will never be identical. In addition to the above, people usually sign "by heart" without seeing a model of their signature, using their "muscular memory", thus producing non-identical signatures.*

Simply put, any two identical signatures shall both be considered the same signature and therefore at least one is a facsimile of the other. Empirical evidence shows that two signatures from an individual may be similar, but never identical: and this is taught as a fundamental principle in FDE training courses.

In order to perform this comparison/investigation, five signatures of Ms Zhang's were compared and analyzed. These signatures were obtained from the following sources:

CETRA TECHNOLOGY

1. The forged Lease (Zhang Signature A)
2. Signature pulled from a WeChat screenshot of DocuSign that Zhang sent to Di Wu (Zhang's Signature B)
3. Signature pulled from a DocuSign Title Guaranty Satisfaction/Waiver document (TG Satisfaction) completed by Zhang and ultimately the source for Signature B (Zhang Signature C).
4. Signature from the Chinese version of the Investment Agreement (Zhang Signature D).
5. Signature from the English translation of the Investment Agreement (Zhang Signature E).

The images for these are as follows:

Zhang Signature A



Zhang Signature B



Zhang Signature C



Zhang Signature D

CETRA TECHNOLOGY



Zhang Signature E



Source of Zhang Signature C (TG Satisfaction)

The Lease that was allegedly signed by Zhang and provided by Di Wu and contains the Zhang Signature A.

CETRA TECHNOLOGY

9. **Binding Effect:** The covenants, obligations, provisions, and conditions In this Agreement shall be binding on the heirs, legal representatives, agents and assigns of Tenant and Landlord.

10. **Notice:** Any written notice required or permitted under this Agreement or under governing law shall be deemed sufficiently given or served If sent by United States certified mail, return receipt requested. Landlord or Tenant may change the place notice is to be given under this paragraph by written notice to the other party sent United States certified mail, return receipt requests to the last valid address under this paragraph.

11. **Execution in Counterparts and Copies:** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The parties are entitled to rely upon a copy or facsimile signature of the other parties to this Agreement transmitted via electronic mail or telecopier.

Landlord: Tenant:

Page 2

The analysis of these signatures is quite interesting and quite compelling. The language of any writing is not relevant in relation to how it is written. Signature analysis is the science of comparing two different samples of writing and comparing the characteristics of the writing style. Thus, in order to write a character, the writer must write each piece of the character or signature by lifting the writing instrument and then placing the instrument back on the media to write the next part of the character. Typically, this has several components for a single character. Because of this, there is a third dimension that adds to the ability to compare different signatures. In other words, there is a lot more opportunity for variability each time the signature (character) is written. What is even more interesting is the author wrote the source signature with her finger on a mobile phone screen. Getting a signature that is remotely similar (not to mention an exact match) to a written signature is (in my experience) more than impossible.

## Analysis

All five of the signatures of Zhang were compared and analyzed. The simplest comparison is to resize each signature to be equal, care must be taken to maintain consistent proportions. Once done, each signature can be overlaid to provide a visual representation. Upon doing so, the first three signatures (A, B, and C) are exact

CETRA TECHNOLOGY

overlays of one another. The last two signatures from both language versions of the Investment Agreement have some anomalies such that we will discuss them separately further down. The exact overlay of the first three signatures should not be a surprise for Signatures B and Signature C (since we know they are facsimiles), but the overlay indicates Signature A is a facsimile of B or C. Once that was determined the next step was to look for any anomalies that would indicate Signature A was written differently than Signature B or Signature C.

Fortunately, the forger did not attempt to disguise or alter this signature at all and as such the evidence is overwhelming that Signature A is a facsimile of B. Additionally, virtually nothing was done to attempt to hide or alter the characteristics or traits. One can look at various parts of the Signatures and compare line width, starts and stops, turns, intersections and other features. Every single attribute compared showed no deviation between signatures. For example:

**Relative size is consistent with facsimiles**






**The tilt of each of the lines are identical**



**Start and Stops on each stroke is identical:**



Signature A Signature B Signature C

As an aside, visually comparing Di Wu's different signatures, the point is further illustrated. Every signature of Di Wu's seen by this investigator is clearly unique.

## Conclusion (for Lease Agreement signature)

After studying the above-mentioned attributes, it is very clear (incontrovertible) that the signature used on the disputed Lease is identical to the Source. There can be no disputing this. This would then fall on the timeline. Which document came first? Did Ms Zhang sign the Title Guaranty Satisfaction first or did she actually sign the disputed Lease first and the Title Guaranty Satisfaction signature was copied from the disputed document?

1. The most obvious being the dates on the documents themselves. The source document was signed on or about July 2, 2019 between 8:38 am and 9:03 am (China time). There may be some ambiguity on the exact time since the Title Guaranty Satisfaction was signed in China. However, the difference can only be minutes and not days and cannot be considered relevant.

   In comparison, the Lease was dated June 30, 2021, nearly two years after the Title Guaranty Satisfaction was signed.

2. In looking at all three signatures, one may notice that Signature C is much clearer than the other two signatures. This would be expected as Signature C was created electronically. Things like pressure of the finger do not translate electronically. This would also lend credence to the fact that Signature C is the original signature while the other two signatures are facsimiles of Signature C. In

fact, we already know that Signature C was created before Signature B and that Signature B is a screenshot of Signature B.

In my opinion, Signature A is a copy of Signature B while it is known that Signature B is a copy of Signature C. My conclusions are based on the proven analysis if the three signatures and once the date of creation of the three signatures, there can be no other conclusion.

## Analysis of Investment Agreement

As mentioned above the last two signatures (D and E), there were some anomalies with those signatures that should be dealt with separately. The analysis of these two signatures is interesting and somewhat more esoteric. The first Signature, D, is a signature supposedly written by Zhang signifying she is in agreement with the Chinese version of the agreement. The second Signature, E, is supposedly ZhengZhang's the signature on the English translation signifying her assent of this agreement. Both signatures were compared to one another as well as compared to the Signature C (the source). The anomalies of Signature D and Signature E show some differences in the first part of each signature to each other as well as when compared to Signature C.



Signature D



Signature E



Signature D Signature



Signature E



Signature D



Signature E



Signature D



Signature E



Signature D



Signature E



Signature D



Signature E

CETRA TECHNOLOGY



Signature E



Signature D Signature E



Signature D Signature E



Signature D Signature E

CETRA TECHNOLOGY



Signature D Signature E

## Conclusion for Investment Agreement Signatures

Although both signatures do not line up with each other 100%, approximately 70% of the signatures line up and match perfectly. Further, they share a significant number of common points, intersections, angular trajectories and both have the same anomalies, The quantity of these common points indicates both signatures share the same parent meaning they originate from the same source.

Respectfully submitted by:



Michael McMurdo
Senior Forensic Investigator
June 21, 2024

**Investigation Team**
Senior Forensic Investigator
Cetra Group, Inc.

**Michael McMurdo**, CEO Cetra Group: EnCase certified Forensic Engineer with over 30 years' of IT experience with both hardware and software. Performed countless forensic collections and investigations; primarily collection and review. Retained to perform many forensic investigations including authentication, intrusion, spoofing detection, etc. Retained as an Expert Witness in several cases (listed below).
Education: BS Mathematics, Graduate work Physics
**Matt Manosca**, Forensic Engineer, Cetra Group: more than 4 years' experience in forensic work at Cetra Group. Former HPD Police Officer.
Education: BS Computer Science, Master Criminal Science

List of court approved expert witness:

Case: Eastman v Stromsdorfer
November 2020
Ward Jones (Bervar & Jones, Attorneys At Law)
Case Synopsis: Eastman sued Stromsdorfer for breach of contract and fraud. Eastman alleged Stromsdorfer not only violated the conditions on an asset sale agreement, but also fabricated data covering up the violation as well as hacked into Eastmean's IT system and stole critical customer information.
Expert Testimony: Testified to the likelihood of a breach, interference with Eastman's company and authenticity of documents being provided by Stromsdofer.

Case: Vincent Tylor v Hawaiian Springs, LLC
April 2019
Seth Reise (Watanabe Ing, LLC)
Case Synopsis: Tylor sued Hawaiian Water for copyright infringement of photos
Expert Testimony: To determine if the photographs used by Hawaiian Springs were the same photos as claimed by Tylor and if so to determine where those photos were actually obtained.
Court time: Case was settled after deposition

Case: Adachi VS Crofford (State of Hawaii Family Court)
September 2015
Michael Green Attorney and Maria Penn Attorney
Case Synopsis: High profile divorce case where husband had several affairs and physically abused wife who was a well-known endocrine surgeon. Injuries sustained forced her to give up her practice.
Expert Testimony: testified as to timelines and Internet surfing, posting and photos. Also testified about potential child pornography discovered and its origins. Testified on two separate occasions.

Case Name: Coles v. Eagle, et al. (9th district US Court of Appeals)
December 2014
Chung & Ikehara (City & County of Honolulu)
Case synopsis: Police brutality case of a prisoner claiming he was beaten up during his arrest for auto theft. Plaintiff was tried and convicted for the crime and sent to prison. Plaintiff represented himself and sued the City and County of Honolulu for brutality. He lost his case but appealed. The 9th Circuit sent the case back for retrial stating the Plaintiff had poor legal representation. A Seattle law firm was appointed to represent the Plaintiff.
Expert Testimony: Cetra was retained to collect documents and emails from HPD and C&C servers. Court appearance was to testify about authenticity of documents collected as well as to determine if any had been deleted or altered.

Other notable experience investigations or affidavits:

Case: Narayan vs Marriott International
August 2013
Starn O'Toole Marcus & Fisher
Requested by Law firm Starn O'Toole to compel opposing side to produce discovery in Native format. Issue was opposing side wanted to provide discovery in an alternate format.
Expert Testimony: Affidavit was prepared by Guy Fernandes arguing that changing the data from its native format to an alternative could alter or delete certain metadata. Court ruled in favor.

**Reed Hayes,** CDE
**Handwriting & Document Examiner**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
24-JUN-2024
06:09 PM
Dkt. 464 EXH

November 27, 2022

Yuriko J. Sugimura, Esq.
Clay, Chapman, Iwamura, et al.
700 Bishop Street, Suite 2100
Honolulu, Hawaii 96813

Re: Dandan Zhang / Di Wu – Civil No. 1CVV-22-0000964 – Questioned Residential Lease Agreement

Dear Ms. Sugimura,

As you are aware, I am a certified handwriting and document examiner whose training, experience and qualifications are evidenced in my curriculum vitae, attached as Exhibit 1 to my previous report of September 2, 2022 in the above-referenced matter.

Newly Provided Material

Subsequent to my previous reports of September 2, 2022 and November 16, 2022 you provided me with an electronically transmitted copy of an undated Title Guaranty Escrow Services "Satisfaction/Waiver" document bearing a DocuSign signature admittedly written or produced by your client Dandan Zhang. A copy of said document is attached hereto as Exhibit 1.

Assignment

You have indicated Ms. Zhang believes the Satisfaction/Waiver signature was copied and transferred to the June 30, 2021 Residential Lease Agreement which you previously provided for my examination. (See copy at Exhibit 2.) You requested an examination and comparison of the signature on the Satisfaction/Waiver document with the signature on the Residential Lease Agreement to determine if in fact the Satisfaction/Waiver signature was copied and transferred.

Method of Examination

1. Using Adobe Photoshop, the Satisfaction/Waiver signature and Residential Lease Agreement signature were extracted from the documents and copied into Microsoft PowerPoint.

2. Using PowerPoint the transparency level of both signatures was increased.

3. Both signatures were superimposed in order to determine if they are an exact match.



P.O. Box 235213 • Honolulu, HI 96823
Tel: 808-292-6640
Email: reed@reedwrite.com • Website: reedwrite.com

**EXHIBIT 7**

Findings From Examination

The Satisfaction/Waiver signature and the Residential Lease Agreement signature are in fact exact matches, indicating one of them must be a duplicate of the other. (See below illustration created in PowerPoint. Note: In the illustration the two signatures are slightly offset so that one does not completely obscure the other.)




Due to natural variation, which is governed by both internal and external influences, no one signs identically from one time to another; there is always some degree of variation in one's handwriting or signature. Some people are relatively consistent in the way they form their letters resulting in a low degree of variation, while others have greater variability.

Some degree of signature or handwriting variation is one indicator of genuineness. Lack of variation between two signatures indicates one must be a copy or reproduction of the other.

Kipouràs, et al. write: "…a unique sequence of muscle movements is required to produce a specific signature or handwriting, so if a person tries to repeat the same movement, the two actions will never be identical. In addition to the above, people usually sign 'by heart' without seeing a model of their signature, using their 'muscular memory', thus producing non-identical signatures."[1]

Edna Robertson notes, "Signatures so identical that they almost perfectly coincide are suspect…Because no two genuine signatures are ever precisely identical, any unusual likeness should be thoroughly explored." She continues, "Signatures that are exactly identical are replicas of which only one, if any of them, is genuine."[2]

[1] Pàvlos Kipouràs, Christos Kosmidis & Dimitrios E. Skarpalezos, "Why Two Signature Are Never Identical in Practice," International Journal of Innovative Science, Engineering & Technology, Vol. 8 Issue 4, April 2021.

[2] Edna W. Robertson, *Fundamentals of Document Examination,* Nelson Hall Publishers, Chicago, 1991, p.152.



P.O. Box 235213 • Honolulu, HI 96823
Tel: 808-292-6640
Email: reed@reedwrite.com • Website: reedwrite.com

Katherine Koppenhaver states, "When you encounter identical signatures on different documents, one or all of the signatures are not authentic since no one can exactly duplicate his signature."[3]

## Previous Findings/Opinions

Prior to receipt of the newly provided Satisfaction/Waiver document and signature, I had examined "Dandan Zhang" signatures on (1) a "Property Investment Agreement" (Mandarin version), dated May 28, 2020, (2) a "Property Investment Agreement" (English version), dated May 28, 2019 and (3) the June 30, 2021 "Residential Lease Agreement". (See copies of Property Investment Agreements at Exhibit 3.) I compared the Dandan Zhang signatures on those three documents with 47 pen and ink exemplar signatures written by Ms. Zhang. I concluded none of the three signatures were in agreement with the Zhang exemplars. I therefore opined it is highly probable the three signatures were not signed by Ms. Zhang.

At the time of my prior examinations I did not realize the three questioned signatures had been produced via DocuSign versus pen and ink. By way of personal experience I am aware that DocuSign signatures, like other electronic signatures, often bear little resemblance to one's usual pen and ink signature. My examination and comparison of the newly provided Satisfaction/Waiver signature, which Ms. Zhang admits to having written or produced via DocuSign, negates my prior opinion that Ms. Zhang did not produce the signatures appearing on the three documents noted above.

I also previously stated that all of the three questioned signatures noted above were written by the same person. (See illustration below, demonstrating their similarity.) If Ms. Zhang wrote or produced the DocuSign signature on the Satisfaction/Waiver document as she admits, then she also produced the other three signatures. However, based on the documents provided for my review, aside from the June 30, 2021 Residential Lease Agreement signature which was transferred from the Satisfaction/Waiver document, I am unable to determine how the other two signatures were affixed to the Mandarin and English versions of the Property Investment Agreement. It is entirely feasible they were also transferred from other DocuSign documents. It is also feasible the Satisfaction/Waiver signature may have been transferred to the two Residential Lease Agreements and then altered slightly using Adobe Photoshop or other software in order to render them unidentical and therefore not detectable as having been transferred.


Property Investment Agreement Mandarin Version


Property Investment Agreement English Version


6/30/21 Residential Lease Agreement

[3] Katherine M. Koppenhaver, *Attorney's Guide to Document Examination,* Quorum Books, Westport, CT, 2002, p.203.



P.O. Box 235213 • Honolulu, HI 96823
Tel: 808-292-6640
Email: reed@reedwrite.com • Website: reedwrite.com

<u>Summary</u>

1. The Dandan Zhang signature on the June 30, 2021 Residential Lease Agreement is an exact duplicate of the Satisfaction/Waiver signature, evidence it was transferred or copied to the Residential Lease Agreement.
2. Ms. Zhang admits to having written or produced the Satisfaction/Waiver signature via DocuSign.
3. As the Dandan Zhang signatures on the Mandarin and English versions of the Property Investment Agreement are in agreement as to authorship with the Satisfaction/Waiver signature, they must also have been written or produced by Ms. Zhang via DocuSign.
4. Given the documentation provided for my review, I am unable to determine how the Dandan Zhang signatures on the two Property Investment Agreements were affixed to the documents. It is entirely possible they were also transferred from other DocuSign documents.

If additional documents DocuSigned by Ms. Zhang are produced I will gladly examine signatures on those documents to determine whether any of them may have been the source for signatures on the Property Investment Agreements.

Should you require that I testify to any of this material, please contact me at your earliest convenience so that I may have adequate preparation time.

Sincerely,

Reed Hayes, CDE



P.O. Box 235213 • Honolulu, HI 96823
Tel: 808-292-6640
Email: reed@reedwrite.com • Website: reedwrite.com

4G 87 08:45

Review and sign document(s) | DocuSign

Are you finished signing?

FINISH

TITLE GUARANTY
TITLE & ESCROW SERVICES

**TITLE GUARANTY ESCROW SERVICES, INC.**
**HAWAII KAI OFFICE** 6600 KALANIANAOLE HIGHWAY, SUITE 108A, HONOLULU, HI 96825

SATISFACTION/WAIVER

TITLE GUARANTY ESCROW SERVICES, INC.
6600 KALANIANAOLE HIGHWAY, SUITE 108A
HONOLULU, HI 96825
Attn.: Alan Chun

ESCROW NO.: 21319128329
SELLER: DIETER KURT STADELMANN
BUYER: DAN DAN ZHANG
TAX KEY: 1430060160000
PROPERTY: 1039 KOOHOO PL

The undersigned hereby agree that, subject only to the recording of the necessary documents, the procurement of required title coverage, and the proper disbursement of the funds, all terms and conditions contained in the Transfer of Property Agreement (Contract), Reference Date April 29, 2019, or any other form of agreement submitted to Escrow, including but not limited to additional agreements between the undersigned reached during the term of this escrow, have been satisfied or are hereby waived, and Escrow has no further responsibility with respect thereto.

Escrow and/or Title Company, is hereby authorized to do the following to documents submitted for recordation/submission to the Bureau of Conveyances or the Office of the Assistant Registrar of the Land Court. 1) fill in the effective date or execution date of the document and 2) endorse the grantee's, or if the document(s) affect Land Court property, any party of interest's address; marital status; and, if married, the full names of their spouses; the state where a legal entity was incorporated, formed, or registered; and/or the current number of the certificate of title or document number as mentioned within the document; as required by the Department of Land and Natural Resources, Amendments to Chapter 13-16-7, Hawaii Administrative Rules.

Buyer has received from Seller the Waiver/Exemption Form for FIRPTA and the N-289 form for HARPTA or has received assurance that the Seller will pay, through escrow, the full amount of tax due each agency. All provisions pursuant to Section 1445 of the IRS Code of 1984, as amended (FIRPTA) and Section 235-68 HRS, as amended (HARPTA), noted in the contract have been satisfied and escrow has no further liability thereto.

These instructions may be executed in counterparts, each of which when executed shall, irrespective of the date of its execution and delivery, be deemed an original and said counterparts together shall constitute one and the same instrument.

This document has been executed on the _____ day of ________________________, 20___.

______________________________
DIETER KURT STADELMANN

DocuSigned by:
______________________________
DAN DAN ZHANG

Exhibit 1—Satisfaction/Waiver Document

**RESIDENTIAL LEASE AGREEMENT**

THIS NOTICE OF RESIDENTIAL LEASE AGREEMENT ("Agreement") dated *Jun 30th 2021* is made and entered into, by and between Di Wu, Married ("Tenant") and Dandan Zhang ("Landlord"), Married. Di Wu is the co-owner of the property.

I. RECITALS

1. Landlord is the fee owner of the certain real property being, lying and situated at 1039 Koohoo pl, Kailua, HI 96734 and further identified by Tax Map Key No. (1) 4-3-006-160-0000 ("Premises");
2. Landlord desires to lease the Premises to Tenant pursuant to the terms and conditions contained herein; and
3. Tenant desires lo lease the Premises from Landlord pursuant to the terms and conditions contained herein;

II. TERMS AND CONDITIONS

1. **Lease Term**: Landlord leases to Tenant and Tenant leases from Landlord, the Premises together with any and all appurtenances thereto, for a term of 10 years from Jul 1st, 2021 through Jul 1, 2031 ("Term"). This Lease shall automatically convert to a month to month tenancy unless cancelled in writing by either party no less than 60 days from the desired termination date. The Term may be extended by written agreement of both the Tenant and the Landlord and all other terms and conditions shall continue to apply unless agreed to otherwise
2. **Rent:** The total yearly rent for the Term agreed to above is TWENTY THOUSAND DOLLARS ($20,000.00) ("Rent") per year payable on the last day of the year.
3. **Payment Address**: All payments shall be made to the Landlord and sent to the following address:

   Both parties agree

4. **Security Deposit:** Landlord and Tenant agree that a security deposit is not required.
5. **Use of Premises:** The Premises shall be used and occupied by Tenant and Tenant's family, and other rentals or sublease purpose.



Exhibit 2—Residential Lease Agreement

trial1

6. **Utilities:** Tenant shall be responsible for arranging for and paying for all utility services required on the Premises.

7. **Governing Law:** This Agreement shall be governed, construed and interpreted by, through and under the Laws of the Slate of Hawaii and City and County of Honolulu.

8. **Severability:** If any provision of this Agreement is, for any reason and to any extent, determined to be Invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected.

9. **Binding Effect:** The covenants, obligations, provisions, and conditions In this Agreement shall be binding on the heirs, legal representatives, agents, and assigns of Tenant and Landlord.

10. **Notice:** Any written notice required or permitted under this Agreement or under governing law shall be deemed sufficiently given or served If sent by United States certified mall, return receipt requested. Landlord or Tenant may change the place notice is to be given under this paragraph by written notice to the other party sent United States certified mail, return receipt requests to the last valid address under this paragraph.

11. **Execution in Counterparts and Copies:** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The parties are entitled to rely upon a copy or facsimile signature of the other parties to this Agreement transmitted via electronic mail or telecopier.

Landlord: Tenant:

# 共同出资协议书05.28.20.

甲方: Dandan Zhang　　证件号：G40409420
乙方: Di Wu　　证件号：G51525965

甲乙双方经友好协商，就共同出资购买位于夏威夷1039 Koohoo Pl, Kailua 96734一处房产，达成以下协议：

1. 该房产购入总价壹佰捌拾伍万美金（USD1,850,000），按照合同约定在交割日closing day之前甲方出资购房总价的75%，壹佰叁拾捌万柒仟伍佰美金(USD1,387,500)，乙方出资购房总价的25%，肆拾陆万贰仟伍佰美金（USD462,500）。
2. 由于该房产需要重新修整之后才能入住，整修费用以185,000美金计，甲方出资75%，乙方出资25%，工程时间控制在两个月之内完成。
3. 甲方配合办理房产过户交易手续，房屋产权证上甲方为持有人，方便后续申请唯一房屋物业税减半优惠。甲方享有上述共同所购物业产权的75%，乙方享有25%。
4. 该房产重修之后用于出租，租金收入部分20%支付给物业管理公司，由指定的物业管理公司对该房产进行运营维修清洁等管理，此事项由甲方授权乙方代为负责。扣除物业管理费、物业税、水电费等基本开销之后的租金净收入，按照出资比例进行分配，甲方获取75%，乙方获取25%。每年1月31日前乙方向甲方公开账目，并将属于甲方的租金收益转入甲方指定账户。
5. 该房产今后如需出售或者以信托形式留给甲乙双方继承人，双方可经友好协商达成共识。
6. 未经双方协商同意，任何一方不得将共有房产进行转让、为自己或第三人提供抵押担保及作为实物出资等。
7. 如一方对外转让房产份额，另一方在同等条件下有优先购买权。
8. 因该房产的市场增值部分，属于双方共同享有，权益按双方出资比例进行分配。
9. 因不可抗力或政府政策等原因，导致的房产损失、被征收等情形出现，风险由双方共同承担，所得补偿由双方按出资比例分配。
10. 任何一方不得因个人的债务导致共有房产的所有权、使用权收到影响，否则，应赔偿另一方所产生的损失。
11. 甲乙双方共同持有该房产股份，一切经营行为及产生的债权、债务、纠纷等由甲乙双方按照出资比例共同承担。
12. 甲乙双方本着合作共赢的目的签订此协议，如产生任何争议，应由双方经友好协商解决。
13. 本协议一式两份，双方各执一份，自双方签字之后生效。

甲方签字：　　乙方签字

Property investment agreement 05.28.2019
Party A: Dan-dan Zhang. ID Number: G40409420
Party B: Di Wu. ID Number:G51525965

After friendly consultation with each other, Part A and B have reached the following agreement on the joint purchase property in
1039 Koohoo Pl, Kailua 96734, Hawaii:

1. The total purchase price of the property is US dollars1,850,000. Party A provides 75% of the total fund. Party B provides 25% of the total fund.

2. Since the property is in tear down condition, needs to be renovated to become inhabitable. the renovation cost will forecast would be above 185,000 US dollars or market value, Party A contributes 75%, Party B contributes 25%

3. Party A will make all best she can in the real estate escrow procedures, and Party A will be the title holder on the property deed, which is convenient for the property tax exemption. Party A enjoys 75% of the above-mentioned jointly purchased property rights, and Party B enjoys 25%.

4. After the renovation of the property, 20% of the rental income will use for property maintenance, cleaning and other costs of the property, Net rental income after deducting basic expenses such as property management fees, property taxes, utilities, etc., is distributed according to the proportion of capital contribution, party A gets 75%, and Party B gets 25%. Before January 31 of each year, Party B will brief Party A and transfers the rental income belonging to Party A to the designated account

5. After renovations both parties agree to put the property into a joint families trust. If the property needs to be sold in the future or left in the form of a trust to the heirs of both parties, the two parties may reach a consensus through friendly consultation.

6. Neither party may transfer the common property, provide mortgage security for itself or to a third party, or contribute in any kind without the consent of both parties.

7. If one party transfers its share of the property to the third party, the other party has the right of first refusal under the same conditions.

8. Because the market appreciation part of the property belongs to both parties, the rights and interests are distributed in proportion to the capital contribution of both parties.

9. In the event of loss or expropriation of real estate caused by force majoure or government policies, the risk shall be borne jointly by both parties, and the compensation shall be distributed by both parties in proportion to the capital contribution.

10. Neither party shall affect the ownership or use of the joint property due to the debts of the individual, otherwise, the other party shall be compensated for the losses incurred.

11. Both parties shall jointly hold the shares in the real estate, and all business activities and creditor's rights, debts, disputes, etc. arising therefrom shall be jointly borne by both parties in accordance with the proportion of capital contribution.

12. The parties A and B sign this agreement for the purpose of win-win cooperation, and if any dispute arises, it shall be resolved by the two parties through friendly consultation.

13. This Agreement shall be made in duplicate, one for each Party, and shall enter into force upon signature by the Parties.

Party A. [signature] Party B. [signature]

*Signature A originates from a fake lease agreement.

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
24-JUN-2024
06:09 PM
Dkt. 465 EXH

## RESIDENTIAL LEASE AGREEMENT

THIS NOTICE OF RESIDENTIAL LEASE AGREEMENT ("Agreement") dated *Jun 30th 2021* is made and entered into, by and between Di Wu, Married ("Tenant") and Dandan Zhang ("Landlord"), Married. Di Wu is the co-owner of the property.

### I. RECITALS

1. Landlord is the fee owner of the certain real property being, lying and situated at 1039 Koohoo pl, Kailua, HI 96734 and further identified by Tax Map Key No. (1) 4-3-006-160-0000 ("Premises");
2. Landlord desires to lease the Premises to Tenant pursuant to the terms and conditions contained herein; and
3. Tenant desires lo lease the Premises from Landlord pursuant to the terms and conditions contained herein;

### II. TERMS AND CONDITIONS

1. **Lease Term:** Landlord leases to Tenant and Tenant leases from Landlord, the Premises together with any and all appurtenances thereto, for a term of 10 years from Jul 1st, 2021 through Jul 1, 2031 ("Term") This Lease shall automatically convert to a month to month tenancy unless cancelled in writing by either party no less than 60 days from the desired termination date. The Term may be extended by written agreement of both the Tenant and the Landlord and all other terms and conditions shall continue to apply unless agreed to otherwise
2. **Rent:** The total yearly rent for the Term agreed to above is TWENTY THOUSAND DOLLARS ($20,000.00) ("Rent") per year payable on the last day of the year.
3. **Payment Address:** All payments shall be made to the Landlord and sent to the following address:

   Both parties agree

4. **Security Deposit:** Landlord and Tenant agree that a security deposit is not required.
5. **Use of Premises:** The Premises shall be used and occupied by Tenant and Tenant's family, and other rentals or sublease purpose.



EXHIBIT 8

*Signature A originates from a fake lease agreement.

6. **Utilities:** Tenant shall be responsible for arranging for and paying for all utility services required on the Premises.
7. **Governing Law:** This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Hawaii and City and County of Honolulu.
8. **Severability:** If any provision of this Agreement is, for any reason and to any extent, determined to be Invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected.
9. **Binding Effect:** The covenants, obligations, provisions, and conditions In this Agreement shall be binding on the heirs, legal representatives, agents, and assigns of Tenant and Landlord.
10. **Notice:** Any written notice required or permitted under this Agreement or under governing law shall be deemed sufficiently given or served If sent by United States certified mail, return receipt requested. Landlord or Tenant may change the place notice is to be given under this paragraph by written notice to the other party sent United States certified mail, return receipt requests to the last valid address under this paragraph.
11. **Execution in Counterparts and Copies:** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The parties are entitled to rely upon a copy or facsimile signature of the other parties to this Agreement transmitted via electronic mail or telecopier.

Landlord: Tenant:

Signature A

*Signature B originates from a WeChat screenshot.



Signature B originates from a WeChat screenshot.




TITLE GUARANTY
TITLE & ESCROW SERVICES

TITLE GUARANTY ESCROW SERVICES, INC.
HAWAII KAI OFFICE, 6600 KALANIANAOLE HIGHWAY, SUITE 108A, HONOLULU, HI 96825
PH (808)394-5252, FX (808)394-5250, Email: hawaiikai@tghawaii.com

SATISFACTION/WAIVER

TITLE GUARANTY ESCROW SERVICES, INC.
6600 KALANIANAOLE HIGHWAY, SUITE 108A
HONOLULU, HI 96825
Attn.: Alan Chun

ESCROW NO.: 21319128329
SELLER: DIETER KURT STADELMANN
BUYER: DAN DAN ZHANG
TAX KEY: 1430060160000
PROPERTY: 1039 KOOHOO PL

The undersigned hereby agree that, subject only to the recording of the necessary documents, the procurement of required title coverage, and the proper disbursement of the funds, all terms and conditions contained in the Transfer of Property Agreement (Contract), Reference Date April 29, 2019, or any other form of agreement submitted to Escrow, including but not limited to additional agreements between the undersigned reached during the term of this escrow, have been satisfied or are hereby waived, and Escrow has no further responsibility with respect thereto.

Escrow and/or Title Company, is hereby authorized to do the following to documents submitted for recordation/submission to the Bureau of Conveyances or the Office of the Assistant Registrar of the Land Court: 1) fill in the effective date or execution date of the document and 2) endorse the grantee's, or if the document(s) affect Land Court property, any party of interest's address; marital status; and, if married, the full names of their spouses; the state where a legal entity was incorporated, formed, or registered; and/or the current number of the certificate of title or document number as mentioned within the document; as required by the Department of Land and Natural Resources, Amendments to Chapter 13-16-7, Hawaii Administrative Rules.

Buyer has received from Seller the Waiver/Exemption Form for FIRPTA and the N-289 form for HARPTA or has received assurance that the Seller will pay, through escrow, the full amount of tax due each agency. All provisions pursuant to Section 1445 of the IRS Code of 1984, as amended (FIRPTA) and Section 235-68 HRS, as amended (HARPTA), noted in the contract have been satisfied and escrow has no further liability thereto.

These instructions may be executed in counterparts, each of which when executed shall, irrespective of the date of its execution and delivery, be deemed an original and said counterparts together shall constitute one and the same instrument.

This document has been executed on the ______ day of ________________________, 20____.

______________________________
DIETER KURT STADELMANN

DocuSigned by:
C818E33EEA5B436...
______________________________
DAN DAN ZHANG

Signature B

21319128329 47210 ASC:tt 19128329**47210

*Signature C originates from an Escrow satisfaction survey.

ign Envelope ID: 945E0D87-8D60-4B9B-8341-18561025E392

TITLE GUARANTY
TITLE & ESCROW SERVICES

TITLE GUARANTY ESCROW SERVICES, INC.
HAWAII KAI OFFICE, 6600 KALANIANAOLE HIGHWAY, SUITE 108A, HONOLULU, HI 96825
PH (808)394-5252, FX (808)394-5250, Email: hawaiikai@tghawaii.com

## SATISFACTION/WAIVER

TITLE GUARANTY ESCROW SERVICES, INC.
6600 KALANIANAOLE HIGHWAY, SUITE 108A
HONOLULU, HI 96825
Attn.: Alan Chun

ESCROW NO.: 21319128329
SELLER: DIETER KURT STADELMANN
BUYER: DAN DAN ZHANG
TAX KEY: 1430060160000
PROPERTY: 1039 KOOHOO PL

The undersigned hereby agree that, subject only to the recording of the necessary documents, the procurement of required title coverage, and the proper disbursement of the funds, all terms and conditions contained in the Transfer of Property Agreement (Contract), Reference Date April 29, 2019, or any other form of agreement submitted to Escrow, including but not limited to additional agreements between the undersigned reached during the term of this escrow, have been satisfied or are hereby waived, and Escrow has no further responsibility with respect thereto.

Escrow and/or Title Company, is hereby authorized to do the following to documents submitted for recordation/submission to the Bureau of Conveyances or the Office of the Assistant Registrar of the Land Court: 1) fill in the effective date or execution date of the document and 2) endorse the grantee's, or if the document(s) affect Land Court property, any party of interest's address; marital status; and, if married, the full names of their spouses; the state where a legal entity was incorporated, formed, or registered; and/or the current number of the certificate of title or document number as mentioned within the document; as required by the Department of Land and Natural Resources, Amendments to Chapter 13-16-7, Hawaii Administrative Rules.

Buyer has received from Seller the Waiver/Exemption Form for FIRPTA and the N-289 form for HARPTA or has received assurance that the Seller will pay, through escrow, the full amount of tax due each agency. All provisions pursuant to Section 1445 of the IRS Code of 1984, as amended (FIRPTA) and Section 235-68 HRS, as amended (HARPTA), noted in the contract have been satisfied and escrow has no further liability thereto.

These instructions may be executed in counterparts, each of which when executed shall, irrespective of the date of its execution and delivery, be deemed an original and said counterparts together shall constitute one and the same instrument.

This document has been executed on the ______ day of ____________________, 20___.

______________________________
DIETER KURT STADELMANN

DocuSigned by:

C618E33EEA5B435...
______________________________
DAN DAN ZHANG

Signature C

21319128329 47210 ASC:ft 19128329**47210

1.The specimens and the samples maintain the same height across all positions.



Signature A Signature B Signature C

*Signature A originates from a fake lease agreement.

*Signature B originates from a WeChat screenshot.

*Signature C originates from an Escrow satisfaction survey.

2.In the aspect of the lines' tilt angle, the specimens and the samples are completely identical.



Signature A Signature B Signature C

*Signature A originates from a fake lease agreement.

*Signature B originates from a WeChat screenshot.

*Signature C originates from an Escrow satisfaction survey.

# 3.Across all positions regarding width, the specimens and samples are identical.




*Signature A originates from a fake lease agreement.

*Signature B originates from a WeChat screenshot.

*Signature C originates from an Escrow satisfaction survey.

4.The lines' thickening traits at both their beginning and concluding positions are in complete agreement.



Signature A



Signature B



Signature C

*Signature A originates from a fake lease agreement.

*Signature B originates from a WeChat screenshot.

*Signature C originates from an Escrow satisfaction survey.

Although there is considerable loss in the detail of the lines of Signature A, its line trajectory is clear, which makes it suitable for comparison with Signature B and Signature C. After superimposing them using Photoshop, it is found that although the continuity of Signature A's lines is not 100% identical to that of Signature B and Signature C, the outline of all lines, their running paths, and the starting and ending positions of each edge line are completely the same, indicating that Signature A, Signature B, and Signature C were formed by the same handwriting. Due to the impossibility of complete consistency in the stability of signature writing, the length of the international routes and the combination of strokes will exhibit some inconsistencies. It is impossible for the signature method to be completely identical, thus it can be conclusively determined that Signature A was directly copied from either Signature B or Signature C.

## Signature Sample Source

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000964
24-JUN-2024
06:09 PM
Dkt. 466 EXH

### 共同出资协议书05.28.20.

甲方：Dandan Zhang　　证件号：G40409420
乙方：Di Wu　　证件号：G51525965

甲乙双方经友好协商，就共同出资购买位于夏威夷1039 Koohoo Pl, Kailua 96734一处房产，达成以下协议：

1. 该房产购入总价壹佰捌拾伍万美金（USD1,850,000），按照合同约定在交割日closing day之前甲方出资购房总价的75%，壹佰叁拾捌万柒仟伍佰美金(USD1,387,500)，乙方出资购房总价的25%，肆拾陆万贰仟伍佰美金（USD462,500）。
2. 由于该房产需要重新修整之后才能入住，整修费用以185,000美金计，甲方出资75%，乙方出资25%，工程时间控制在两个月之内完成。
3. 甲方配合办理房产过户交易手续，房屋产权证上甲方为持有人，方便后续申请唯一房屋物业税减半优惠。甲方享有上述共同所购物业产权的75%，乙方享有25%。
4. 该房产重修之后用于出租，租金收入部分20%支付给物业管理公司，由指定的物业管理公司对该房产进行运营维修清洁等管理，此事项由甲方授权乙方代为负责。扣除物业管理费、物业税、水电费等基本开销之后的租金净收入，按照出资比例进行分配，甲方获取75%，乙方获取25%。每年1月31日前乙方向甲方公开账目，并将属于甲方的租金收益转入甲方指定账户。
5. 该房产今后如需出售或者以信托形式留给甲乙双方继承人，双方可经友好协商达成共识。
6. 未经双方协商同意，任何一方不得将共有房产进行转让、为自己或第三人提供抵押担保及作为实物出资等。
7. 如一方对外转让房产份额，另一方在同等条件下有优先购买权。
8. 因该房产的市场增值部分，属于双方共同享有，权益按双方出资比例进行分配。
9. 因不可抗力或政府政策等原因，导致的房产损失、被征收等情形出现，风险由双方共同承担，所得补偿由双方按出资比例分配。
10. 任何一方不得因个人的债务导致共有房产的所有权、使用权收到影响，否则，应赔偿另一方所产生的损失。
11. 甲乙双方共同持有该房产股份，一切经营行为及产生的债权、债务、纠纷等由甲乙双方按照出资比例共同承担。
12. 甲乙双方本着合作共赢的目的签订此协议，如产生任何争议，应由双方经友好协商解决。
13. 本协议一式两份，双方各执一份，自双方签字之后生效。

甲方签字： 乙方签字 

Signature A

**EXHIBIT 9**

Property investment agreement 05.28.2019
Party A: Dan-dan Zhang. ID Number: G40409420
Party B: Di Wu. ID Number:G51525965

After friendly consultation with each other, Part A and B have reached the following agreement on the joint purchase property in
1039 Koohoo Pl, Kailua 96734, Hawaii:

1. The total purchase price of the property is US dollars1,850,000. Party A provides 75% of the total fund. Party B provides 25% of the total fund.

2. Since the property is in tear down condition, needs to be renovated to become inhabitable. the renovation cost will forecast would be above 185,000 US dollars or market value, Party A contributes 75%, Party B contributes 25%

3. Party A will make all best she can in the real estate escrow procedures, and Party A will be the title holder on the property deed, which is convenient for the property tax exemption. Party A enjoys 75% of the above-mentioned jointly purchased property rights, and Party B enjoys 25%.

4. After the renovation of the property, 20% of the rental income will use for property maintenance, cleaning and other costs of the property, Net rental income after deducting basic expenses such as property management fees, property taxes, utilities, etc., is distributed according to the proportion of capital contribution, party A gets 75%, and Party B gets 25%. Before January 31 of each year, Party B will brief Party A and transfers the rental income belonging to Party A to the designated account

5. After renovations both parties agree to put the property into a joint families trust. If the property needs to be sold in the future or left in the form of a trust to the heirs of both parties, the two parties may reach a consensus through friendly consultation.

6. Neither party may transfer the common property, provide mortgage security for itself or to a third party, or contribute in any kind without the consent of both parties.

7. If one party transfers its share of the property to the third party, the other party has the right of first refusal under the same conditions.

8. Because the market appreciation part of the property belongs to both parties, the rights and interests are distributed in proportion to the capital contribution of both parties.

9. In the event of loss or expropriation of real estate caused by force majoure or government policies, the risk shall be borne jointly by both parties, and the compensation shall be distributed by both parties in proportion to the capital contribution.

10. Neither party shall affect the ownership or use of the joint property due to the debts of the individual, otherwise, the other party shall be compensated for the losses incurred.

11. Both parties shall jointly hold the shares in the real estate, and all business activities and creditor's rights, debts, disputes, etc. arising therefrom shall be jointly borne by both parties in accordance with the proportion of capital contribution.

12. The parties A and B sign this agreement for the purpose of win-win cooperation, and if any dispute arises, it shall be resolved by the two parties through friendly consultation.

13. This Agreement shall be made in duplicate, one for each Party, and shall enter into force upon signature by the Parties.

Party A.  Party B. 

Signature B

**Signature Sample Comparison**

1.The two signatures are exactly the same in terms of the break position, break width, and thickness at the break of the arrow



Signature A



Signature B

**Signature Sample Comparison**

2.The protruding shapes at the arrow标识 of the two signatures are exactly the same.



Signature A



Signature B

# Signature Sample Comparison

3.The two signatures become thinner at the same location indicated by the arrow



Signature A



Signature B

# Signature Sample Comparison

4 .The two signatures have identical triangular indentations at the point indicated by the arrow.



Signature A



Signature B

# Signature Sample Comparison

5.The two signatures feature an identical short line segment at the location indicated by the arrow.





Signature A

Signature B

## Signature Sample Comparison

6.The two signatures have identical indentations in both position and shape at the location indicated by the arrow.



Signature A



Signature B

## Signature Sample Comparison

7.The positions of the two signatures are not completely identical in terms of width, but the positions of the six crossing points of the lines are exactly the same. The differences, as indicated by the blue lines and arrows, are clearly visible and occur only in the peripheral areas, while the relative positions in the central part remain completely identical.



## Signature Sample Comparison

8.The blue dashed line indicates the positions where they do not match



Signature A

Signature B

## Signature Sample Comparison

9.The positions of the two signatures are basically consistent in terms of the direction of the line's slant, with the only significant differences occurring at the locations indicated by the arrows. These differences are all located in the peripheral areas, while the angles of slant at the corresponding positions in the central part are completely identical.



Signature A　　Signature B

## Signature Sample Comparison

10.The positions of the line breaks are the same, the thickness at the beginning and the shape at the end are consistent: the relative length of the short horizontal stroke on the top left side is the same; the line starts thicker at the lower left side; the line is thicker at the starting position in the middle; the triangular shape at the end on the lower right side is completely the same; the interruptions and shapes of the horizontal strokes on the right side are exactly the same.



Signature A



Signature B

## Signature Sample Comparison

11.The two signatures are identical at the six crossing points indicated by the arrow.



Signature A Signature B

**Conclusion**: The majority of lines in these two signatures share invisible trajectories and relative positions, and the local writing styles are exactly the same, indicating that these two signatures were formed by different PS distortions of the same signature. Additionally, the multiple similarities in horizontal, vertical, and diagonal directions and the consistency of six crossing points also demonstrate that these two signatures originate from the same one.

**Important**: For dynamic signature comparison, please review the video file.

**summary**：Handwritten strokes, even if very skilled, cannot be perfectly accurate, especially the line interruption phenomenon caused by rapid writing, where the position of the interruption, the thickness of the lines, and the length will all have obvious differences. The two interruptions in these two pieces of handwriting, especially the style on the right, the shape, and the way the surrounding strokes are written are exactly the same, making the possibility of coincidence almost non-existent. Therefore, it is believed that these two signatures originate from the same source file.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| Wu Di,<br><br>Plaintiff,<br><br>v.<br><br>DAN DAN ZHANG, AKA DANDAN ZHANG; JOHN AND JANE DOE 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants. | Civil No.: 1CCV-22-0000964 |

DEPOSITION OF

JASON TOOTELL

Taken on behalf of the Defendant at the offices of CLAY CHAPMAN IWAMURA PULICE & NERVELL, 700 Bishop Street, Suite 2100, Honolulu, Hawaii, commencing at 9:00 a.m. on Wednesday, November 30, 2022, pursuant to Notice.

Reported by:

KATE McALPINE, RPR, CSR NO. 537
Certified Shorthand Reporter

**EXHIBIT 10**

is this supposed multi-millionaire having me cart him around and buying him lunch after all he put me through in this situation.

But I got him a sandwich and he did what he needed to do, I guess, at Apple. And then I drove him home and he told me we might not be able to see each other and we should communicate electronically, and he wanted me to give him like a periodic, like, emoji saying that I was okay. And he kept on stressing he was concerned about my wellbeing and I kept asking him, do I need to be worried about my physical safety or my wife's physical safety? Why do you keep saying this to me?

And he is like, you never know, you never know. He is capable of anything. Guard your stuff. Don't leave the house. So for the next, like, couple weeks, I was like a prisoner inside my own house where I was staying. My wife and I couldn't leave the property at the same time because I had no idea what was going on if somebody was going to come in and steal all my stuff.

I ended up meeting with him I think maybe a few days after that. He asked me to go up to Hillside again and his wife was there and she was crying and upset and telling me the stories how traumatized his



daughters were going through this whole situation.

And he pulled his wife Joy over into the conversation and she kept asking him what did he do wrong, he must have done something wrong. He was adamant he did nothing wrong. This is a Chinese civil war and we need to be prepared to fight.

And I said Wu Di, listen, I'm not interested in any of this, I want nothing to do with any of this anymore. He says, well, you know now that the rental, all these properties, that is no more. So he said, I could talk to Danny and you could work -- I said Wu Di, I'm not interested in doing anything business relationship with you any longer. I don't want anything to do -- I'm done. I said, our relationship, professional or business wise, is over.

So that would have been I don't know, at some point in early July, August 5th, 6th, 7th, I don't know, one of those days.

And he just, you know, he wanted to keep communicating with me via -- he had me stop communicating through WeChat and asked me to download Telegram. So we communicated through that for, like, a couple of months prior to me going on vacation and then when I came home.

And then all of a sudden, one day I received a



new message thread that said something on it and then had like a message underneath it that says this message will self-destruct -- the sender has a self-destruct for, like, one minute or something. And I responded back, I think that one or the other one, saying what is this?

And he -- he explained to me that's one he wanted to communicate through this private thing and I said, listen, I'm not interested. I said, why do we need to communicate through some private thing that deletes all of our conversations. He started off on some tangent about big data and I don't know, how naive I was. And I said listen, I'm not interested in communicating like this.

So our communications became very sparse. He would send me, like, a random, like, thumbs up thing and ask -- and if I didn't respond he would get upset and say he was concerned about my wellbeing. I said, don't worry about me, I'll take care of myself.

And then I moved out -- my wife and I moved out of 572-C found other living arrangements. I didn't say anything to him. And I happened to be in Kailua one day at the post office and he randomly as I was getting into my car from the post office, he randomly walked around the corner from Target parking



lot and asked if he could talk to me.

And I said Wu Di, I'm kind of busy, I've got stuff going on. And he said, oh, five minutes. So we talked outside briefly. And then he asked me to go inside the car and talk with me. He was talking with me inside the car. It was a weird conversation. He had told me he had bumped into Liu, like, on the street or something and supposedly Liu apologized to him for how ugly this was getting and, you know, he is trying to fix things and make them right or whatever.

And you know, asked me if I was still interested in communicating with him. And I told him, I said, Wu Di, I said, if you're going to continue to try to communicate with me through some means that deletes itself and is a secret, I said I'm not interested in that at all. So no, I'm not interested in communicating with you like that.

And he says, can I shake your hand and I said that's fine so I shook his hand and he held on to my hand for probably what was five minutes and just continued talking about, you know, some of the good things that we had accomplished together and done and everything. And I think, looking back at it, I think at the time he probably knew that that might be the last time he ever shook my hand or was in front of me

personally and he kept -- he kept holding my hand and shaking my hand and that was it. He got out of my car and I haven't seen him since.
He tried communicating with me through Telegram through that nonsense secret thing. I got a thing that popped up that said something just a couple -- maybe a week ago or something and I didn't even because if you open it, it acknowledges that you looked at it so I didn't even open it. Didn't even open it.
And then I just checked I think the other -- yesterday and that whole entire message is gone again so he deleted the whole thread and he deleted our original Telegram communication that had a couple months of -- he deleted the whole thing so I don't have access to it anymore, and here I am.
Q. And you haven't spoken or communicated with him since?
A. Nope.
MS. SUGIMURA: Okay. I have no further questions.
MR. WONG: Okay. You want to take a break?
MS. SUGIMURA: No.
THE WITNESS: No.



MR. WONG: Okay.
CROSS-EXAMINATION
BY MR. WONG:
Q. My name is Tom Wong and I represent Wu Di or Di Wu.
A. Can I ask you one quick question?
Q. Go ahead.
A. Did he have ability to come here today?
Q. I guess he could have.
A. And he chose not to?
Q. Usually the attorneys show up.
A. I just -- thank you.
Q. Before the deposition started with Ms. Sugimura, she gave you instructions and those same instructions apply. I'm going to ask you questions and --
A. Em-hmm.
Q. -- if you answer, I presume you understand the question.
A. Sure.
Q. If -- if you don't understand, I sometimes don't ask clear questions, let me know and we can basically rephrase the question --
A. Sure.
Q. -- is that understood?



A. Understood.
Q. I'll try and get you out of here as quickly as I can.
A. Take your time.
Q. You got the subpoena. It does show the address as Jason Tootell, 5712-C North Kalaheo. So are you living there now?
A. No.
Q. Okay. But you were living there?
A. Correct.
Q. And is it your understanding the owner was Xin Liu or Liu Xin?
A. Recently I was made aware of that. Prior to all this, no, I was not aware that he was the only owner of that property, no.
Q. So have you ever met him?
A. I have.
Q. Is that through Di Wu or Wu Di?
A. It was.
Q. You're not working for Mr. Liu at this time?
A. No.
Q. When did you meet him?
A. When did I meet who?
Q. Xin Liu? I'm sorry.
A. Back when I was with Lowe's.



Q. Okay.
A. In 20 -- I don't know. It would have been some time in 2016, '17, or something when I would have met Wu Di at the property at 572 North Kalaheo. He was there at one of the meetings that I had with him --
Q. Okay.
A. -- that he just briefly introduced me to him. And then when we were constructing 159 Kakahiaka Street, I was -- met him many times there and communicated with him in regards to the construction of that property.
Q. Okay. Thank you.
I want to go back because you testified you were a, quote, employee of Di Wu or Wu Di; is that correct?
A. Correct.
Q. Okay. But you never got a -- when you get paid, how did you get paid?
A. So he would either pay me in cash or he would have me write a check from the Global Chain account.
Q. Okay. So you never got, like, an actual paycheck sometimes with, you know how they do withholding or FICA?
A. Correct.

I, JASON TOOTELL, hereby certify that I have read the foregoing typewritten pages 1 through 98, inclusive, and corrections, if any, were noted by me and the same is a true and correct transcript of my testimony.

______________________
JASON TOOTELL

______________________

Signed before me this ____ day of
__________________, 20__

Wu Di v. Dandan Zhang, Circuit Court of the First Circuit, Civil No. 1CCV-22-0000964, taken on November 30, 2022, by Kate McAlpine, RPR, CSR.



CERTIFICATE

I, KATE McALPINE, do herby certify:

That on Wednesday, November 30, 2022, at 9:00 a.m., appeared before me JASON TOOTELL, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript:

X Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

_ Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

_ Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 12th day of December, 2022, in Honolulu, Hawaii.

______________________
Kate McAlpine, RPR, CSR NO. 537

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| LONNIE ADAMS, Plaintiff, vs. 210 S LLC; YILIN FENG; DI WU; JOHN DOES 1-10; JANE DOES 1-10; and DOE ENTITIES 1-10, Defendants. | Civil No. 1CCV-22-0001122 |

DEPOSITION of LONNIE ADAMS, taken at Clay Iwamura Pulice & Nervell, 700 Bishop Street, Suite 2100, Honolulu, Hawaii, commencing at 11:00 a.m., on Friday, June 30, 2023, pursuant to Rule 30 of the Hawaii Rules of Civil Procedure.

REPORTED BY: DARCY J. BROKAW, Hawaii CSR #371
(Appearing Remotely)
Registered Professional Reporter
Certified Realtime Reporter



EXHIBIT 11

APPEARANCES:

For Plaintiff LONNIE ADAMS:

GARY G. GRIMMER, ESQ.
Gary G. Grimmer & Associates
City Financial Tower
201 Merchant Street, Suite 1940
Honolulu, Hawaii 96813
808.457.1330
gary@grimmerhawaiilaw.com

For Defendant 210 S LLC and YILIN FENG:

YURIKO J. SUGIMURA, ESQ.
Clay Iwamura Pulice & Nervell
Topa Financial Center
700 Bishop Street, Suite 2100
Honolulu, Hawaii 96813
808.535.8400
ysugimura@paclawteam.com

Also present: Yilin Feng

INDEX TO EXAMINATION

WITNESS: LONNIE ADAMS

| EXAMINATION | PAGE |
|---|---|
| BY MS. SUGIMURA | 6 |

# INDEX TO EXHIBITS

LONNIE ADAMS

Adams v. 210 S LLC, et al.

Friday, June 30, 2023

Darcy J. Brokaw, RPR, CRR, CSR No. 371



| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Complaint; Exhibits 1 -2, Summons | 53 |
| Exhibit 1a | First Amended Complaint; Exhibits 1 - 2; Demand for Jury Trial; Summons | 69 |
| Exhibit 2 | Notice of Residential Lease Agreement re 210 A South Kalaheao Avenue, Kailua, Hawaii | 55 |
| Exhibit 3 | Rental Agreement re 2120 South Kalaheo Avenue, Kailua, Hawaii | 58 |
| Exhibit 4 | 8/3/2022 letter from Yuriko Sugimura to Lonnie Adams, re "Notice to Vacate Premises and of Owner's Intent to File Suit" | 98 |
| Exhibit 5 | Compilation of checks from Ocean Fit Promotions LLC Bates Nos. A0323, 0148, 1444, 146 | 130 |
| Exhibit 6 | Vrbo statement Bates Nos. A0074 - 80 | 128 |
| Exhibit 7 | "Set 1" compilation of deposit receipts and checks Bates Nos. A0299 - 0314 | 134 |
| Exhibit 8 | Compilation of checks written from Ocean Fit Promotions (Nonsequential) beginning with Bates No. A0180 | 136 |

INDEX TO EXHIBITS (Continued)


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Reports prepared by Wu Di of rent that was collected Bates No. 000055 | 108 |
| Exhibit 10 | Organization hierarchy chart Bates No. A0197 | 109 |
| Exhibit 11 | Department of Taxation Hawaii Tax Online re Ocean Fit Promotions LLC Bates Nos. A0045 - 061 | 98 |
| Exhibit 12 | "Set 1" compilation of account registers Bates Nos. A0315 - 345 | 169 |

Q. And you're saying -- and so after 2020, were there --

A. I wasn't -- no, I was not in charge. Wu Di was in charge, and I was basically with his guidance. I was in charge but with his guidance. And he had control over everything.

But he was teaching me how to speak to the people. I was getting copies through an e-mail that -- there was an e-mail address for 210 that was with Airbnb, that the e-mail -- that basically any correspondence went to me and to Wu Di so that I was able to view how he was corresponding and answering questions.

Q. Do you still have copies of these e-mails?

A. No. I have a copy of the e-mail address. Wu Di deleted and everything went -- he had control over that e-mail, not me.

Q. How can you delete e-mails?

A. I think the whole e-mail address was deleted. I've tried to log into it. I can't get into it. He says it doesn't exist. There was that that got deleted, and there was a --

Q. Okay. What --

A. This was after -- this was after I tried -- the eviction started.

Q. Okay. Let me go back. This e-mail that you had with Wu Di, it wasn't your standard e-mail? Was it WeChat? Was it Telegram?

A. No, it was e-mail -- it was Gmail.

Q. Gmail?

A. Mm-hmm.

Q. And he was able to delete it?

A. I imagine so. It's gone, yes.

Q. Were you ever --

A. He had the e-mail address.

Q. Were you communicating with him through WeChat?

A. No.

Q. Or Telegram?

A. Yes. And all that got deleted as well.

Q. When did you start communicating with Wu Di through Telegram?

A. 2018. It's been a long time.

Q. Okay. Prior to your entering into this agreement with Wu Di, did he provide you with any documentation to show he was authorized to sign a lease agreement for the owners?

A. No.

Q. Did you ask him?

A. No.

20 percent?
A. No.
Q. When you rented the properties, as part of the charge, did you charge the tenants a cleaning fee?
A. Yes.
Q. So were the cleaning -- so how did you report the cleaning fees? Was that a deduction on your tax returns because it was an expense?
A. No. I had to pay taxes on those cleaning fees. Those cleaning fees are separate from the rental fees. They were listed as such through the Airbnb and Vrbo as a cleaning fee, and they were paid.
Q. For the Airbnb accounts that you mentioned --
A. Mm-hmm.
Q. -- do you have records?
A. No. Wu Di had all those records. I have some screenshots of some things, but I sent them to you. I may have some other stuff in some paper documents that I would have to go through and see, but I did not have access -- Wu Di had access to that, and when they all got deleted, they all got deleted.

Q. Even after you were in charge of the rentals, he had access to these accounts?
A. They were his accounts.
Q. The Airbnb?
A. Yeah, Airbnb was his. He set that up. I never had control of the Airbnb account.
Q. Or the Vr- --
A. The Vrbo account was the only one I had control over, and I set that up after he started an eviction on me.
Q. Okay. In your -- we're still on your First Amended Complaint, paragraph 17. It states:

"On July 29th, 2022, strangers entered the Subject Property, claiming to be working for the owners."

Do you know who these people were?
A. Yes.
Q. Who were they?
A. Thompson.
Q. Thompson Pham --
A. Yes.
Q. -- was one of them?
A. And the other, Tim Wu, Tim Tu or Timmy Tu or something.
Q. Okay.

talking about Exhibit 10, right?

MS. SUGIMURA: Exhibit 10, yes.

A. Yes.

BY MS. SUGIMURA:

Q. So Wu Di comes to the property in early August. We know it wasn't August 1 because you had the meeting with the gang on August 1?

A. Right.

Q. And you tried to get ahold of Wu Di, and he shows up with this document?

A. A few weeks after. Because I was inquiring about what was going on. I had no clue of what was going on.

Q. So when was the first time that Wu Di contacted you in response to your inquiries after August 1?

A. I think August 3 or August 4.

Q. And how was that communication? Did he text you?

A. Text message.

Q. And what was the text?

A. I don't remember. All those texts were deleted.

Q. But do you remember what his response was?

A. No.

Q. And then what was the next response you got from him?
A. I don't remember. They were all deleted. I wish I would have made copies, but I did not.
Q. You don't recall --
A. No.
Q. -- what they were?
Okay. So when was the first time you met with him after?
A. I don't know the dates.
Q. So it was a couple of weeks afterwards?
A. It was a few weeks, yes.
Q. So it might have been in August or September?
A. It may have been.
Q. So what happened? He just showed up? Did he call you to say --
A. I believe he just showed up. And then I got a text message saying come outside.
Q. So you go outside and he hands you this?
A. Yes. And he says, here, these are how Liu's in control of the properties.
Q. And did you have a discussion about --
A. No.
Q. -- what happened?

A. No.
Q. You said you have all these questions.
A. Yes.
Q. So did you have -- how long was your --
A. No. That was all -- everything was via text message prior to that, and I don't have copies of those text messages.
Q. Okay. And you can't remember the gist of --
A. No. I know that they were all deleted. And I should have copied them. That's all I know.
Q. Did he -- did you ask him what happened?
A. I'm sure I did. But all that was in text message, and I don't have any of that.
Q. Did he confirm to you --
A. He said that he doesn't know what happened either; that he got screwed. And he was on vacation, and he got -- and everything happened, that he was set up. And I don't know. I don't know what his business dealings were. I don't know anything about what happened. All I know is that I'm a guy in the middle getting squished.
MR. GRIMMER: Wait for the next question.
BY MS. SUGIMURA:
Q. Okay. So he shows up with this document,

Q. And you did that after Wu Di was terminated?

A. Correct.

Q. But before that, Wu Di did all the marketing?

A. Well, he did it, but he also walked me through how to do it.

Q. How did he walk you through -- I mean, how much time did he spend with you to show you how --

A. Hours.

Q. So would he do that remotely or would he be --

A. He would come over and he would sit at the table and he would go over stuff and he'd say, this is how you do this, this is how you do that.

And he set up an account so that when e-mails and stuff came in, we both got beeped and I got to see the transactions that were taking place, the communications that were going on. And he said, educate yourself, watch what I'm doing.

But all those transactions and all that stuff disappeared when Wu Di deleted all that information.

Q. And that was -- when did he delete that?

A. When the eviction started.

Q. And that would have been around September 29th, 2022?
A. Correct.
MR. GRIMMER: I thought it was July 29th.
BY MS. SUGIMURA:
Q. July 29th.
A. July 29th, I was first even on the rent.
Q. So after Wu Di was terminated, then did you consider yourself to be the person in charge of the rentals?
A. Yes.
Q. Did you consider yourself to be the agent for the owners?
A. Yes.
Q. Did you have an agreement with the owners to manage their property?
A. The lease.
MR. GRIMMER: The rental agreement.
THE WITNESS: The rental agreement.
BY MS. SUGIMURA:
Q. Yet you said you don't know who the owners were?
A. No. But that rental agreement was set up for -- it says agent or owners, right? So --

Q. You don't know if Wu Di was authorized to sign that agreement?
A. I don't understand how --
Q. Did he provide you with any documentation to show you that he was authorized to sign that agreement?
A. No.
MR. GRIMMER: He's asked and answered this one. He said no both times.
MS. SUGIMURA: Okay.
BY MS. SUGIMURA:
Q. Where does -- the short-term rental, the nonconforming use agreement, have you ever seen it?
A. No.
Q. How do you know it even exists?
A. I don't. I've seen records that stated the -- when you had said that I was illegally renting -- it showed somebody didn't pay it or something. I'm not even aware of . . .
MR. GRIMMER: You saw something after it was no longer in effect?
THE WITNESS: Yeah, or with a violation or something.
BY MS. SUGIMURA:
Q. Are you familiar with an address at

150 Hamakua Drive, No. 852, Kailua?
A. No.
Q. You don't know what that address is for? You know, when Wu Di -- when all of those records got deleted, did you contact Wu Di to say, what's happening?
A. Mm-hmm.
Q. Did he respond?
A. No. I had no way of contacting him. Everything got deleted. All the accounts with my contact information, everything got deleted.
Q. So you don't have a phone number for him?
A. No.
Q. And he gave you no explanation as to why he was deleting all of that?
A. No.
Q. Did that give you a concern that all those records were gone?
A. Well, of course.
Q. You know, the rental agreement, your rental agreement, the one that's dated September --
MR. GRIMMER: Exhibit 3 to the deposition, Rental Agreement. Go ahead.
BY MS. SUGIMURA:
Q. Would you be willing to provide us with

# W I T N E S S   C E R T I F I C A T E

I, LONNIE ADAMS, hereby certify that I have read the foregoing transcript of my deposition, taken on June 30, 2023, and that corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this ______ day of ____________________, 2023.

________________________________

LONNIE ADAMS

Signed before me this ____ day of ___________________, 2023.

________________________________

Deposition of: LONNIE ADAMS
Taken on: June 30, 2023
Adams v. 210 S LLC, et al.
Civil No. 1CCV-22-0001122
State of Hawaii/Circuit Court of the First Circuit
By: Darcy J. Brokaw, CSR #371

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
COUNTY OF MAUI )

I, Darcy J. Brokaw, CSR for the State of Hawaii, do hereby certify:

That on June 30, 2023, at 11:00 a.m., appeared before me LONNIE ADAMS, the witness, whose testimony is contained herein; that prior to being examined, the witness was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature.

That the proceedings were taken down by me in machine shorthand and were thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript:

__X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.
____ Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.
____ Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause named in the caption.

Dated this 11th day of July, 2023.

______________________________
Darcy J. Brokaw, RPR, CRR, CSR #371

Of Counsel
CLAY IWAMURA PULICE & NERVELL
ATTORNEYS AT LAW
A LAW CORPORATION

YURIKO J. SUGIMURA 2315
MATTHEW H. MURAKAMI 10970
Topa Financial Center, Bishop Street Tower
700 Bishop Street, Suite 2100
Honolulu, Hawaii 96813
Telephone: (808) 535-8400
Facsimile: (808) 535-8444
Email: ysugimura@paclawteam.com
Email: mmurakami@paclawteam.com

CARLSMITH BALL LLP

JOHN P. MANAUT 3989
KAI WANG 7319
1001 Bishop Street, Suite 2100
Honolulu, Hawai'i 96813
(808) 523-2548
jpm@carlsmith.com
kwang@carlsmith.com

Attorneys for Plaintiff
210S LLC

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| 210S LLC, a Hawaii limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>DI WU; and JOHN DOES 1-5; JANE DOES 1-5; DOE PARTNERSHIPS 1-5; DOE COMPANIES 1-5; DOE CORPORATIONS 1-5; DOE ENTITIES 1-5 AND DOE GOVERNMENTAL UNITS 1-5,<br><br>Defendants. | CIVIL NO. 1CCV-22-0001069 (LWC)<br>(Breach of Contract)<br><br>**DECLARATION OF LONNIE ADAMS** |



**EXHIBIT 12**

**DECLARATION OF LONNIE ADAMS**

Lonnie Adams, under penalty of law, declares as follows:

1. I am a resident of Honolulu, Hawaii.

2. I am authorized and competent to testify to the matters set forth herein, and unless otherwise indicated, I make this declaration based upon personal knowledge and information.

3. This Declaration is made as part of an obligation for cooperation and to provide testimony and evidence under a global settlement with 210S LLC for use in any legal claims and cases deemed necessary by 210S concerning my involvement with Di Wu aka Wudi Thn ("Di Wu"). For purposes of this action, my testimony concerns the premises owned by 210S LLC ("210S") at 210 South Kalaheo Avenue, Kailua, Hawaii 96734 (the "Property").

4. Di Wu led me to believe that he had influence and control over a group of investors from China who had put their trust in him and relied on him in acquiring investment properties in Kailua and in renovating and managing short-term rentals for the properties post-acquisition.

5. Di Wu claimed that he was the group's everything man, ranging from realtor, designer, developer to architect. Di Wu told me that he was a contractor and a property manager. On multiple construction sites, I witnessed Di Wu instructing everybody what to do.

6. I was told by Di Wu that my experiences and skill-sets will serve him well in working with the group. Di Wu initially hired me to repair, maintain and captain a luxury, multi-million dollar catamaran Di Wu said was owned by a member of the group. Di Wu laid out his plan to lure Chinese investors to acquire, renovate and rent out high-end short-term rental properties in Kailua and told me that, as a retirement plan for me, I was going to get 20% of compensation from the rental properties and the catamaran.

7. As part of my involvement with Di Wu, he asked me to assist him in renting the Property to third parties, including short term rentals, with my compensation as set forth in the Rental Agreement he and I signed on or about September 20, 2020. Di Wu did not tell me the terms and conditions of his agreement with 210S. I did not contact the owner 210S directly or its principals to verify if Di Wu had any authority regarding the Property, including to rent the Property, pay me directly for any work I performed, or the alleged control and handling that Di Wu claimed to have for the Property.

8. As part of my involvement with Di Wu, I lived at 771 Wanaao Road, Kailua, Hawaii 96734 (the "771 Property") for a few days. Later Di Wu asked me to handle a small claims lawsuit involving the 771 Property. Di Wu presented to me a Hawaii Limited Power of Attorney (the "POA") from "Elvis Wu 771 LLC" granting me the authority to handle the lawsuit. I actually went to court on the matter.

9. Di Wu created multiple accounts on online short-term rental platforms such as Airbnb and VRBO to handle the procurement, renting and payment for rental of the Property owned by 210S. Di Wu did not give me control over the rent from the platforms, but gave me access to the online communications with the platforms and renters. I could see that Di Wu had multiple properties on the platforms. Later Di Wu had me open a bank account in the name of my LLC Ocean Fit Promotions and from time to time he would instruct the platforms to send rent from the Property to that account.

10. I was unaware of the disputes between the owner, 210S and Di Wu until an ejectment complaint was served on me, and at that time I learned that Di Wu and 210S had problems with the handling of rentals.

11. After the dispute was made known to me, I learned that Di Wu had deleted and

destroyed accounts, transaction history and records related to actual and proposed rentals with the online short-term rental platforms and third parties. At least one gmail account and other electronically stored data and information, such as chat records, images and video recordings on messaging apps such as Telegram, were willfully deleted by Di Wu despite the fact that members of the group and Di Wu were in disputes over payments and the information in those accounts could provide important evidence.

12. The deleted accounts included ones Di Wu and I used to communicate and book rentals leaving me in a very difficult situation for my accounting and booking. I had people showing up weekly saying they had paid for a week at the property, but I had no record of it and had to turn very upset tourists away. One time I was actually worried they were going to break in.

13. I came to learn that monies collected by Di Wu for rentals was allegedly not paid to the members of the group, including 210S, as they allege in the lawsuits. From time to time Di Wu would tell me what to do with the rent deposited in my Ocean Fit Promotions account, but I have no information on what Di Wu paid 210S, if anything.

14. Di Wu insisted on me paying him through Bitcoin or cash or as rental offsets for work done, but his accounting was not provided to me.

15. At Di Wu's instruction, I routinely transferred funds to Di Wu's Bitcoin accounts.

16. I am willing to assist and cooperate with the group, including, without limitation, 210S, Olina Ona LLC, and 771 LLC, and their respective owners and affiliates, in their claims against Di Wu to the extent I have information and will provide additional truthful cooperation and information as the cases proceed to discovery and trial.

I hereby declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.

DATED: Honolulu, Hawai'i, January 10, 2024.

LONNIE ADAMS

**Wendell F. Brooks, Jr.**
**Real Estate & Business Consultant**

June 23, 2024

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-22-0000964**
**24-JUN-2024**
**06:09 PM**
**Dkt. 454 EXH**

Carlsmith Ball LLP
1001 Bishop Street, Suite 2100
Honolulu, Hawaii 96813

Re: Consultant's Report –Di Wu v. Dan Dan Zhang - Civil No. 1CCV-22-0000964

Counsel:

This Report is submitted in response to your request for an evaluation of lost rentals and damages ("Damages") related to Plaintiff Di Wu's actions, or lack of action, regarding the property located at 1039 Koohoo Place, Lanikai, Oahu, Hawaii, aka Tax Map Key (1) 4-3-006-016 and 43006016 (the "Property"). The evaluation is to be used in the calculation of Damages incurred as the result of Plaintiff Di Wu's fraudulent actions and mismanagement relating to services, he illegally offered pursuant to oral agreements with Defendant Dan Dan Zhang aka Dandan Zhang ("Ms. Zhang").

The issue at hand is Ms. Zhang's claim that Di Wu was engaged to assist her in the acquisition of the Property, to prepare the Property for rental, and manage it as a Vacation Rental. Ms. Zhang claims that, among other matters, Di Wu did a very poor and incomplete job of renovating the Property, rented the Property, did not provide an accounting, and did not remit net rental proceeds. Di Wu failed to abide by Hawaii State (the "State") laws and City and County of Honolulu (the "City") Ordinances, failed to obtain approvals from Ms. Zhang and failed to provide an accounting of expenditures for alleged renovations.

Further, it is reported that Di Wu and his family occupied all or a portion of the Property, without authorization and disclosure to Ms. Zhang, and did not pay an agreed-upon rent. Other failings have been discovered and are discussed below. More failings may be discovered in the future.

Ms. Zhang experienced Damages in the past and continues to experience Damages.

The issues are further complicated by Di Wu's reported advance or loan of approximately $173,000 as a portion of the purchase price, including closing costs, , to assist Ms. Zhang with the purchase of the Property. Di Wu now claims to be a part owner of the Property because of the advance, and he claims to have advanced significant funds to renovate the Property. Di Wu does not appear on Title. Ms. Zhang was the only identified owner in fee simple on the title documents during the period that Di Wu was involved.

**999 Wilder Avenue #1104, Honolulu, HI 96822**
**Phone: (808) 722-3495 – Email: wendellbrooksjr@aol.com**



**EXHIBIT 13**

I inspected the property on December 13, 2023, with John P. Manaut, Esq. of Carlsmith Ball LLP. Attorneys for Defendant, Dan Dan Zhang. I have been given information and had meetings, phone conversations and exchanged emails with Kai Wang, Esq., also of Carlsmith Ball. In addition, I have had a meeting with Di Wu associate, Jason Tootell, and email exchanges with Eric Chen, Broker, the current Rental Agent of the Property. I have conducted other research on various elements of this case.

**Description of the Property & Environs**

Lanikai is located on the East side of the Island of Oahu. That side of the Island is often referred to as "The Windward Side" because it faces the usual North-Easterly Tradewinds. It is a suburban neighborhood located near Kailua Town.

To get to Lanikai from the major employment centers on Oahu or from the Daniel K. Inouye International Airport on the leeward side of the Island, one travels to "The Windward Side" via freeway - H-2 or H-3. The drive time is about thirty minutes, depending on traffic. The route to the Property then passes through Kailua town.

The Property is located about 2.5 miles from the heart of Kailua Town with a drive-time of about ten minutes, depending on traffic. Many residents of "The Windward Side" commute to work in employment centers in Leeward Oahu.

The current heart of Kailua Town is a relatively young, vibrant, commercial area that offers shopping centers, a Foodland Super Market, a Target store, a wide variety of eateries and various types of retail shops. Kailua Town and the surrounding older commercial areas primarily serve the nearby residents and businesses.

Kailua Town and its surroundings have also been attractive to visitors seeking either a different experience from the Waikiki Visitor Center or an opportunity to mingle with the resident community. Asian visitors have been particularly attracted to the area.

Part of the attraction is that some of Oahu's largest and best beaches are in Kailua. There is a large beach park with free public parking. There are also frequent "rights-of-way" from the coastal road (Kalaheo Avenue) to the beach. Ocean conditions in the area are usually safe and excellent for beach goers.

The popularity of Kailua beaches and nearby Lanikai beaches frequently causes traffic congestion. Special limitations have been promulgated that periodically preclude on-street parking in Lanikai on holidays and during special events.



**Nearby Lanikai Beach December 13, 2023**

Lanikai Beach is about a ten-to-fifteen-minute walk from the Property. Walking to the beach is downhill and rather easy. The return is uphill and more difficult, particularly the last portion, up the rather steep driveway. (See Photo Below)

The view from the Property (see picture below) is in an Easterly direction. One can experience the sunrise on most mornings. The site is shaded from the late afternoon sunset by the mountains to the West. The Tradewinds blow onshore, can often be brisk, and bring frequent showers to the area.



**The view from the Property**

Access to the Mid-Pacific Country Club is through Lanikai. Guest memberships are available if one knows a member, belongs to a Reciprocal Club, or has some other connection.

Another attraction of the area is "The Lanikai Pillbox Hike" aka "Kaiwa Ridge Trail". The hiker's reward is the spectacular view. It is the same view as seen from the Property, but from a higher elevation. "Pillbox" refers to concrete fortifications that were constructed early in World War II (1940s) to serve as a defense in the case of an enemy attack from the East.

Upon arrival in Lanikai, access to the subject property is somewhat complex in that Koohoo Place is a narrow road, lacks standard road improvements and portions are in poor condition. There is a lack of on-street parking. Identifying the driveway entry is difficult for those arriving for the first time.

The Property contains a land area of approximately 68,613 square feet. It is a flag lot located on the steep hillside on the Mauka side of Koohoo Place.

According to the City's on-line Zoning Map, almost all of the Property is zoned "P-1 Preservation". A portion of the driveway is in the R-7.5 Residential Zoning District.

The City and County of Honolulu, Real Property Tax Division, allocates 11,380 square feet or about 16% of lot to Residential Use. The balance of 57,238 square feet, about 84%, is undeveloped hillside. The City's Tax Division's records of the lot date back to 1938. However, it appears that the lot was not improved until later or perhaps an earlier improvement has been replaced.

While somewhat unclear, it appears that the current dwelling was originally constructed in about 1971. The subsequent record of renovations is also unclear.

Recently the Real Property Tax Division changed its policy to reflect what it believes to be a more accurate allocation of value between Land and Buildings. The Land Assessed Value for Fiscal 2024-2025 is $1,859,000. Buildings Assessed Value is $599,200. The total Assessed Value for the Property is $2,458,200. This, despite a recorded sale for the Property on May 22, 2019, reportedly at $1,800,000.

Real Property values on Oahu have increased in the interim. The Assessed Value reflects the appreciation in values, regionally and Island wide, due to limited inventory and high demand. I have not reviewed the City's data, analysis or met with the Assessor.




**Arial of 1039 Koohoo Place**



**1039 Koohoo Place Tax Map Overlay**

The City & County of Honolulu Department of Planning ("DPP") - Real Property Division, appears not to have any record of a major renovation since May 22, 2019, the date of Ms. Zhang's acquisition. A renovation in the amount of $1.5+ million is reportedly claimed by Di Wu. This suggests that either all or part of the expenditure was not in fact made or the work was done illegally without Building Permits, except plumbing work as noted below.

The site inspection on December 13, 2024, revealed that the second story of the dwelling can be used as a separate living unit, i.e., a studio type apartment, containing the three elements of a unit with a kitchen, i.e., stove, refrigerator, and sink. That would make the improvements a Duplex which would appear to be illegal under the applicable Zoning restrictions. The design, presumably by, or approved by, Di Wu lacks privacy for the bathroom facilities. The unit might be suited for one person or two at the most. (See photo – Studio, Bath & Bidet below)

The "Preservation" classification (P-1) is unique in that, unlike all other zoning districts on Oahu, approval of "use" is controlled by the State of Hawaii, Office of Conservation and Coastal Lands ("OCCL").

Building Permits are controlled by DPP in all zoning districts. The City will not issue a Building Permit in the P-1 District unless OCCL has approved the proposed use. Lack of approval may, in part, account for the lack of Building Permits. Di Wu failed to conform to zoning regulations and Building Codes.

It would have been relatively easy to make renovations without them being detected by City Building Inspectors. The Property is not readily visible from the street and access is limited by a narrow driveway and two locked gates.

Di Wu's failure to comply with zoning and/or other regulations may cause serious problems i.e., Damages, for Ms. Zhang or successors seeking to make future legal renovations.

-0-

A World War II Pillbox can be seen from a portion of the Property. It appears from the above online Tax Map/photo that a portion of the trail may cross the top boundary of the Property. The photo also shows areas near the top of the lot that may be structures. The balance of the lot is steep hillside and remains in a natural state. The risk of landslides is unknown.



**1037 - 1039 Koohoo Place shared driveway**

The driveway shown in the picture above is the "flagpole" of the "flag lot" that provides access to the Property through the lower gate. 1037 Koohoo Place is the dwelling in the middle of the photo and not part of the Property.

A small portion of the roof of 1039 Koohoo Place can be seen beyond the 1037 Koohoo Place dwelling. A second gate is further up the driveway around the corner and is not visible in this photo. Both gates have controlled access.

Although 1037 Koohoo Place has street frontage, it is accessed over the driveway to 1039 Koohoo Place. It is not known if 1037 Koohoo Place has an easement over the driveway and/or if there is a *Joint Driveway Maintenance Agreement* of record or otherwise.

There appears to be a drainage course that runs along the Southern boundary of the Property (to the left in the photo above). The building pad for 1039 Koohoo appears to be at a sufficiently higher elevation to minimize and perhaps eliminate the risk of flooding from storm-runoff.

The parking and turning areas on the Property are adequate for a single-family dwelling and a few guests. There is a two-car enclosed garage. The gates, driveway, parking and turning areas appear to be in good condition.

According to the City & County of Honolulu online records, the dwelling contains four bedrooms and five baths in an area of 3,826 square feet. There is a bed on an open-air covered platform in the yard. The platform is not enclosed. While interesting, mosquitoes and the local weather patterns suggest that wind and rain preclude its use most of the time.

-0-

There is no record of the number of tenancies, rates charged, term of tenancies, number of tenants in the groups that rented, or may have rented the Property, gross receipts, expenses paid by Di Wu, or remittances of net proceeds to Ms. Zhang. Net Rental Income, less a minimum required balance in the Owner's Account, is normally remitted monthly.

Reportedly, Ms. Zhang has paid many expenses directly. Payment of "Fixed Expenses" by Owner is Standard in most cases. Payment of Rental related expenses are usually paid by the Rental Agent from Owner trust funds, held in a required separate account. Comingling of funds is against the law. It is not known if Di Wu maintained a separate Bank Trust Account for Ms. Zhang, but it does not appear to be the case.

Below are pictures of the Property while it was being prepared for rental by Mr. Chen.



**Partially Covered Pool Deck with View**



**Living Room with Fireplace**



**Bedroom with adjacent Sauna**



**Bedroom**



**Lavatory**



**Studio with Bath & Bidet**



**Dining area and Kitchen with Range to the left**



**Open Air Bed and Sauna**



**Lavatory with Shower reflected in mirror.**

**<u>Background</u>**

It is my understanding that Di Wu held himself out as an entrepreneur who has or had investors who acquired real estate in Hawaii. According to Mr. Tootell, Di Wu had thirteen (13) properties under management. Reportedly, many, if not most, of his investors are or were from Mainland China. Di Wu is Chinese and reportedly fluent in Cantonese and Mandarin. He is also fluent in conversational and written English based on a review of records.

Reportedly, his prospective investors are typically high-net-worth individuals seeking to diversify their assets out of China by investing in the United States.

Du Wi was introduced to Ms. Zhang by a Mr. Liu, reportedly as "a trusted friend". Mr. Liu claimed to have had a successful business relationship with Di Wu and recommended him highly. The business relationship between Mr. Liu and Di Wu, if any, is unknown.

The transaction to acquire the Lanikai Property ensued. Ms. Zhang speaks Mandarin and felt comfortable because she could converse clearly with Di Wu.

Reportedly, as part of his inducement for Ms. Zhang to purchase Real Estate in Hawaii, Di Wu also offered to provide Asset Management and Property Management services, including management of renovations to prepare the Property for Vacation Rental.

Di Wu is not known to be licensed in any of these disciplines.

It is noteworthy that the acquisition of the Property occurred about nine or ten months before the Covid 19 Pandemic appeared in the United States, China and elsewhere, and hit the news. The advent of the virus emerged during the latter part of 2019. Ms. Zhang was unable to travel to Hawaii due to Covid-related travel restrictions. Ms. Zhang was totally dependent on Di Wu based on oral agreements.

-0-

The Property was reportedly acquired for $1.8 Million. Ms. Zhang was able to transfer $1.6 Million from China to apply to the purchase. Di Wu reportedly agreed to loan or advanced up to the $200,000 difference plus closing cost (minus the $36,000 commission rebate that the broker for the acquisition provided which was never disclosed by Di Wu to Ms. Zhang). To my knowledge there is/was no debt placed against the Property.

There is a lack of written documentation and apparently none regarding the business relationship between Di Wu and Ms. Zhang. The Escrow Seller's Settlement Statement (Closing Statement) should be reviewed to verify Di Wu's actual cash advances, as opposed to credits for fees, commissions or negotiated discounts.

Di Wu also claims to have spent over $1.5 Million on improvements and renovations to the dwelling. Di Wu has not provided a detailed accounting of the improvement and renovation expenses.

Not knowing the condition of the Property at the time of acquisition, i.e., pre-improvement and renovation, it is difficult to judge the reasonableness of Di Wu's claims. During my visit, I observed required repairs (Deferred Maintenance) left unattended by Di Wu. The successor Rental Agent was in the process of attending to the Deferred Maintenance prior to accepting rentals.

As noted, DPP does not have a record of extensive, million - dollar plus renovations, or remodeling after the date of Ms. Zhang's acquisition of the Property on May 22, 2019. It is not

likely that the scope of alleged renovations would qualify for exemptions from required Building Permits.
There are four Building Permits listed in the active files of DPP:

| | |
|---|---|
| Sewer Connection Value - $100 | 5/25/1978 |
| Sauna Value - $9,000 | 7/22/1985 |
| Driveway Asphalt Value - $11,992 | 7/24/2019 |
| Electrical & Plumbing Value - $60,000 | 3/31/2020 |

The driveway work would have been after July 3, 2019, closing date of the purchase of the Property and the Electrical and Plumbing work would have been in the year after acquisition.

It appears that the remodeling, whatever it might have been, may have been done without a permit. No record of plans, specifications, or contracts for the alleged improvements, renovations, and remodeling have been provided. It is not known if there was a contractor, or if it was licensed. Construction was reportedly completed in mid-January - 2020. The timing is questionable as $1,500,000 of pre-construction and actual construction would likely have taken longer, even without Covid.

Di Wu was to prepare the Property for Vacation Rental based on his oral agreement with Ms. Zhang. He represented that there would be a cash flow of at least $100,000 per year. Presumably he meant after the Variable Expenses of rental, e.g., commissions, Vacation Rental Taxes, housekeeping, supplies, minor maintenance, and repairs. It is not clear what the Gross Rent and Extras would have to total in order to have a net cash flow of $100,000 or more.

Fixed Expenses such as Real Property Taxes, Insurance, Utilities, major Repairs, Maintenance and Replacements, would not normally be a rental expense as they, and other expenses, occur regardless of occupancy.

I assume that Insurance has been properly attended to for Ms. Zhang's protection.

-0-

The Property was listed by Di Wu with Airbnb, an International Marketer of B & B accommodations, Vacation Rentals, "Experiences" and other similar accommodations. Airbnb's self-description is similar to what is often referred to in the industry as a "Wholesaler", i.e., a company that "packages" accommodations, transportation and activities.

According to Google, "Airbnb is an American-San Francisco based company operating an online marketplace for short and long-term homestays and experiences."

According to its webpage, Airbnb.com represents properties throughout the world. Presumably, it spreads its marketing expense over a very large inventory of properties, giving its client properties exposure that individual property owners could not afford to duplicate. VRBO (Vacation Rental By Owner) is a competitor of Airbnb offering similar services and there are three or four other major players plus numerous smaller rental management companies, local and out of state, that specialize in Vacation Rentals[1].

Airbnb has encountered zoning issues and other problems according to news accounts; however, it has been successful in generating Vacation Rental Clients as the result of its range of offerings and market reach. It appears that it is particularly successful in reaching affluent prospects.

According to Mr. Tootell, Di Wu would obtain leads from Airbnb from other Short-Term Rental Properties permitted properties under his control and double-book. Then, he would redirect tenants to other properties, such as the Property, thereby avoiding the payment of commissions to Airbnb.

A prospective tenant would arrive only to find that the rental property promised was occupied.

Di Wu would offer other properties and invariably, rather than be "out on the street", the tenant would accept and avoid facing the uncertainty and time requirement to locate and negotiate a new arrangement. Di Wu's actions were similar to "Bait and Switch".

There were rentals during June and July 2021 according to the Deposition of Mr. Tootell, a former employee or associate of Di Wu. Mr. Tootell mentioned *"a gentleman by the name of Wen Sheng… I think four guests in total"*. When asked about the rent, Tootell stated "*It was $18,900 for Twila"…. "There was a lady, Erica, that was I believe $20,000…. Wen Sheng, I don't know…. then there was a guy Caesar also about $20,000…. So, I guess ballpark, I would say $20,000 as a – as a rough estimate, per each.*" The term of rentals was not mentioned in Mr. Tootell's Deposition.

It is assumed that there were "net proceeds". Reportedly, Di Wu was to be compensated with a 20% fee for his services. However, as noted, it is not clear which rental expenses were included

[1] My former Company, Chaney, Brooks, & Company owned a Vacation Rental Subsidiary known as Hawaiian Islands Resorts.

in his fee. There does not appear to be any detailed accounting maintained by Di Wu for these transactions.

-0-

Ms. Zhang has engaged Carlsmith Ball LLP to attempt to recover the Damages she has incurred based on Di Wu's activities. Attorneys John P. Manaut and Kai Wang are collaborating on the case. Ms. Wang heads the Greater China Practice Group within the Carlsmith Ball firm and speaks Mandarin.

From WeChat communication Di Wu had with Ms. Zhang, he would apply net proceeds from rental against the advances he made for the balance due on the purchase price at closing, the closing costs and the $180,000 renovation cost (that was approved by Ms. Zhang) for renovations.

-0-

Vacation Rentals have caused unrest among occupants in Residential Neighborhoods and Residential condominiums on Oahu. Numerous complaints have been filed with the City.

In response, the Honolulu City Council voted to increase the minimum term for rental from thirty (30) to ninety (90) days on April 26, 2022, i.e., almost three years after Ms. Zhang's acquisition of the Property on July 3, 2019. However, a Court Order temporally and then permanently enjoined implementation of the Ordinance. A Permanent Injunction was issued by the Court in December 2023. The minimum term for Short Term non-conforming Vacation Rentals in Residential Districts was, and is, thirty (30) days. That restriction would apply to the Property and does not require a Permit or *Certificate of Non-conforming Use*. State General Excise Tax of 4.5% is due, but other visitor accommodation taxes are not.

It is my understanding that the new Ordinance "Grandfathered" those non-confirming units operating as Short-Term Vacation Rentals prior to its enactment. No new Short Term Vacation Rentals would be permitted in Residential areas. Grandfather status is not transferable upon sale of the property. If a Short-Term rental is ceased, it may not restart later. Short Term Vacation Rentals are required to be register with the City. According to the DPP, the subject Property is not listed as "Grandfathered" and therefore, does not qualify for unlimited Short-Term Rentals.

-0-

The December 13, 2023, inspection focused on the interior, the area of the Property that likely would be most important to a short-term tenant, after the grandeur of the ocean view wore off.

The exterior and grounds appear to be in adequate condition and adequately maintained.

The interior layout, in my opinion, is functionally awkward and the floor plan is "chopped up". I consider the interior and furnishings as "Contemporary".
I would also call the furnishings observed during my inspection as "Minimalist"[2], i.e., sterile, devoid of furnishings and accessories that create a "luxury home-like" environment.

Reportedly, Di Wu removed accessories and art when he and his family moved out of the Property.

It is not known if the items removed were Di Wu's Personal Property or items purchased for the Vacation Rental. No inventory has been provided. In any event, the removal is likely to have adversely affected tenant satisfaction.

A meeting was held with the current Rental Agent, Eric Chen, of Hawaii USA Realty LLC on December 27, 2023. I determined prior to the meeting that Eric Chen and his company are licensed. Thompson Pham's company was the property manager after Di Wu's termination. Eric Chen took over after Thompson Pham's termination.

The "take-aways" from the meeting with Mr. Chen were as follows:

1. He was given no plans or records for the Property prior to the start date of his engagement.
2. He and his wife, who I gather is his Partner and Administrative Assistant, were faced with the major task of dealing with a substantial amount of Deferred Maintenance. The Deferred Maintenance required resolution before the Property could be rented.
3. The time required to complete the work required was such, that the first rental would start/started on December 31, 2023, and ended on January 29, 2024, pursuant to a thirty-day rental agreement booked though Airbnb. I have not seen Mr. Chen's Agreement with Airbnb or the Rental Agreement with the tenant.
4. Airbnb indicated to Mr. Chen that if the property was in top condition it would rent for $50,000 for thirty days. However, given the overall condition of the Property, the

[2] Minimalist - A Google definition is in part: "Stripped away excess."

assigned value was "discounted" by Airbnb to $20,000. I am assuming gross rent in both cases, i.e., including rental taxes and fees.

5. The rental rate of $20,000, apparently was a rounded number. I requested an accounting of the first rental, which Mr. Chen provided. The first tenant paid the following for a full 30-days:

| | |
|---|---|
| Base Rent | $16,000 |
| Cleaning Fee | $ 1,032 |
| Guest Service Fee | $ 1,815 |
| Property Use Taxes | $ 3,071 |
| **Total** | **$21,982** |
| **Say** | **$22,000** |

From the tenant's point of view, the cost of the rental was $21,982 or, $ 733 per night for thirty nights. Assuming three couples (six people) the nightly rate would be $733 or $122 per person per night. That rate would be considered very favorable when compared to a luxury hotel in Waikiki that would likely be $250 per person per night, or more, double occupancy.

It appears that Long Term Thirty-day Vacation Rentals are a legal use of the property; however, there remains an unanswered question regarding the need for the OCCL approval of use, given that the Property is in the P-1 Zoning District.

My call to OCCL resulted in a limited verbal indication that the Property was not registered, but that a full formal reply would require three months, due to their backlog.

If the Property was a legal transient accommodation/Short-Term rental, the "Property Use Taxes" are State General Excise Tax – 4.5% and Transient Accommodation Taxes 10.25% and City TAT 3.0%, would total of 17.75%. Property Use Taxes do not include Federal and State Income Taxes.

To obtain a rate of $50,000 for 30 days, Ms. Zhang would likely need to engage a Project Manager, Interior Designer, Architect and Contractor. She would need to invest in improvements, furnishings, accessories, and art.

Further, I assume that when applying for a Building Permit, some of the existing unpermitted work by Di Wu may have to be retroactively permitted. To the extent that Di Wu did work that is not Code Complaint, it too will likely have to be corrected. The cost of "Legalizing" the Property may require expenditures for missing Building Permits, penalties, interest, and all costs related to future work, in addition to lost time for rental during construction. It should be explored, estimated, and claimed as part of Damages. (See comments below)

Work that at one time may only have required a minor repair may have escalated to a major project. Design (plans and specifications) may be required. Permits take a notoriously long time in Honolulu. Construction will take time. All the time for these steps will likely be without rental income, adding to Ms. Zhang's Damages, i.e., added expense, and loss of income.

However, given that Ms. Zhang lives in China and there are limits on the transfer of funds out of her Country, "Legalizing" the Property may face additional roadblocks and delays.

My online check of the State's GET and TAT licensees reveals the following:

| | GET Tax No. | TAT Tax No. |
|---|---|---|
| Dandan Zhang | 021-983-3856-01 | 021-983-3856-01 |
| | 165-73502192-01 | |
| Di Wu | None found | None found |
| Great One LLC | 104807-0144-01 | 104807-0144-01 |
| Global Chain, Inc. | 008-500-9480-01 | None found |
| | 087-343-7696-01 | |
| Lani Iris LLC | 082-749-6448-01 | 082-749-6448-01 |

None of the people or entities listed above were found to have Real Estate licenses, based on a search of My PLV, Department of Commerce and Consumer Affairs ("DCCA") conducted on December 26, 2023.

The list of Licensees did not reflect the date of issue, the payment of taxes, the date of payments or the amounts paid. If General Excise Tax Returns can be obtained, they may contain information about the timing and amount of rents received.

-0-

To estimate the Rental Rate – I undertook to find Comparables ("Comps") advertised online. I looked at a sampling of *"Vacation Rentals – Kailua Hawaii"* online, scanning a seemingly endless list of individual rooms, studios, condominium units of various sizes, cottages, and single-family dwellings. The rates reviewed ranged from under $116 per night to over $10,000 per night. Most properties were in the $200 to $400 per night range. However, there were a number in the $1,200 to $1,500 per night range. Rates tended to reflect the size (sleeping

capacity) and quality of the properties. Amenities such as swimming pools, beach front and exceptional views also appeared to be a consideration.

-0-

As reported by Mr. Tootell, 127 Kakahiaka Street in Kailua was the original rental of the Property to the mother of one of three young male tenants for four nights at a rental rate of $18,000 per night. Di Wu was able to switch the double-booking to 1039 Koohoo Place for $18,900 for four nights with the mother's approval. That amounts to $4,725 per night or $1,575 per person per night. The rental was doubtfully legal and was reportedly very disruptive to the neighbors.

There are several hundred Vacation Rental properties listed on the internet. Many purport to be luxury units. Below is a sampling. In reviewing those listed below and others, I found that the rates charged for the Property were in line with other offerings, when adjusted for quality.

The properties listed below indicate the nightly rate. Most listings do not include the nightly rate.




The pictures and prices per night tend to indicate a much higher quality of property than 1039 Koohoo Place.

## Damages

In my opinion, there are two aspects of Damages in this case:

The first is based on the underlying permitted uses of the property.

All but a small portion of the Property (the driveway) is Zoned P-1 (Preservation). As noted, unlike all other zoning classifications on Oahu, permitted use in the Preservation Zone is controlled by the State of Hawaii.

Presumably, the State approved the construction of the original dwelling. The City and County of Honolulu controls Building Permits. Presumably the original dwelling had a Building Permit. City records suggest that the original four bedroom - five bath dwelling had the required approvals.

As noted, it is further assumed that the Property may be used for a rental for periods of thirty days, or longer without additional approvals, licenses or permits, other than a State General Excise Tax License. The dwelling could be rented for less than thirty-days, provided that there was only one rental in a thirty-day period.

Given the circumstances, it is not likely that Di Wu fully explained the legal limitations on rentals to Ms. Zhang. It is my understanding that Ms. Zhang speaks Mandarin and was in China the whole time, it is doubtful that she had a clear understanding of City and County of Honolulu Ordinances.

The range of rent/term possibilities is very broad, and the combinations are endless.

-0-

There are multiple problems with the oral agreements in this case. While I have no knowledge of Mandarin, it is my understanding from a Chinese friend who speaks a dialect of Chinese, that, like most languages, a word or phrase can have more than one meaning depending on context or inference. Further, translating English to Mandarin may also have multiple variations.

It appears that Di Wu took advantage of the circumstances and defrauded Ms. Zhang.

The following is a listing of other ways Di Wu defrauded Ms. Zhang:

1. It is not known if Di Wu has or had a business relationship with Mr. Liu that was undisclosed to Ms. Zhang. Did Di Wu compensate Mr. Liu in some way for the referral and endorsement?

2. It is not known to what extent Di Wu attempted to negotiate the sales price and terms of acquisition of the Property. Was the Property listed for sale and, if so, what was the listing price. While the reported purchase price of $1,800,000 appears to be attractive today, the market in 2018 was different and the condition of the Property was presumably very different, pre-renovation, i.e., older and dated. Any Brokers involved in the transaction should be able to describe the condition of the property at the time of the transaction. It is not clear, but there is an indication the Di Wu worked with a local Broker as the Buyer's Agent. The Buyer's Escrow Closing Statement indicates there was a $36,000 commission credit. Susan Martin, who served as buyer's broker, confirmed that.

3. A common practice is for Seller's and Buyer's Agents to share a six percent (6%) commission 50/50. Di Wu's Broker may have earned a three percent commission or $54,000. It appears that Di Wu receive an undisclosed portion of that commission

directly, or possibly as a credit against the Purchase Price which he now claims as part of his contribution to the purchase price to support his part ownership claim.

4. It is not known if there was an oral agreement between Di Wu and Ms. Zhang regarding advances reportedly made by Di Wu regarding the purchase price and closing costs. What is Ms. Zhang's understanding and did Di Wu comply?

5. There is no record of professional licenses held by Di Wu. He appears to have operated illegally. There is no known Rental Management Agreement as required by law.

6. Di Wu claims that he undertook to renovate the Property at a cost of $1,500,000. However, there are no known Design Contracts, Plans & Specification, Building Permits, Construction Contracts, or evidence of detailed supporting invoices, receipts, and payments. Based on the Deposition of Mr. Tootell, a onetime Di Wu associate, and my meeting with him, there was work done using materials of poor quality imported from China. Did Di Wu receive a fee or commission from the Chinese suppliers?

   The current floor plan of the Property is of questionable quality and functionality; practicality, including the open bathroom in the "studio".

7. The Property was reportedly not rented, or physically rentable during renovations or during Covid lockdown; however, there is no record of Project Management or the alleged renovation time schedule.

8. The Property did not have a "Grandfathered" Short Term Rental *Nonconforming Use Certificate* at the time of purchase in 2019. Even if a Certificate was in existence at one time, it was not assignable under City and County of Honolulu rules.

9. Reportedly Di Wu and his family occupied the "studio" for a period of time without any known oral or written agreement or payment of rent. Ms. Zhang says she did not approve him moving in or know he was living there. The amount of time is unknown. Reportedly there were some rentals during the time Di Wu and family lived in one area of the Property. Di Wu was not a "Host" under a B & B Permit.

   Given the likely sporadic rental of the Property, one must assume that Di Wu and family availed themselves of the entire Property, rent free, when not rented to a third party.

10. No rental records, i.e., income or expenses, have been provided. Di Wu was known to operate on a cash basis and even accept Crypto Currency in payment of rent[3].

11. My brief inspection of the Property and my brief meeting with Mr. Chen may only have exposed some of the problems related to the Property. A professional survey of the Property would likely reveal other Damages or potential Damages due to the lack of Di Wu's Due Diligence.

12. Given the above reported history of the Property during Di Wu's control, there is a distinct possibility that the Property has past, and current, use violations, lacks Building Permits and/or has building Code violations.

    As the result of Di Wu's activities, or failures, there may be unpaid expenses and the Property may be in violation of Laws, Ordinances or Codes for which the Property owner (Ms. Zhang) may ultimately be held responsible in the future.

13. It appears that Di Wu did not do a thorough job of Due Diligence and matters such as easements, driveway maintenance agreements, insurance, claims of Prescriptive Right by hikers and other matters may be lurking below the surface.

14. In my opinion, each of these actual or potential Damages, the cost of determining Damages in each case, plus Treble Damages, Interest and Legal Fees and Expenses should be pursued for Ms. Zhang.

Damages can in part be estimated based on rental income that could have been earned after completion of renovations, not including the lock-down period during the peak of the Covid Pandemic. The calculations below provide such an estimate.

To the extent that there were illegal Vacation rentals, Di Wu should not be allowed to benefit financially.

-0-

There are two primary considerations regarding the total or Gross Rent the Property could have generated, i.e., Rental Rate and Occupancy Rate. Marketing is also a major factor.

[3] Source: Jason Tootell

Rental Rates tend to vary based on the overall quality of the rental property, the seasonality of the Visitor Industry and uncontrollable events such as International Tensions, Economic events, severe weather events or other events.

Historically, Visitor arrivals have had two "Peak Seasons", i.e., February and August of each year. Low periods have been such times as the first two weeks of December, the first two weeks of January, May, early June, and September. Other times of year, sometimes referred to as "the Shoulder Season", have varying rates of occupancy. Occupancy is influenced by such things as long Holiday weekends, school vacation/holiday schedules, Mainland U.S. weather and other factors. Rates fluctuate with existing conditions.

Another factor affecting gross revenue is the extent to which a Vacation Rental Property is marketed. Rental companies, such as Airbnb can spread the cost of marketing over their large inventory of properties. The property might also be marketed though Wholesalers and/or Retail Travel Agents. The greater the amount of promotional activity, the higher the likelihood of increased occupancy and gross revenue.

-0-

Di Wu's reported removal of accessories upon vacating the dwelling after his eviction, raises the question regarding ownership of Personal Property. Removal has downgraded the appearance and appeal of the interior to the point that it does not, in my opinion, meet the standard of a luxury property. If the accessories were purchased for the dwelling, they have been wrongfully removed. Removal of furnishing may have contributed to Airbnb's substantial down grading of the Vacation Rental

Mr. Chen, the current Rental Agent, has indicated that he and his wife have spent a large amount of time attending Deferred Maintenance. He reported almost daily trips to the Property to attend to problems, allowing the Deferred Maintenance to accumulate, without owner knowledge or approval, is a dereliction of duty by Di Wu. One must wonder how Di Wu managed thirteen or more properties with only one known associate, Mr. Tootell.

Mr. Chen should be able to provide the financial and time delay information.

In the long run, Preventative Maintenance is typically less expensive than curing Deferred Maintenance. Di Wu's failure to properly maintain the Property has caused Ms. Zhang Damages in the amount paid out for repairs and maintenance. Like other issues, the rental income lost due to the delays, pending repairs, are part of Damages.

-0-

Di Wu used poor judgment in the purchase of items from China, which were of a poor quality. The question arises – "Did Di Wu receive a fee or commission on the furnishing that he purchased for the Property?" The result of poor quality has been the need for on-going maintenance, repair, and replacement, at a cost of time and money. To correct the deficiencies in a manner that will make the Property attractive as a Luxury Vacation Rental, Ms. Zhang will likely have to incur substantial future expenses and delay of rentals income.

If Ms. Zhang should desire to sell the Property, she, as the owner, will be required to make full disclosure by preparing a *Seller's Disclosure Statement* of known past and existing problems. The disclosure is required for Residential Property. Ms. Zhang's Broker will also be required to disclose problems.

Ms. Zhang may encounter problems due to what appears to be a lack of Building Permits for work undertaken by Di Wu. As noted, correcting the record, correcting physical elements not in compliance with Zoning or the Building Code, will be expensive and take time.

There may be grounds for Treble Damages. It appears that Di Wu did not provide Ms. Zhang with a written agreement to act as her Agent. Transactions involving Real Estate require i) a real estate license, ii) be in writing, iii) Agency Disclosure, and iv) care and competence, good conduct and following lawful instructions. Among other requirements, an Agent owes its Principle and accounting, loyalty, and avoidance of self-dealing. In my opinion, what appears to be illegal conduct by Di Wu should be punished.

-0-

Ms. Zhang acquired the Property on July 3, 2019. She engaged Di Wu to prepare it for Vacation Rental. The details of his efforts are unknown; however, reportedly he ordered materials from China and commenced a renovation. Developing a design and plan, placing the materials order and shipping would have taken, say, six months, i.e., until, say, the end of November 2019. Construction could have started in the interim.

During this same six-month time frame, Covid infections were discovered, and the consequences followed. The renovation was reportedly completed in January 2020.

Presumably Di Wu had concurrently been working on marketing in anticipation that the Property would be available in January 2020. However, adverse Covid related news continued to mount, and no doubt interfered with bookings.

In about mid-March 2020, Hawaii Governor Ige imposed a "lock down" for Residents and Visitors were told not to come to Hawaii. In retrospect, the "lock down" has been questioned due to its adverse impact on the Economy, school children and life in general.

Restrictions were lifted slowly in increments, albeit the priorities were frequently questioned. Vaccination was required in most cases. Masks and "Social Distancing" were ordered. Starting in about mid-May 2020 Residents were allowed out and about and Tourists were encouraged to visit as the need to restart the Economy became an urgent matter.

For the purpose of this Report, I assume that the Property was available for rent and physically ready to accept tenants that complied with restrictions by, say, June 1, 2020. I further assume that the Property was available for rent by Di Wu until his vacating the Property in July of 2023, a period of approximately thirty-eight months.

An effort to verify the timeline should be undertaken as the results may impact the estimate of Damages. Di Wu and his family's rent-free occupancy of the Property may have affected rentals. While the "studio" is more or less separate from the main dwelling, tenants paying substantial rent would likely object to the necessary sharing of common facilities with the occupants of the "studio".

The above timeline appears reasonable for the purpose of calculating potential rental income during the thirty-eight-month period. It is also reasonable to assume that even with the unexpected initial surge in visitor arrivals, it took some time for marketing to take effect.

Within the thirty-day legal rental limitation, the property could have been rented thirty-eight times. However, that was not likely. Assuming fifty percent of the allowed thirty-day rentals were utilized (19 rentals), and that the term of each rental was, say, either (1) one week at, say, $20,000 ($2,857 per night) or, (2) say, thirty- days at $20,000 ($667 per night), gross rental income could have been $380,000 for the thirty-eight months. The <u>average</u> would have been $120,000 per year ($10,000 average per mo. for 12 mos.). The range of Rates can be quite broad depending on advance bookings or the lack thereof.

Further assuming 80% to Ms. Zhang, she would have/could have received $96,000 per year. This amount would be consistent with what Di Wu indicated was achievable; however, it does not answer the question regarding which expenses were paid by Di Wu from his 20% share ($24,000) or how much Ms. Zhang netted. According to Ms. Zhang, Di Wu had represented to Ms. Zhang that he could accomplish those rental returns for her based on his experience and expertise, as her agent.

**In any event, this example suggests that Ms. Zhang is entitled to Damages of $380,000 (average $10,000 per month for 19 months.** That the amount is consistent with Di Wu's representations and fills the void in Di Wu's records. It gives full recognition to the possible effects of Covid. Therefore it would be hard for Di Wu to argue that the estimated amount is unreasonable. Based on my experience, a fair rental value for the entire property, assuming Di Wu actually performed what he represented he could accomplish according to Ms. Zhang, for a quick remedial work under a limited budget in order to make it rentable, and if it was rentable, could be an approximate rent of $380,000 i.e., Damages to Ms. Zhang. On the other hand, if Di Wu and family occupied the property for the thirty-eight months in question, at say, $5,000 per month, Di Wu will still owe $380,000.

**Conclusions:**

It is clear that Di Wu undertook to defraud and conceal material facts from Ms. Zhang. In addition, he failed to fulfill his fiduciary duties as a trusted agent handling this property for Ms. Zhang and failed to abide by applicable Laws and Ordinances.

Should Ms. Zhang decide to sell, she will likely face problems: First, she, and her Broker, are obliged to disclose past and known issues. It would appear difficult for Ms. Zhang to respond to questions about the Property with option "Not to my Knowledge". Her Broker also will have the legal duty to do Due Diligence and make disclosures.

It is highly likely that prospective buyers may choose to not purchase the Property and become embroiled with the City on matters of zoning violations, lack of permits and other matters. In short, the liquidity of the Property could decline. A prospective purchaser, willing to take on the task will likely seek a significant discount in the price, thus Damaging Ms. Zhang due to a loss of value.

The Buyer's Escrow Closing Statement indicates there was a $36,000 commission credit. Susan Martin, who served as buyer's broker, confirmed that.

Specifically, there does not appear to have been a professionally prepared floor plan and building design by a licensed Architect, with required input from other design professionals, including an Interior Designer for furnishings. There may be Building Code violations to correct. There does not appear to have been a Building Permit or a Final Inspection and Approval of work by a City Inspector. There may be past fees, penalties and interest. Past violations cause years of delay for Ms. Zhang and may haunt her or a successor in the future. There is little or no record of Building Permits. There is no record of a Contractor. To the contrary, Ms. Zhang is listed as "Owner Builder" by Di Wu, even though she was living in China and unable to travel to the United States due to Covid and/or other restrictions. It does not

appear that Di Wu obtained any Warranties from whomever may have performed work.

It is not possible to estimate the time and cost of correcting any of the illegal or unacceptable quality of work undertaken by or at the direction of Di Wu until the site has been inspected, non-compliance determined, a corrective plan is prepared, and estimates are obtain from contractors.

However, given the size of the dwelling, partial demolition required, correction of Zoning and Code violations and the quality expectations of Ms. Zhang based on Di Wu's representations, new renovations would likely require one (1) year to complete and cost, order of magnitude, $1.0 Million. This estimate attempts to consider 2025 future costs. The actual cost is unknown at this time.

The cost of bringing the property into compliance with Di Wu's representations to Ms. Zhang does not include the lost rental income during planning and renovation. As noted above, the lost net rental income, post Covid, is estimated at $380,000 for nineteen (19) months.

Assuming twelve (12) months out of service for construction and mobilization and an estimated 50% of allowable rentals, based on the thirty-day rule at $20,000 per occupancy, lost rental income would be an additional $120,000.

Damages under these assumptions would be $1,500,000, not including interest, legal expenses and Treble Damages, if awarded by the Court. Total estimated Damages, $4,500,000.

Specifically, there does not appear to have been a professionally prepared floor plan and building design by a licensed Architect, with required input from other design professionals, including an Interior Designer for furnishings. There may be Building Code violations to correct. There does not appear to have been a Building Permit or a Final Inspection and Approval of work by a City Inspector. There may be past fees, penalties and interest. Past violations have caused years of delay for Ms. Zhang and may haunt her or a successor in the future.

There is little or no record of Building Permits. There is no record of a Contractor. To the contrary, Ms. Zhang is listed as "Owner Builder" by Di Wu, despite the fact that even though she was living in China and unable to travel to the United States due to Covid and/or other restrictions. It does not appear that Di Wu obtained any Warranties from whomever may have performed whatever work may have been done.

It is not possible to estimate the time and cost of correcting any of the illegal or unacceptable quality of work undertaken by or at the direction of Di Wu until the site has been inspected, non-compliance determined, a corrective plan is prepared, and estimates are obtain from contractors.

However, given the size of the dwelling, partial demolition required, correction of Zoning and Code violations and the quality expectations of Ms. Zhang based on Di Wu's representations, new renovations would likely require one (1) year to complete and cost, order of magnitude, $1.0 Million. This estimate attempts to consider 2025 future costs.

The cost of bringing the property into compliance with Di Wu's representations to Ms. Zhang does not include the lost rental income during planning and renovation. As noted above, the lost net rental income, post Covid, is estimated at $380,000 for nineteen (19) months based on 50% of allowable-rentals.

Assuming twelve (12) months out of service for construction and mobilization and an estimated 50% of allowable rentals, based on the thirty-day rule at $20,000 per occupancy, lost rental income would be an additional $120,000. Damages under these assumptions would be $1,500,000, not including interest, legal expenses and Treble Damages, if awarded by the Court. Total estimated Damages, $4,500,000.

-0-

Attached is my Consultant's Profile. I was previously President of Chaney Brooks & Company ("CBC"). CBC had a Vacation Rental subsidy, Hawaiian Island Resorts, Inc. We managed about 2,000 Vacation Rentals located in the major resort vacation destinations statewide. Most were condominium units. Approximately one third of our inventory was in multi-unit properties with Rental Pools. The Pools operated more or less like hotels. The balance were mostly single units that operated individually.

The sources of information about the subject case are extremely limited. It appears that the records of transactions related to the Property during its management by Defendant Di Wu are either non-existent or have been destroyed or are being withheld.

The information herein and my conclusions and opinions are subject to change when and if records or evidence to the contrary emerges.

My opinions and conclusions are based on a reasonable degree of probability.

I am not an attorney. My comments regarding the law reflect my understandings but are not intended to be legal opinions. I am a Licensed Real Estate Broker and aware of the laws related to Real Estate and Property Management.

Thank you for the opportunity to be of assistance in this matter, please contact me to discuss reasoning and conclusions if you have any questions.

Yours truly

Wendell F. Brooks, Jr.
CPM, CRE & Broker/Realtor

Enclosure

# Wendell F. Brooks, Jr.

## Consultant's Profile

Wendell F. Brooks, Jr. is a fifth-generation resident of Honolulu with a long career in real estate and business in Hawaii. Educated at Punahou School, Oregon State College and the University of California, Brooks began his real estate career in 1959 with Bishop Trust Company. He has held the following executive positions:

| | | |
|---|---|---|
| Aaron M. Chaney, Inc. | Vice President | 1963-1968 |
| Castle & Cooke | | |
| Mililani Town, Inc. | President | 1968-1977 |
| Oceanic Properties. Inc. | Executive V.P. | 1974-1977 |
| Wailea Dev. Company | General Manager | 1977-1980 |
| Chaney, Brooks & Company | President and CEO | 1980-1993 |
| Kamehameha Schools | CIO | 2000-2001 |
| Kahala Nui Senior Living | Acting President | 2005 |

Since 2001 he has practiced as *Wendell F. Brooks, Jr., Real Estate & Business Consultant*. He is a licensed Real Estate Broker/Realtor and Certified Property Manager. Brooks has been responsible for the development of large-scale real estate projects including the 3,500-acre "new community" Mililani Town in Central Oahu, the 5,000-acre second home development known as the Sea Ranch in Northern California, Wailea, a 1,400-acre resort on Maui and other smaller projects.

Brooks' development experience includes over 4,000 residential units of various types, commercial properties, and resort amenities. For thirteen years he was the President of Chaney, Brooks & Company, at the time largest association management and property management company in Hawaii, and a top three commercial brokerage.

As Chief Investment Officer for Kamehameha Schools (Bernice Pauahi Bishop Estate), Brooks was part of the team that established a CEO-base management system after the ouster of the "former Trustees.
He was responsible for the Trust's portfolio of financial and real estate assets valued at $6.0 Billion.
Brooks has successfully managed large companies, complex projects and has provided Brokerage services.

He has provided Consulting and Asset Management services to clients from Australia, Hong Kong, Japan. Guam, Philippines, South Pacific and the Mainland U.S. Assignments have included Feasibility Studies, Strategic Plans, work-out Management, Development and Financial Analysis. He serves as an Expert Witness on selected subjects and as a Court appointed Receiver, Commissioner and Trustee.

Professional Organizations include Counselors of Real Estate - C.R.E; Institute of Real Estate Management - C.P.M; Hawaii Association of Realtors-President 1972 and Lambda Alpha International.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br><br>Plaintiff/Counterclaim Defendant<br><br>vs.<br><br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br><br>Defendants/Counterclaimant | CIVIL NO. 1CCV-22-0000964 (DEO)<br><br>NOTICE OF HEARING MOTION |

**NOTICE OF HEARING MOTION**

TO: DI Wu
2943 Parkway Blvd, Unit 222
Salt Lake City, UT 84119

Email:
PacificHale@gmail.com
Difinity812@gmail.com

DI WU
*Pro Se* Plaintiff

NOTICE IS HEREBY GIVEN that Defendant Dan Dan Zhang aka Dandan Zhang's MOTION FOR SUMMARY JUDGMENT shall come on for hearing in person before the Honorable Dean E. Ochiai, Judge of the above entitled Court, in his courtroom in the Circuit Court of the First Circuit, 7th Division, State of Hawai'i, located at Ka'ahumanu Hale, 777 Punchbowl Street, Honolulu, Hawaii 96813, on September 23, 2024, at 8:30 o'clock, a.m., or as soon thereafter as counsel can be heard.

DATED: Honolulu, Hawai'i, August 30, 2024.

*/s/ John P. Manaut*

JOHN P. MANAUT
STEVEN M. EGESDAL
KAI WANG

Attorneys for Defendant/Counterclaimant
DAN DAN ZHANG AKA DANDAN ZHANG

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| DI WU<br>Plaintiff/Counterclaim Defendant<br>vs.<br>DAN DAN ZHANG AKA DANDAN ZHANG; JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10; AND ALL PERSONS UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN SAID REAL PROPERTY DESCRIBED IN THIS COMPLAINT,<br>Defendants/Counterclaimant | Civil No. 1CCV-22-0000964 (DEO)<br><br>CERTIFICATE OF SERVICE |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated below, a true and correct copy of the foregoing document will be duly served on the following parties via *JEFS* and email as follows:

**Di Wu**
2943 Parkway Blvd, Unit 222
Salt Lake City, UT 84119

Email:
PacificHale@gmail.com
Difinity812@gmail.com

*Pro Se* Plaintiff

DATED: Honolulu, Hawai'i, August 30, 2024.

*/s/ John P. Manaut*
JOHN P. MANAUT
STEVEN M. EGESDAL
KAI WANG

Attorneys for Defendant/Counterclaimant
DAN DAN ZHANG AKA DANDAN ZHANG